```
J6SPGITC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LORRAINE A. GITTENS-BRIDGES,

                Plaintiff,

           v.                                19 CV 272 (ER)

CITY OF NEW YORK, ET AL.,

                Defendants.

------------------------------x
                                            New York, N.Y.
                                            June 28, 2019
                                            10:39 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                            District Judge

                         APPEARANCES

LAW OFFICES OF SPECIAL HAGAN
     Attorney for Plaintiff
BY:  SPECIAL HAGAN


NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants, City of New York, New York City
Department of Corrections, Garland Baretto, Audwin Pemberton,
Nadene Pinnock and Claudette Wynter
BY:  NATALIE SHARON MARCUS
```

1           (In open court)

2           (Case called)

3           MS. HAGAN:  Special Hagan for plaintiff, Lorraine

4   Gittens.  Good morning, your Honor.

5           THE COURT:  Good morning.

6           MS. MARCUS:  Good morning, your Honor.  Natalie Marcus

7   from the New York City Law Department on behalf of the City of

8   New York, New York City Department of Corrections, Garland

9   Baretto, Audwin Pemberton, Nadene Pinnock and Claudette Wynter.

10          THE COURT:  Thank you.  Ms. Marcus, good morning to

11  you.  I would ask that you please keep your voice up.

12          This matter is on for a pre-motion conference at the

13  request of the defendants.  So, Ms. Marcus, I'll turn to you

14  first.  Tell me why it is that you believe a motion to dismiss

15  would be appropriate at this time.  If you could bring the

16  microphone closer to you.

17          MS. MARCUS:  Yes, your Honor.

18          THE COURT:  You can remain seated, too.

19          MS. MARCUS:  Well, your Honor, as the defendants

20  outlined in their pre-motion letter, there are multiple grounds

21  to dismiss this complaint.  The first one is there are

22  time-barred issues.  The complaint alleges that the plaintiff

23  was denied promotions going back to the 2014, and under the

24  statute of limitations under the ADEA, the 14th Amendment

25  Section 1983.

1    THE COURT REPORTER: I'm sorry, counsel. Can you
2    bring the microphone closer, please.
3    MS. MARCUS: I apologize.
4    THE COURT REPORTER: Thank you.
5    MS. MARCUS: Your Honor, as the letter outlines, the
6    complaint alleges denial of promotions going back to 2014, and
7    those are clearly time barred under the ADEA, given when the
8    plaintiff filed her charge with the EEOC.
9    So as an initial matter, those claims, the failure to
10   promote claims from 2014 and 2015 and part of 2016 are time
11   barred.
12   THE COURT: Okay.
13   MS. MARCUS: The same holds true for certain
14   retaliation claims are time barred, given the time period of
15   when they happened. For example, the complaint alleges
16   supposed retaliation in 015, which is also time barred under
17   the same statute of limitations issue.
18   Then going to the merits of the complaint, with
19   respect to the discrimination claims, the complaint has failed
20   to establish a plausible inference of discrimination. For
21   example, the complaint repeatedly alleges that she was
22   denied -- plaintiff was denied a promotion based on younger and
23   less-experienced employees pertaining to the position. But the
24   case law is clear, merely alleging that a person was younger
25   and less experienced is not enough to establish an inference of

J6SPGITC

discrimination.

With respect to the plaintiff's disparate impact claim, plaintiff must allege a facially neutral employment policy or practice that has a significant disparate impact. As we mentioned in the letter briefly, that plaintiff has failed to identify a facially neutral employment policy, much less one that has had a significant disparate impact on the employees in the category of being over the age of 40.

THE COURT: Okay.

MS. MARCUS: Also, with respect to the retaliation claim, aside from the time-bar issues, there are also issues regarding plaintiff has failed to allege a causal connection between the protected activity and the adverse action.

For example, plaintiff alleges in October 2017 she filed an EEOC charge of discrimination, and then alleges that in August 2018 she had some type of adverse action. Now, we dispute that that actually was an adverse action, but as a simple example, you can't have eight months to establish a causal connection between purported protected activity and supposed adverse action. Eight months is simply too large a time span. The courts have established two months as being the outlier in order to establish a causal connection.

THE COURT: And what was the adverse action?

MS. MARCUS: Plaintiff contends that there was -- she was provided some tasks and standards that she -- I'm not

J6SPGITC

conceding that that was an adverse action, but in the complaint it's alleged as an adverse action, that she received some tasks and standard that were below her Civil Service title.

It's unclear to me, frankly, how that is an actually is an adverse action. I don't believe it is, but given the eight-month time span, it really can't serve as a retaliatory action for something that happened eight months prior.

THE COURT: Okay.

MS. MARCUS: And then with respect to plaintiff's hostile work environment claim, she's also failed to allege that the workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the terms and conditions of her employment.

Repeatedly alleging in her complaint that somebody was harassed without detail is not sufficient to allege a hostile work environment.

THE COURT: Okay. Ms. Hagan, let me turn to you. You read the government's letter -- or the city's letter, and the reason I have these pre-motion conferences is to determine whether or not we can do something short of full-blown motion practice. I know that you have amended this complaint one time prior, but now that you have the city's letter, do you believe that you can further amend the complaint in a fashion that would address some of these alleged deficiencies?

1          MS. HAGAN:  I mean, I guess I could, but I would
2  disagree with the position as to the viability of these claims
3  that they're challenging.
4          THE COURT:  What about the time bar?
5          MS. HAGAN:  The time bar, you know, I would cite a
6  reference to continuing violations, actually.  We are alleging
7  that Ms. Gittens has applied to at least 17 different positions
8  and that she really didn't become aware that she -- in fact,
9  Ms. Gittens she didn't become aware that she was being passed
10 over in writing until August of 2016.
11         THE COURT:  She was being passed over in writing?
12         MS. HAGAN:  Well, you know, basically what happened is
13 there was established eligible lists for the examination.  She
14 was, I guess, maybe No. 13 out of the 17, I guess passing
15 scores for the Department of Corrections.  She was repeatedly
16 passed over for any number of positions, and we kind of list
17 them in the complaint.
18         THE COURT:  But every time she was passed over, she
19 was aware of it, correct?
20         MS. HAGAN:  Not necessarily.  I mean, it wasn't
21 official.  They would change the position.  They would change
22 the names of the positions.  It wasn't -- you know, it would
23 be --
24         THE COURT:  Well, she knew that she wasn't promoted.
25         MS. HAGAN:  She wasn't -- there were different

1     vacancies that arose in the agency itself, and under Long

2     Beach, what happened is instead of hiring provisionals, they

3     would have to fill the positions with civil servants.  But what

4     DOC would do instead is that they would designate these various

5     positions, and I guess kind of like amorphous titles and they

6     would hire these provisionals and, as a result, people who were

7     like Ms. Gittens, who were long-standing civil servants, were

8     actually passed over for these positions.  They would change

9     titles so they would not have to be required to hire civil

10    servants, and I'm not sure if that was necessarily conveyed as

11    clearly.

12              THE COURT:  The city was doing this in order to

13    discriminate against one Lorraine Gittens-Bridges?

14              MS. HAGAN:  Not necessarily just one person.  There

15    was an ongoing policy that -- the plaintiff alleges that the

16    DOC, specifically the named defendants, had in place where they

17    did not want to hire or promote people who had been at DOC for

18    more than 20 years, who were of retirement age, and that's

19    basically some of the crux of plaintiff's allegations in this

20    case.

21              THE COURT:  I'm sorry, there was a policy about that?

22              MS. HAGAN:  Well, you know, you had statements made by

23    one of the defendants that:  We want to get rid of the old

24    people; that the people here we're trying to -- you know, there

25    were a number of discriminatory statements that were made by

the defendants that, basically, articulated their policy.

They did not want to hire these older employees or put them in positions of, you know, authority or prestige within the agency. And what we are alleging is that any number of employees who were similarly situated to Ms. Gittens were treated the same way. The complaint is rife with allegations of various employees, like Aida Jackson, at least a half a dozen people who were basically harassed, pushed out of the agency by the named defendants.

So I'm not quite sure why the defendants are saying that there aren't any allegations of disparate treatment or disparate impact in the actual complaint itself. I think the 49-page complaint kind of lists in detail the various similarly situated employees who experienced similar treatment or mistreatment to Ms. Gittens.

THE COURT: Okay.

MS. HAGAN: And I guess as far as the continuing violation doctrine, in support of our plaintiff's position, we would cite *Harris v. The City of New York*. It basically goes into how these allegations don't necessarily ripen until the person is actually aware, and what we are alleging --

THE COURT: How was she not aware that she wasn't promoted when you allege that she applied for 17 different positions and didn't get any?

MS. HAGAN: Well, she applied for different positions,

J6SPGITC

1    but they would change the titles to the positions.  So for
2    example, she --
3             THE COURT:  But she still wasn't promoted.
4             MS. HAGAN:  Well, there's one thing to be promoted,
5    and another thing to be hired for a different position.
6             THE COURT:  Yes, but let's use the same -- I'm not
7    making a distinction between the two.
8             MS. HAGAN:  Okay.  Well, she wasn't actually given
9    written confirmation that she was being passed over until, I
10   would say, August -- until, I guess -- not August.  We had, I
11   think it was, June.
12            THE COURT:  Did she not know that other -- aren't you
13   alleging that other people were hired?
14            MS. HAGAN:  She was aware of it because she was in HR,
15   but she wasn't necessarily --
16            THE COURT:  Oh, she was in HR?
17            MS. HAGAN:  She was in HR, but it -- again, it wasn't
18   like a confirmed because exactly -- you had different titles to
19   these positions.  So like, for example --
20            THE COURT:  But she knew that, right?
21            MS. HAGAN:  Well, it wasn't -- I mean, it's one thing
22   to say, okay, I know this is what's happening and another thing
23   for it to officially happen.  Like, for example, if she applied
24   for the director of HR.  Let's just use that example.
25            THE COURT:  Okay.

J6SPGITC

         MS. HAGAN:  She applied for director of HR, what DOC might do is say, oh, this is an assistant commissioner right now position, and we're going to fill it with an assistant commissioner rather than a director of HR.

         THE COURT:  And that would happen?

         MS. HAGAN:  Yes.

         THE COURT:  And she knew that?

         MS. HAGAN:  Well, I don't know if she necessarily knew for certain that that's what was going on.  She can allege that was what was going on.  It wasn't a written policy, per se, but she knew on that level, but it wasn't until late down the line that it was confirmed in writing.

         THE COURT:  Okay.  Four weeks to make the motion?

         MS. HAGAN:  Your Honor, can I interject?

         THE COURT:  Sure.

         MS. HAGAN:  Now, there are prescribed timelines as to when things should happen in these cases.  Like, as far as, like, pre-motion -- as far as scheduling orders and, I would say scheduling orders and just in general, as far as discovery is concerned.

         And in this instance, I would find it hard to believe that all of these claims would be dismissed.  And it seems as if this would be somewhat of a dilatory tactic on the part of the city to engage in motion practice.

         I may not necessarily be articulating every point, but

1    this is a 49-page complaint that's rife with details, and I
2    would find it hard to believe that every one of these claims
3    are going to be dismissed.  I would think that, you know, in
4    the interim, that we should at least be developing some kind of
5    scheduling order so that it's not like we're starting as if the
6    case just started once these various -- once this motion is
7    fully briefed and decided.
8             THE COURT:  Have you engaged in initial discovery?
9             MS. HAGAN:  No, not at all.  We haven't done anything.
10            THE COURT:  Okay.  Ms. Marcus?
11            MS. MARCUS:  Well, your Honor, just to start out, the
12   reason we asked to stay discovery is, given the time-bar issues
13   with certain promotions, for example, in 2014, the plaintiff
14   alleges in the complaint that she applied for a position and
15   that another person received the promotion.  So clearly, she
16   was on notice at that point, in 2014, that she wasn't promoted
17   and that that would be time barred because -- that would be our
18   position anyway.
19            And given the outcome of whatever the motion to
20   dismiss, whether it be the entirety or limiting the scope of
21   the complaint, that would prevent doing this much broader
22   discovery for time-barred claims.  If we move forward with
23   discovery at this point, we would possibly be going into claims
24   that are going to be dismissed by your Honor, and that's why we
25   sought a stay of discovery, in order to not go into -- you

1 know, expend resources that are unnecessary.

2 THE COURT: Are you intending to move to dismiss the
3 entire complaint or just partial?

4 MS. MARCUS: No, the entire complaint. So our
5 position is the whole complaint should be dismissed, your
6 Honor, but one example is the time-bar issue, which is just
7 clearly -- you know, I don't know what your Honor is going to
8 do.

9 Our position is I believe the complaint should be
10 dismissed in its entirety, and depending on the outcome of the
11 motion, either the complaint will be dismissed and that will be
12 the end of the matter, or if the claims are limited in time, we
13 will at least have a narrower scope of discovery.

14 THE COURT: Okay. Four weeks to --

15 MS. HAGAN: Your Honor?

16 MS. MARCUS: I'm sorry, your Honor, about the time
17 period?

18 THE COURT: Sure.

19 MS. MARCUS: Given, as I mentioned in the letter, I'm
20 taking a vacation. Could I have until August 7th, which is one
21 extra week?

22 THE COURT: Okay.

23 MS. MARCUS: Thank you.

24 MS. HAGAN: Your Honor, may I interject?

25 THE COURT: Sure.

MS. HAGAN:  Defendants are going on about the time-bar issue, but of course, National Railroad allows at least, I guess, events outside of the statutory period to be used as background information.  That's to begin with.

THE COURT:  Sure.

MS. HAGAN:  On top of that, it's clear that there are allegations sufficient to meet Rule 8 of the Federal Rules of Civil Procedure, as far as the plaintiff's simple statements of the pleadings in terms of disparate treatment, specifically, disparate impact.

We're talking about a retaliation.  In fact, the way the retaliation claim was presented to your Honor wasn't exactly accurate.  There are at least two instances of protected activity that's referenced in the complaint.  One, for example, would involve the EEOC charge that my client filed in October of 2017, which is paragraph 281 of the complaint. We allege that in December of 2017, there were false or manufactured disciplinary actions put underway by her immediate supervisor.

So even though we don't necessarily agree with counsel's, I guess, framing of what would be considered the, I guess, permissible time frame for showing causation, the Second Circuit hasn't really actually clearly defined what would be permissible for purposes of temporal proximity, specifically citing the Kopstick position, which basically lays out

1   perhaps --
2           THE COURT:  But the Second Circuit has suggested that
3   beyond two months --
4           MS. HAGAN:  Right.
5           THE COURT:  -- you are getting away from that
6   presumption.
7           MS. HAGAN:  Exactly, but the defendants just argued
8   today that two months was the actual, you know, fixed time,
9   where you have, you know, decisions that clearly expand that
10  time frame.  So, you know, clearly, the complaint is -- I'm not
11  saying that you're going to find a certain way, but as far as
12  Rule 8 is concerned, plaintiff respectfully argues that there's
13  enough in this complaint that it's not going to be entirely
14  dismissed.
15          I'm saying that you are deciding any given way, your
16  Honor, but to kind of make a bold statement that all of the
17  claims in this 49-page complaint are going to be thrown out is
18  somewhat bold.  And to a certain degree, even if you were to
19  narrow the time frame for which plaintiff could recover, ESI
20  searches are permitted probably within the five-year term.
21          We are in 2019.  We're probably, at best, going back
22  to 2014, regardless of whether or not you narrow the time frame
23  from 2016 to 2019.  So you're looking at, let's say, two years
24  before 2016, which would still be 2014, and perhaps up until
25  present time.

1   So I don't believe that even if we -- if some of the
2   time-bar issues were not resolved in plaintiff's favor, that
3   the timeframe would be so narrowly restricted by your Honor's
4   determination, that the time frame would be different for,
5   let's say, any discovery to be started.  So that's plaintiff's
6   argument, respectfully, and it just appears that it would make
7   sense to at least have some kind of scheduling together, some
8   kind of exchange.  We haven't even done 26(a)(1) disclosures at
9   this point.
10              THE COURT:  Why don't you do that, then.
11              MS. HAGAN:  We can do 26 -- thank you.  The 26(a)(1)
12   disclosure, the HIPAA releases, and perhaps some kind of 26(f)
13   tentative pre-scheduling order.  That's all I have been asking
14   for in the interim.
15              THE COURT:  Okay.  So why don't you do the 26(a)
16   disclosures.
17              Four weeks after August 7, Ms. Hagan, to respond?
18              MS. HAGAN:  That's fine.
19              THE COURT:  And then two weeks to reply.
20              MS. HAGAN:  And will the 26(f) scheduling order, do
21   you want us to actually do that?
22              THE COURT:  Yes.  Why don't you that, put together and
23   submit something for me to endorse.
24              MS. HAGAN:  And when would you like that?
25              THE COURT:  What's today, Friday?

J6SPGITC

MS. HAGAN:  Yes.

THE COURT:  End of day Tuesday.

MS. HAGAN:  Tuesday.  Okay.

THE COURT:  Yes.

MS. HAGAN:  Thank you.

THE COURT:  Okay.  We're adjourned.

MS. HAGAN:  Thank you.

THE COURT:  Thank you, folks.

(Adjourned)