**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LORRAINE A. GITTENS-BRIDGES,

        Plaintiff,

        -against-

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION; GARLAND
BARRETO; AUDWIN PEMBERTON; NADENE
PINNOCK; DINA SIMON; and CLAUDETTE
WYNTER , in their official and individual capacities
and as aiders and abettors

        Defendants.

**SECOND AMENDED**
**COMPLAINT**

**19-cv-00272**

**JURY TRIAL DEMAND**

        PLAINTIFF, LORRAINE A. GITTENS BRIDGES ("GITTENS" or "PLAINTIFF") by

and through her attorney, SPECIAL HAGAN, ESQ.,  complains of Defendants:  The City of

New York ("CITY")/ NEW YORK CITY DEPARTMENT OF CORRECTION("DOC"));

GARLAND "TOI" BARRETO ("BARRETO"); AUDWIN PEMBERTON ("PEMBERTON");

NADENE PINNOCK("PINNOCK"); DINA SIMON ("SIMON"); and CLAUDETTE WYNTER

("WYNTER"), in their official and individual capacities and as aiders and abettors.


## I.    INTRODUCTORY STATEMENT

1. This is an action for injunctive relief, declaratory judgment, equitable relief, money damages
   and punitive damages on behalf of PLAINTIFF, LORRAINE A. GITTENS-BRIDGES
   (GITTENS).  GITTENS contends that she is experiencing a continuing violation of her rights
   and an ongoing hostile work environment based on her age.

2. PLAINTIFF contends that DEFENDANT, GARLAND BARRETO (BARRETO), has engaged in an ongoing campaign to thwart her efforts to advance within DOC under various managers based on her age.

3. PLAINTIFF filed a charge of discrimination with the EEOC on October 20, 2017.  Therefore since she also brings claims under § 1983, the NYSHRL and NYCHRL the petition herein seeks relief for events stemming from August 2014 onward.

4. GITTENS contends that the CITY and DOC have a widespread policy of discriminating against older workers in terms of promotions and job opportunities.  Plaintiff alleges that the overall objective of the CITY and named defendants  is to force out older civil servants and replace them with younger employees.  In support of this allegation, PLAINTIFF references a comment made by Mayor De Blasio: "It is a known fact that there is a hyper-complaint dynamic -sometimes for the wrong reasons."[1]  Consistent with this sentiment, the CITY, DOI and DOC specifically have an ongoing policy or custom of failing to investigate complaints of discrimination; they also have a policy or custom of retaliating against employees who complain.

5. PLAINTIFF alleges that CITY, DOI and or DOC failed to investigate DOC employees' collective complaint of cronyism, nepotism and age discrimination.  GITTENS alleges that DOC employees compiled a list of hires by DEFENDANTS that were rooted in age based animus, cronyism and nepotism. GITTENS alleges that upon receipt of this complaint that the CITY, DOI and or DOC failed to investigate and or act.

---

[1] "Mayor de Blasio:  Many City Workers' Complaints Not Real,"  by Linda Schmidt, Fox5 News,  April 25, 2018.  http://www.fox5ny.com/news/mayor-false-complaints.

6.  PLAINTIFF contends that she has been repeatedly passed over for positions within the agency in violation of the civil service law because of her age.  GITTENS also contends that she has experienced disparate treatment and disparate pay, and that the discrimination she has experienced is indicative of the agency's policy of discriminating on the basis of age.

7.  GITTENS contends that DOC and the named Defendants have engaged in these practices to the detriment of all older civil service employees with over 20 years of experience at DOC. PLAINTIFF contends that in violation of her rights under the ADEA and the First Amendment, that Defendants retaliated when she and other DOC employees have spoken out against age discrimination.  GITTENS contends that DOC/CITY and named Defendants have a policy or custom of retaliating against employees who complain of discrimination and cronyism under the First Amendment.

8.  During the time relevant, CLAUDETTE WYNTER, NADENE PINNOCK  and DINA SIMON have engaged in rampant cronyism and age discrimination.  The named defendants have engaged in cronyism and nepotism in the hiring and promotion processes to the detriment and disparate impact of employees over the age of 40 at the agency; specifically those DOC employees who have worked at DOC for over 20 years and who are of retirement age.

9.  Within weeks of her protected activities, PLAINTIFF contends that she experienced retaliation when she complained of this disparate treatment and discrimination. DEFENDANTS unlawfully assigned her work to other employees, attempted to write her up, openly plotted to get rid of PLAINTIFF in front of her colleagues and marginalized her.

10. GITTENS complained of discrimination to  CLAUDETTE WYNTER (WYNTER), NADENE PINNOCK (PINNOCK) and DINA SIMON (SIMON) -to no avail.  Instead,

WYNTER, PINNOCK and SIMON have retaliated against PLAINTIFF and other DOC

employees who have complained about pay disparities, cronyism and nepotism.

11. WYNTER, PINNOCK, and SIMON have engaged in an ongoing campaign to marginalize

and or force older employees to retire from the agency by reducing their responsibilities,

denying them job opportunities, and by repeatedly passing them over for promotions.

12. PLAINTIFF alleges that the terms, conditions and privileges of her employment relationship

with Defendants have been adversely affected under:  the  1st and 14th Amendments of the

United States Constitution; the Age Discrimination in Employment Act, 29 U.S.C.A. § 621

et. seq. ("ADEA"); 42 U.S. C. §§ 1983 and 1988; the New York State Human Rights Law as

contained in New York Executive Law § 296 et. seq. ("NYSHRL"); the New York City

Human Rights Law 8-107(1) et. seq. ("NYCHRL"); and N.Y. Civ. Serv. Law § 61.

13. Accordingly, this action is being brought to vindicate PLAINTIFF'S human and civil rights

under the law. This action is also being brought on behalf of other similarly situated

employees who have been repeatedly passed over for positions and promotions because of

their age, cronyism and nepotism and who have experienced retaliation for speaking out

against these policies and customs.

## II.      JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to §§ 1331 and 1343 to secure protection

of and to redress the deprivation of rights secured by: the ADEA; 42 U.S.C. §§ 1983 and

1988; and the 1st and 14th Amendments of the United States Constitution.

15. This Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over

the PLAINTIFF'S state and city law claims arising under the New York State Executive Law

and the New York City Administrative Code respectively, because the PLAINTIFF'S

federal, state and city claims derive from a common nucleus of operative facts and form part of the same case or controversy.

16. PLAINTIFF's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201 and 2202.

### III.   PROCEDURAL REQUIREMENTS

17. PLAINTIFF filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") on or about October 20, 2017.  PLAINTIFF received a notice dated October 11, 2018 of her "Right to Sue" in the United States District Court; this notice thereby permits Plaintiff to bring this action.

18. Pursuant to § 8-502(c) of the Administrative Code of the City of New York, copies of this Complaint have been served upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

### IV.   PARTIES

19. GITTENS is 57 years old.

20. PLAINTIFF has been continuously employed by the CITY/DOC from 1986 to present; PLAINTIFF has worked for the CITY/DOC for over 33 years.

21. At all times mentioned herein, PLAINTIFF is an employee within the meaning of the ADEA and is protected against discrimination in employment on the basis of her age.

22. GITTENS is a resident of the State and City of New York.

23. GITTENS's current civil service title is Associate Staff Analyst and her current salary is approximately $83,233.

24. Due to Defendants' discriminatory and retaliatory actions, GITTENS has not been placed in the permanent civil service title for which she is eligible: Administrative Staff Analyst.

25. PLAINTIFF took and passed the civil service examination for the Administrative Staff Analyst position and was the only DOC employee who passed the examination who was not picked up off of the eligible list.

26. GITTENS contends that the reasons that she was the only DOC employee not selected from the eligible list were her age and because of her complaints of discrimination and cronyism at the agency.

27. At all times mentioned herein, DEFENDANT/CITY is an employer within the meaning of the ADEA.  The CITY is a municipal corporation existing by virtue of the laws of the State of New York, and at all times relevant was PLAINTIFF's employer.

28. The CITY is liable for the discrimination suffered by PLAINTIFF and other similarly situated employees at the Department of Correction (DOC) over the age of 40.

29. The NEW YORK CITY DEPARTMENT OF CORRECTION ("DOC") is a New York City agency as defined by Chapter 25 of the New York City Charter.

30. DOC employs over 10,400 civilian and uniformed staff members.

31. The CITY/DOC maintain a policy, custom and or practice of discrimination based on age in the areas of compensation, promotions, employment opportunities and job titles.

32. The CITY/DOC and or the Department of Investigation (DOI) maintain a policy, custom and or practice of failing to investigate complaints of discrimination, malfeasance, waste, cronyism and or nepotism.

33. The CITY and or DOC maintain a policy, custom and or practice of retaliating against employees who file complaints of discrimination, cronyism and or waste.

34. The events alleged herein took place at: DOC's headquarters at 75-20 Astoria Boulevard, East Elmhurst, New York 11370, where PLAINTIFF was employed at all times relevant.

35. At all times relevant, DEFENDANT GARLAND "TOI" BARRETO ("BARRETO") was either Acting Deputy Commissioner or Director of Personnel Operations for the DOC/CITY.

36. At all times relevant to this cause of action BARRETO was either PLAINTIFF's direct or indirect supervisor, and therefore BARRETO directly and adversely affected PLAINTIFF'S terms and conditions of employment.

37. As GITTENS's indirect supervisor, BARRETO presided over and permitted a hostile work environment.

38. GITTENS was assaulted by a colleague in front of BARRETO, and BARRETO failed to act.

39. In fact, BARRETO, in writing denied the assault ever happened.

40. When GITTENS reported the assault to the police, BARRETO retaliated. To date, BARRETO has engaged in an ongoing defamatory vendetta against GITTENS.

41. BARRETO has defamed GITTENS every time she has gotten a new supervisor. BARRETO has maligned and defamed GITTENS to WYNTER, SIMON, PINNOCK and PEMBERTON.

42. On multiple occasions, BARRETO falsely told WYNTER, SIMON, PINNOCK and PEMBERTON that GITTENS was a poor performer and stated that she had "checked out" after she was assaulted by her former co-worker Dounia Alfred (ALFRED).

43. Due to BARRETO's defamatory statements, PLAINTIFF has repeatedly been denied job and promotional opportunities within the agency and at other city agencies.

44. BARRETO personally and directly participated in discriminating against and defaming PLAINTIFF throughout the agency.

45. DEFENDANT BARRETO is sued here both in her individual and official capacities; she is also being sued as an aider and abettor.

46. At all times relevant, DEFENDANT AUDWIN PEMBERTON ("PEMBERTON") was Director of Payroll and Timekeeping for the DOC/CITY.

47. At all times relevant Defendant PEMBERTON, served as PLAINTIFF'S direct supervisor. PEMBERTON also acted directly and personally in the allegations stated herein.

48. PEMBERTON treated older employees under his supervision in a disparate fashion in terms of job opportunities and pay.

49. PEMBERTON did not hire anyone under the age of 40 when he was PLAINTIFF's supervisor.

50. PEMBERTON rarely spoke to PLAINTIFF or anyone in her age group; and he retaliated against PLAINTIFF when she engaged in protected activities.

51. PEMBERTON also refused to assign tasks to older workers and PLAINTIFF that were within their job titles.  Specifically, PEMBERTON would assign tasks to older workers that were out of and beneath their job titles.

52. However, PEMBERTON regularly assigned younger workers under his supervision tasks that were above their job titles and would endow them with managerial functions for which they were unqualified and lacked experience.

53. PEMBERTON engaged in these antics with the intention of marginalizing and demeaning older DOC employees within his unit that dutifully and competently served the DOC for over 20 years.

54. In the wake of being served with the First Amended Complaint for the lawsuit herein, PLAINTIFF overheard PEMBERTON discussing her lawsuit and his submission of retirement documents before he had planned to do so.

55. Upon information and belief, PEMBERTON was asked to resign and or retire  from DOC due to his discriminatory and retaliatory conduct he exhibited towards GITTENS and the other older workers in his unit.

56. PEMBERTON personally and directly participated in passing over PLAINTIFF for job and promotional opportunities at the agency.

57. PEMBERTON personally and directly discriminated, defamed, harassed and marginalized PLAINTIFF.

58. Due to PEMBERTON's efforts, Plaintiff was repeatedly denied: job assignments within the unit that were within her civil service title; job opportunities within the agency and with other city agencies that she applied for; and promotional opportunities within DOC.

59. DEFENDANT PEMBERTON is sued here in both his individual and official capacities, he is also being sued as an aider and abettor.

60. At all times relevant, DEFENDANT NADENE PINNOCK, was either Deputy General Counsel and or the Deputy Commissioner of Human Resources for the DOC/CITY.

61. At all times relevant, PINNOCK was PLAINTIFF'S indirect supervisor.

62. At all times relevant to this cause of action,  PINNOCK acted directly and personally in the allegations stated herein.  PINNOCK retaliated against PLAINTIFF when she engaged in protected activities.

63. PINNOCK also failed to address PLAINTIFF's complaints of discrimination: PINNOCK failed to stop the retaliation GITTENS experienced after she filed a charge of discrimination with the EEOC.

64. At all times relevant, DEFENDANT PINNOCK, was charged with policymaking authority in the management of DOC and was responsible for ensuring that employees were not subjected to discriminatory and/or retaliatory practices.

65. PINNOCK had the authority to address the complaints of age discrimination and retaliation stated herein and failed to do so. PINNOCK has substantial policy making authority as defined by the New York City Charter.  PINNOCK had the ability to make personnel decisions including the ability to hire, fire and promote PLAINTIFF.

66. PINNOCK presided over and participated in the rampant cronyism and nepotism at DOC. She hired friends and relations at salaries that exceeded their experience.  PINNOCK repeatedly passed over older and more experienced DOC employees, especially PLAINTIFF on multiple occasions.  PINNOCK engaged in these acts in  violation of the Civil Service Law and the  Long Beach decision.

67. PINNOCK personally and directly participated in passing over PLAINTIFF for job and promotional opportunities at the agency.

68. DEFENDANT PINNOCK is sued here both in her individual and official capacities, she is also being sued as an aider and abettor.

69. At all times relevant, DEFENDANT, DINA SIMON (SIMON) was First Deputy Commissioner and or Deputy Commissioner of Human Resources at DOC/CITY.

70. At all times relevant, SIMON was PLAINTIFF'S indirect supervisor.

71. At all times relevant, SIMON served as PLAINTIFF'S indirect supervisor, and acted directly and personally in the allegations stated herein.

72. At all times relevant, DEFENDANT SIMON, was charged with policymaking authority in the management of DOC and was responsible for ensuring that employees were not subjected to discriminatory and/or retaliatory practices.

73. Instead SIMON, openly stated that the older DOC employees were idiots and stated that she wanted them out of the agency.

74. SIMON also contributed to an environment that was rife with cronyism and favoritism at DOC.  Like PINNOCK, SIMON hired friends and family who were much younger and less qualified than numerous older DOC employees who were eligible and who applied for the positions.

75. SIMON engaged in these hires in violation of the State Civil Service Laws and the City's Personnel Regulations.

76. SIMON personally and directly participated in passing over PLAINTIFF for job and promotional opportunities at the agency.

77. SIMON had substantial policy making authority as defined by the New York City Charter, and she had the ability to make personnel decisions including the ability to hire, fire and promote employees.

78. Upon information and belief SIMON was asked to resign from her position at DOC in or around May 2017 due to unrelated allegations of malfeasance and waste.

79. DEFENDANT SIMON is sued here both in her individual and official capacities, she is also being sued as an aider and abettor.

80. At all times relevant, DEFENDANT, CLAUDETTE WYNTER was Assistant Commissioner of Human Resources for the DOC/CITY.

81. At all times relevant, WYNTER was PLAINTIFF'S indirect supervisor.

82. At all times relevant DEFENDANT WYNTER, served as PLAINTIFF'S indirect supervisor, and acted directly and personally in the allegations stated herein.

83. WYNTER participated in the acts of cronyism, discrimination and retaliation alleged herein. Her acts were directed at older workers at DOC and PLAINTIFF. Like SIMON and PINNOCK, WYNTER repeatedly hired friends and relations to the exclusion of more qualified and senior DOC employees who were over the age of 40, often times violating the Civil Service Law and depriving them of opportunities to apply for positions at all.

84. At all times relevant, DEFENDANT WYNTER, was charged with policymaking authority in the management of DOC and was responsible for ensuring that employees were not subjected to discriminatory and/or retaliatory practices.

85. WYNTER had the authority to address the complaints of age discrimination and retaliation stated herein and failed to do so. WYNTER had substantial policy making authority as defined by the New York City Charter, and she had the ability to make personnel decisions including the ability to hire, fire and promote PLAINTIFF.

86. WYNTER personally and directly participated in passing over PLAINTIFF for job and promotional opportunities at the agency.

87. DEFENDANT WYNTER is sued here both in her individual and official capacities, she is also being sued as an aider and abettor.

## V.    FACTUAL ALLEGATIONS

### *Background & General Allegations*

88. GITTENS began working for the New York City Department of Corrections (DOC) on August 25, 1986.

89. GITTENS has a Bachelor's of Science from Cornell University's School of Industrial Relations, which she obtained in 1984.

90. GITTENS worked her way up in the agency: initially she was an Office Associate; she then became a Principal Administrative Associate Level 1 (PAA-1) and a PAA-2; and in 1993 she became an Associate Staff Analyst.

91. GITTENS was allowed to skip over the PAA-3 position because of her exemplary leadership skills and experience. Due to her performance, DOC management felt that she was qualified to act in a supervisory capacity as an Associate Staff Analyst.

92. GITTENS has been an Associate Staff Analyst since 1993.

93. When GITTENS received performance evaluations, GITTENS was consistently rated "Outstanding."

94. GITTENS was qualified for her position and the positions she applied for starting in 2014.

95. GITTENS has not received a performance evaluation since she has been under the supervision of BARRETO, PEMBERTON, PINNOCK, SIMON and or WYNTER.

96. Defendants ongoing failure to provide her with annual evaluations violates Section V 7.5.4(e) of the City's Personnel Rules and Regulations: employees "shall receive at least one performance evaluation a year and shall be informed in writing at the beginning of the evaluation period of the performance standards that shall be used as the basis for evaluation."

97. Defendants' failure to provide PLAINTIFF with performance evaluations has been part of their deliberate efforts to thwart GITTENS's career advancement within the agency.

98. Without evaluations, GITTENS is not as eligible for promotions in title or pay; and without evaluations GITTENS' ability to advocate for other opportunities within the agency and at other city agencies is also impeded.

99. The failure of BARRETO, PINNOCK, WYNTER, PEMBERTON and SIMON to evaluate GITTENS has set the stage for her being repeatedly passed over for positions due to cronyism and age discrimination.

100. Until GITTENS was placed under the supervision of WYNTER, SIMON, PINNOCK, BARRETO and or PEMBERTON, she was repeatedly promoted.

101. Over the course of her career at DOC, GITTENS was promoted three times.

102. GITTENS has also received numerous awards throughout her career, including but not limited to: "Employee of the Month;" GITTENS has also received letters of commendation for her professional services and work in the community.

103. Prior to the supervision by the named Defendants, GITTENS had significantly more responsibilities: she was the Acting Assistant Director of Personnel; supervised and trained professional and clerical staff; provided oversight and direction of the recruitment for civilian and uniformed staff; provided oversight of the civil service hiring process; edited and reviewed documents submitted to vendors for agency advertisements; prepared statistical reports and drafted correspondence for senior management; participated in job fairs, career days and related community events; and served as Career Counselor.

104. GITTENS is currently only performing clerical work, duties that are far beneath and out of her civil service title.

105. GITTENS's current job functions are inconsistent with her prior outstanding job performance. GITTENS was demoted in retaliation for complaints of discrimination and cronyism.

106. GITTENS currently works in the Human Resources and Operational Review Unit.

107. GITTENS demotion, reduction in responsibilities and role within the agency are due to an ongoing campaign of retaliation that was started by BARRETO and further maintained by the retaliatory and age based animus of PINNOCK, WYNTER, PEMBERTON and SIMON.

108. Since 2011, BARRETO has either directly or indirectly insured that GITTENS's responsibilities have been reduced.  BARRETO has  defamed and maligned GITTENS to SIMON and PEMBERTON,  and she has aided and abetted the aforementioned in their efforts at age discrimination, retaliation and cronyism.

***Background Information: Barreto's Vendetta Against Gittens[2]***

109. BARRETO became GITTENS' indirect supervisor in 2012.

110. At that time, BARRETO also supervised an employee by the name of Dounia Alfred ("ALFRED").

111. During this period, GITTENS reported directly to ALFRED, who regularly bullied and harassed her.

112. ALFRED accused GITTENS of performance deficiencies, verbally abused and regularly harassed GITTENS.   GITTENS endured this abuse from ALFRED from June 2012 to April 2013.

113. In or around the first week of April 2013, ALFRED confronted GITTENS about a memorandum she assigned her to write.

---

[2]. The allegations from 2012 to July 2014 serve as background information for Plaintiff's claims.  Plaintiff filed her EEOC charge in October 2017, as such consistent with § 1983 and the New York City Human Rights Law she seeks recovery for any and all acts that took place from August 2014 to present.

114. ALFRED had an ongoing problem with communicating with GITTENS and her staff, and consistent with these shortcomings, ALFRED failed to provide GITTENS with any direction or instruction beforehand.

115. GITTENS decided to address ALFRED's abuse, after ALFRED berated her work on a memo.

116. At that time, GITTENS decided to stand up for herself and she complained to BARRETO about the abuse, lack of professionalism and direction she had experienced under ALFRED.

117. Instead of addressing the situation however, BARRETO set GITTENS up to be attacked by ALFRED.

118. Fully aware of ALFRED's propensity for physical violence (ALFRED had other physical altercations with staff), BARRETO convened a meeting with ALFRED and GITTENS.

119. During the course of this meeting ALFRED assaulted GITTENS.

120. ALFRED grabbed GITTENS by both of her arms and violently shook her. Due to the nature of the attack, GITTENS was unable to defend herself and was injured.

121. ALFRED attacked GITTENS in front of BARRETO, in BARRETO's office.

122. BARRETO failed to prevent or to stop ALFRED's violence towards GITTENS in her office.

123. In fact, BARRETO dismissed the police report that circulated around the agency as "gossip," and denied the incident ever happened in an email dated April 16, 2013.

124. After this incident BARRETO began an ongoing campaign to defame and malign GITTENS that has lasted as of the filing of this complaint.

125. GITTENS was hospitalized after she was assaulted by ALFRED.

126. GITTENS took medical leave from DOC from April 2013 to July 2013.

127. GITTENS was psychologically traumatized by the assault.  She was hospitalized for two weeks and had to seek counseling before returning to work.

128. At the time GITTENS was assaulted, DOC did not have a Workplace Violence policy in place to protect GITTENS or anyone else for that matter.

129. DOC's failure to have a Workplace Violence Policy was indicative of the agency's apathy and negligence.  In a paramilitary environment, where staff members are constantly exposed to violent inmates, the agency failed to even have this minimal protection for its employees.

***Violations of the 14th Amendment: Cronyism and Age Discrimination Under SIMON, WYNTER and PINNOCK***

130. DINA SIMON started at DOC in or around September 8, 2014.

131. Upon the commencement of her tenure, to PLAINTIFF'S chagrin, SIMON immediately began an ongoing campaign of cronyism that was characterized by age discrimination.

132. SIMON's hiring activities had a disparate impact on older workers with more than 20 years of experience at DOC.

133. Initially SIMON portrayed herself as someone who would address the issues of discrimination at the agency.  She had a number of agency-wide town hall meetings; she sent out agency-wide surveys; and  she convened brown bag lunches with the staff.

134. In the beginning, SIMON made PLAINTIFF and staff believe that there were opportunities for advancement and growth within the agency.

135. As a member of the HR staff, PLAINTIFF was aware of the increased funds coming into the agency.

136. In or around December 2015, DOC was set to hire 1,800 officers and they also needed to hire staff to process these applications and hires.

137. For the first time since PLAINTIFF worked at the agency, monies were awarded to DOC to effectuate hires and promotions specifically in HR and for other administrative positions throughout the agency.

138. However, it soon became clear that SIMON's overtures to staff were a ruse.  SIMON engaged staff with the real intention of obtaining their job descriptions, so that she could hire her cronies at a higher rate. SIMON's objective was to push older DOC staff  with over 20 years at the agency and nearing retirement age out.

139. For purposes of clarity, a number of DOC staff members with 20 years or more of experience are eligible for their full pensions.

140. Accordingly, DEFENDANTS had a policy, custom or practice of harassing and marginalizing these employees so that they could bring in their cronies and relations who were typically younger.

141. In October through December 2017, and in March 2018, PLAINTIFF and a number of other DOC employees got together and filed complaints against SIMON,  WYNTER and PINNOCK with their respective unions and the Department of Investigations (DOI).

142. The complaints stated that between SIMON, WYNTER and PINNOCK, they had hired a number of their close relatives, friends and associates that cost the agency at least a million dollars in personnel expenditures and that had a disparate impact on DOC employees over the age of 40 with over 20 years of experience at the agency.

143. Upon information and belief, DOI failed to investigate this complaint.

144. As a result, the named Defendants were emboldened.  The named Defendants continued to brazenly hire their friends, cronies and family members.

145. The named defendants also engaged in a campaign to marginalize and pass over older DOC employees as defined by the ADEA.  They passed over DOC employees with over 20 years at the agency for job and promotional opportunities.  The named Defendants also consistently reduced these workers' responsibilities and marginalized them with the hope that they would retire from the agency out of demoralization,  humiliation and frustration.

146. SIMON hired WYNTER as Assistant Commissioner at a salary of approximately $157K.

147. Upon information and belief, WYNTER and SIMON are close friends.

148. SIMON hired Deborah Stewart ("STEWART") as an Executive Director.

149.  Upon information and belief, Stewart is SIMON's  relative and works as Executive Director for Branding & Marketing.

150. Upon information and belief, STEWART had a listed salary of approximately 85K in 2018 but made approximately $157K due to an abuse of overtime.

151. PLAINTIFF and her colleagues reported this abuse to DOI to no avail.

152. WYNTER, SIMON and PEMBERTON would hire 12 Directors all of whom made over 100K:

- Fabrice Armand (ARMAND), Director of Strategic Partnerships & Community Engagement; ARMAND does not directly supervise any staff;

- Armando Chabran (CHABRAN), Director of Human Resources Data Analytics and Classification.

- Ayinde Williams (WILLIAMS), Director of Human Resources and Operations.

- SIMON brought in  PEMBERTON as Director of Payroll and Timekeeping.

- WYNTER also hired Dahlia Grant (GRANT) as Director of Employee Services and Shalimar Aldafari (ALDAFARI).  Upon information and belief, GRANT is also a close friend of WYNTER's and ALDAFARI was her former administrative assistant.

- WYNTER hired four deputy directors without adhering to the CITY's hiring policies:  Mitaben Brahmbhatt (BRAHMBHATT), Deputy Director of HR Operations; Pamela Daniels (DANIELS), Deputy Director of Central Timekeeping Unit; Sherbreina Watson (WATSON), Deputy Director of Payroll; and Kassandra King (KING), Deputy Director of Labor Relations.

- SIMON also hired her relative, Melissa Andre (ANDRE) who worked under her while she was at DOC.

- SIMON also hired Chikera Beckford (BECKFORD), another relative. BECKFORD received a promotion and was promoted to Director of Special Projects.

- SIMON hired Malika Granville (GRANVILLE), Christine Paulino (PAULINO), Dane Ching (CHING), Clinton Dowding (DOWDING), Christopher Howard (HOWARD), Willy De Los Santos (DE LOS SANTOS), Tolani Elumade (ELUMADE), and Lateef Taylor Sr. (TAYLOR).

153. Upon information and belief, each of the hires enumerated above have either personal relationships with the named Defendants' families, are professional colleagues they had at previous positions they held or are their friends.

154. Upon information and belief, each of the hires had less experience than either the DOC applicants for their positions who had been at the agency for over 20 years.

155. Plaintiff and her colleagues filed complaints to the unions and DOI.  Their complaints detailed the rampant cronyism and discrimination at DOC.

156. Upon information and belief, the named Defendants did not adhere to DOC's and or the City's hiring protocols.

157. Upon information and belief,  SIMON, WYNTER and PINNOCK passed over more qualified older DOC employees who may have applied for or been eligible for the positions had the named Defendants complied with the City's hiring and diversity policies.

158. Upon information and belief, DOI, DOC and or the City have failed to investigate and or take any action to address the complaints of cronyism, nepotism and age discrimination at DOC or any other City agency for that matter.

159. Upon information and belief, despite these complaints to the unions and DOI, PINNOCK and WYNTER continue to work at DOC and continue to engage in these crony and age based discriminatory hiring practices -to the detriment of workers who are over 40, with over 20 years of experience at the agency and who are of retirement age.

### SIMON Passed GITTENS over 3 Times for the Same Position and Instead Hired Lesser Qualified and Younger Candidates

160. PLAINTIFF applied for the  Director of Recruitment position for the first time on November 7, 2014.

161. SIMON had Carolyn Maraj ("MARAJ") interview GITTENS for the position.

162. Instead of GITTENS, the agency hired Lakisha L. Grant  (GRANT), who was younger than GITTENS and who had less experience.

163. When GRANT didn't work out DOC re-advertised this position and GITTENS was interviewed again by Armando Cabran (CABRAN) and Melissa Andre (ANDRE).

164. It was clear to GITTENS the second time she interviewed for the position that she would not be selected.  On this occasion, SIMON delegated the interviewing process to CABRAN and ANDRE, two new and very junior DOC employees at the time.

165. SIMON eventually hired Darlene Martinez (MARTINEZ) for the position.  Again MARTINEZ was younger than GITTENS and was less qualified for the position.

166. MARTINEZ didn't stay in the position long, and once again the position became vacant under SIMON.

167. The third time SIMON filled the position, she didn't even bother to post the vacancy.

168. SIMON instead transferred Ayinde Williams (WILLIAMS) in 2016 to her unit.

169. Upon information and belief, WILLIAMS was a close friend or relative of MARAJ.

170. SIMON eventually "upgraded" WILLIAMS to the Director of HR as an Administrative Staff Analyst.

171. Upon information and belief WILLIAMS has less professional experience than GITTENS and is much younger than her as well.

172. It became clear from the WILLIAMS hire that cronyism was at work under SIMON.

173. A review of WILLIAMS's employment history with the CITY will show that his salary and title had gone up exponentially without any requisite increase in his skill set or credentials.

174. For example: in 2014, WILLIAMS was  a Principal Administrative Associate Level 1 & 2 Non-Supervisor and made $65,000; in 2015, Williams remained in his civil service title and earned a salary of $67,733; in 2016 Williams salary jumped to $94,050 (which was when he

was hired as Assistant Director of AIU); his compensation then jumped another 50K when he was paid $134,572 in 2017; and his salary jumped again in 2018 when he paid $151,776.

175. Upon information and belief, WILLIAMS was part of the cronyism rife at DOC.  SIMON's failure to post the Director of HR position was part of a deliberate effort to avoid hiring PLAINTIFF for a position for which she was more qualified than WILLIAMS.

176. Upon information and belief and the statements enumerated herein, SIMON's failure to hire GITTENS was rooted in the named Defendants' age based animus

*GITTENS Applies for Numerous Positions at DOC and is Repeatedly Ignored, Denied Interviews or Job Opportunities; The Positions Are Eventually Filled with Younger, Less Qualified Employees*

177. GITTENS applied for a number of positions between November 2014 through July 2015.

178. After being passed over for several positions, GITTENS wrote SIMON on January 7, 2015 to request an interview for the Project Manager position that was vacant.

179. However, despite having over 29 years of experience at the time, GITTENS did not receive a response from SIMON and she was never interviewed for that position.

180. GITTENS again wrote SIMON on January 8, 2015.  This letter pertained to a vacancy for another Project Manager position in the area of HR Organizational Learning and Development.

181. Again, despite having over 29 years of  directly applicable substantive experience, GITTENS never received a response from SIMON and she never received an interview for the position.

182. In April 2015, GITTENS applied for a position in Special Projects.

183. GITTENS was interviewed by BARRETO.

184. During the course of the interview, BARRETO reviewed GITTENS' resume and made the following comment: "I didn't know you had done all of this community service, I thought you had checked out."

185. BARRETO's comment was in reference to the assault GITTENS experienced in BARRETO's office under her watch.

186. BARRETO made the comment fully aware that GITTENS had been hospitalized due to the physical injuries she sustained, emotionally traumatized and that she ended up taking leave from work for over 2 months.

187. In June 2015 alone, GITTENS applied for three positions where she was passed over for younger lesser experienced employees on each occasion.

188. GITTENS wrote SIMON for a third time on June 3, 2015 and requested an interview for the Director of Strategic Partnerships and Community Engagement position.

189. Again despite her qualifications and years of dedicated service at DOC, SIMON failed to respond or even grant  GITTENS an interview despite the fact that GITTENS ended up being more qualified than the person who was hired to fill that position.

190. Defendants hired Fabrice Armand (ARMAND) a younger candidate with less experience.

191. On June 4, 2015, GITTENS applied for the Director of Special Projects position.  Despite her qualifications GITTENS was not offered an interview.

192. DEFENDANTS instead hired Chikera Beckford (BECKFORD), a younger candidate with less experience.

193. From November 2014 to July 2015, GITTENS was repeatedly passed over for positions for which she applied.  In each of these instances, GITTENS was passed over by the named Defendants for lesser qualified, lesser credentialed and younger candidates.

*GITTENS Complains of Discrimination to SIMON and Learns that BARRETO has Made Defamatory Statements About her Work*

194. After being passed over on these occasions, in or around July 23, 2015 GITTENS met with SIMON.

195. GITTENS discussed the numerous times she had been passed over for positions that she had applied for, and that SIMON had filled with lesser qualified and younger candidates.

196. GITTENS asked SIMON why she had been passed over for the positions.

197. At that time SIMON disclosed that BARRETO had made disparaging statements about GITTENS's performance.

198. Once GITTENS asked SIMON for evidence about her alleged deficient performance, SIMON ended the meeting and escorted GITTENS out of her office.

199. Although SIMON referenced BARRETO's comments, it became clear to GITTENS at that time that SIMON had discriminated against her based on her age.

200. However, despite SIMON's age based animus, GITTENS also knew that BARRETO's defamatory and false  comments impeded her ability to pursue job opportunities and promotions both within DOC and at other City agencies.

201. BARRETO's defamatory statements about GITTENS's mental health and performance would provide the pretext for PINNOCK, WYNTER and SIMON to discriminate against GITTENS based on her age and to retaliate against her based on her protected activities.

202. It was clear from the repeated and constant hires of younger and lesser experienced workers over older more experienced DOC employees, that PINNOCK, WYNTER and SIMON had age based animus towards GITTENS and other older DOC employees who applied for vacancies at DOC.

203. Under conditions like these, it was clear that GITTENS would not have any chance for career advancement under WYNTER, SIMON and or PINNOCK.

**_Age Based Hostile Work Environment at DOC:  WYNTER Declares Her Intent to Get Rid of the DOC Employees With Over 20 Years of Experience:_**
**_"Older employees at DOC were fat, old and didn't fit the image of the agency!"_**

204. Ironically, PLAINTIFF would receive confirmation from BARRETO about WYNTER's and SIMON's age-based animus.

205. In December 2015, during an executive staff meeting attended by BARRETO, WYNTER clearly stated that she wanted to get rid of all the employees who had over 20 years of experience at the agency because they were fat  and old, and because they didn't fit the agency's new and more youthful image.

206. Nadia Griffith ("GRIFFITH") shared the information with PLAINTIFF, that WYNTER made the statement during the course of an executive staff meeting.

207. GRIFFITH told GITTENS because she was a union delegate and because she sought advice from GITTENS about age discrimination at the agency.

208. At that time GITTENS directed GRIFFITH to file with the EEOC because the agency's EEO Office had a history of ignoring or failing to investigate complaints of discrimination.

209. In fact, DOC's EEO Office's failure to act was so well known that the office is commonly referred to as the "Office of Unsubstantiated" by DOC employees.  This phrase is widely understood to mean that the EEO Office will not render a determination of discrimination or retaliation against the agency under any circumstances. Accordingly, DOC employees adopted the stance  that filing a complaint with DOC's EEO Office was an exercise of futility.

210. WYNTER was also frequently overheard referring to older workers at the agency as "dead men."

211. The age-based animus was clear from the hiring practices of PINNOCK, WYNTER and SIMON.

212. WYNTER and SIMON blatantly and recklessly ignored the Civil Service laws.

213. Furthermore by 2016, PINNOCK as the agency's former Deputy General Counsel, and then Deputy Commissioner for Human Resources, PINNOCK also began to engage in these practices herself.

214. As Deputy Commissioner of Human Resources, PINNOCK signed off on all of the hires and personnel actions that took place at DOC.

215. By 2016, after multiple complaints from GITTENS and other DOC staff, PINNOCK failed to take any steps to address the discriminatory hiring practices throughout the agency.

216. From 2016 to present, PINNOCK and WYNTER continue to engage in these tactics at the expense of older, more qualified DOC employees with more seniority.

*DOC: An Age Based Hostile Work Environment Rife with Retaliation Against Employees Who Dared to Speak Out*

217. On or about May 29, 2015, SIMON conducted an agency wide town hall meeting.

218. The alleged purpose of the meeting was to discuss the agency's "14-point plan."

219. At this meeting several staff members took the opportunity to verbally express their objections and concerns about the discrimination and hiring practices in the HR Division.

220. Michelle Roman ("ROMAN"), Ita Jackson ("JACKSON"), Michael Perry ("PERRY"), GITTENS   and others expressed their concerns about the discrimination and cronyism taking place with the agency's hiring process.

221. GITTENS complained about the agency wide discrimination against older workers at DOC and herself. She stated at the staff meeting that she complied with the HR Division's wishes and filled out both surveys. GITTENS then stated that if there were reasons why she was passed over on so many occasions, that she deserved to know why so that she could correct any alleged deficiencies and advance in her career.

222. Instead of being receptive to the issues raised at the Town Hall, SIMON became aggressive. She began yelling at ROMAN and at one point had to be restrained from physically attacking ROMAN.

223. In retaliation for her comments at the meeting, within weeks, SIMON transferred ROMAN and Mary Gainey (GAINEY).

224. Both ROMAN and GAINEY are older workers and both were transferred out of the agency.

225. WYNTER attacked Makvala Moshiavili ("MOSHIAVILI") at another staff meeting.

226. MOSHIAVILI and others spoke out about the age discrimination and cronyism that had become blatant under SIMON and WYNTER.

227. MOSHIAVILI became upset during the course of WYNTER's attack and had a tearful break down in front of staff.

228. MOSHIAVILI ran out of the meeting and WYNTER ran after her. MOSHIAVILI did not return to the meeting.

229. MOSHIASHVILI also experienced retaliation in the wake of her comments about the disparities in pay.

230. SIMON marginalized MOSHIASHVILI, reduced her responsibilities, took away her access to personnel programs (which she needed to do her job) and isolated her. MOSHIASHIVILI was eventually forced into retirement by SIMON.

231. SIMON also retaliated against JACKSON.

232. JACKSON would continue to speak out against SIMON and WYNTER's discriminatory hiring practices at agency wide town halls and staff meetings.

233. JACKSON was also marginalized, transferred to Rikers Island (which is a harsher and less prestigious work assignment), and was eventually forced into early retirement.

234. Althea Cicero ("CICERO") and Mary Gainey ("GAINEY") also experienced retaliation after they complained about the discriminatory hiring practices under SIMON and WYNTER.

235. Upon information and belief, Dahlia Grant ("GRANT") was hired by WYNTER, who upon information and belief is her best friend. WYNTER hired GRANT over CICERO, GAINEY and other older workers at DOC.  GRANT was younger, less qualified and had less experience than CICERO and GAINEY.

236. Upon information and belief CICERO and GAINEY were either denied the opportunity to apply for GRANT's job or were passed over for her position based on their age.

237. Like WYNTER, GRANT was known to verbally abuse older workers.

238. After CICERO complained about the discriminatory hiring practices under SIMON and WYNTER, she was demoted in salary and title.

239. SIMON pushed GAINEY and ROMAN out of the agency after they complained of age discrimination and cronyism.

240. Upon information and belief they hired WYNTER and SIMON hired PINNOCK's god sister, Dominque McGuire ("MCGUIRE").

241. With little to no experience, MCGUIRE would be brought in to supervise three DOC staff who each had over 20 years of experience at the agency:  Tyrone Watson, David and Carmen

Al Farooqi. Each of these employees were over 50 and each of them had more professional experience than McGUIRE.  Additionally each of them would be denied the opportunity to apply for MCGUIRE's position and would be paid significantly less money than her as well.

242. Additionally, McGUIRE would be making more than the cap of her civil service title as Community Coordinator, and she would be managing staff that were more senior in terms of their civil service title.

243. Upon information and belief, McGuire's salary and staff assignments violate the City's Civil Service Rules and Agency personnel norms.

244. Upon information and belief McGuire earned 84K last year; again this amount far exceeds the cap for Community Coordinators.  The named defendants allowed these violations and abuses based on cronyism and age-based animus.

245. Upon information and belief, rumors began to circulate around the agency that WYNTER and SIMON had taken to calling the older DOC employees idiots.

246. After the May 29, 2015 meeting it was clear to GITTENS and staff with over 20 years at DOC that they would not be considered by WYNTER, SIMON and or PINNOCK for professional and or promotional opportunities within the agency.

247. GITTENS and her peers knew that they were not wanted at the agency by the named Defendants because of their age; and as such GITTENS and her colleagues worked in a discriminatory environment in fear of retaliation if they spoke up.

### *WYNTER and PEMBERTON Violate Civil Service Law and Repeatedly Pass Over GITTENS on the Civil Service List*

248. On or about June 26, 2015, GITTENS took Civil Service Examination 5517 for the Administrative Staff Analyst position.

249. GITTENS and PEMBERTON both scored 77.545.

250. The promotional list for the Administrative Staff Analyst Civil Service title was "established" on August 17, 2016.

251. Pursuant to N.Y. CIV. Serv. Law § 61 along with the provisions that pertain to "established" lists issued by the New York City Department of Citywide Administrative Service ("DCAS"), an agency must select one of the top three candidates eligible for an open position in that title within the agency (aka the 1 in 3 rule).

252. Additionally, once a civil service list has been established, any Provisionals in the civil service title for which the examination was established must be replaced by civil servants who passed the examination.

253. This did not happen at DOC under SIMON, WYNTER and or PINNOCK.

254. Typically city agencies designate an assistant commissioner to preside over the hiring process.  Under the circumstances herein, the assistant commissioner has the ability to designate a staff person to execute this function for them.

255. In this instance, PINNOCK should have presided over the selection of eligible candidates from the Administrative Staff Analyst examination, since the person who would typically perform the function, PEMBERTON, had an inherent conflict of interest because he was on the civil service list.

256. However, despite this clear conflict of interest, PEMBERTON not only presided over the administration of the Civil Service list, he selected himself over GITTENS.

257. The fact that DOC ignored PEMBERTON's conflict of interest is indicative of the discriminatory animus that DEFENDANTS had towards GITTENS and other employees at DOC with over 20 years of experience.

258. Upon information and belief, PEMBERTON is younger than GITTENS, and had less applicable professional experience for the position he appointed himself to.

259. Since PEMBERTON did not have any additional vacancies for an Administrative Staff Analyst within his unit, GITTENS should have been considered for other openings under that title in the agency and at other City agencies.   However, contrary to these established rules, policies or customs, GITTENS was never considered or interviewed for positions within the Administrative Staff Analyst title.

260. Pursuant to DCAS procedure, GITTENS should have received what is known as a "Call Letter," which would have notified her of positions for which she was eligible to interview for under that title within the agency.

261. Despite having any number of positions for which she should have been issued call letters, on multiple occasions, PINNOCK, PEMBERTON, WYNTER and SIMON failed to send GITTENS any.

262. In an all-out effort to deprive GITTENS of any opportunity to successfully complete the process, the fore mentioned named Defendants failed repeatedly to comply with DCAS's prescribed protocol.

263. GITTENS was the only person on the list that was not hired by PINNOCK, WYNTER, SIMON and or PEMBERTON.

264. Upon information and belief, of the 17 named people off the list, despite the fact that GITTENS was ranked higher than a number of the candidates; she was the only candidate that was not selected off of the promotional list at the agency.

265. In the fall of 2016, PEMBERTON verbally told GITTENS that she had not been picked up off of the list.

266. On three separate occasions, GITTENS never received letters that said she was considered and not selected (a "CNS Letter") for any of the vacancies that arose at that time.

267. Instead, the agency had over 10 provisional employees serving as Administrative Staff Analysts.   GITTENS was eligible for each of these positions and should have received CNS letters for all of these positions.

268. On each of these 10 occasions, GITTENS did not receive a CNS letter.

269. The CITY has a set policy for civil service examinations and the filling of agency vacancies.

270. When a civil service examination for a civil service title takes place, the agency must replace any Provisionals in the civil service title for which the examination was administered with eligible civil servants who passed the examination.

271. To be clear, DOC should have replaced the 10 provisional employees serving as Administrative Staff Analysts with civil servants who passed the examination in that title.

272. Instead, the named defendants circumvented this process and changed the titles of the Provisionals from temporary Administrative Staff Analysts to another temporary civil service such as Community Coordinator or Community Associate, so that they did not have to place PLAINTIFF in any of these positions.

273. Again the named Defendants did this on at least 10 separate occasions throughout 2016 and 2017.

274. **GITTENS was qualified for all 10 of these positions**.

275. At a minimum, GITTENS should have received CNS and call letters on each of these occasions, however Defendants *failed to provide her with the aforementioned letters each and every time*.

276. It was not until GITTENS went to the union meeting in June 2017, that she learned in writing that she was the only person from the agency that was not picked up off of the list.

277. The positions that she was eligible for arose both before and after October 2016.

278. Up until June 2017, GITTENS had not received any written notification that she was the only one that had not been picked up off of the list.

279. To date, GITTENS still does not have either a call letter or a CNS Letter for any of the positions for which she was eligible either at DOC or at any other City agency.

280. Upon information and belief DEFENDANTS filled each of the vacancies for which GITTENS should have received call letters at DOC with younger candidates with less experience than GITTENS.

281. ***Defendants engaged in these discriminatory acts against GITTENS, despite the fact that she administered the hiring and recruitment process for over 20 years.***

282. GITTENS was the Section Supervisor for Recruitment and served as Acting Assistant Director for Recruitment from 1993 to 2011; she presided over the very process that the named Defendants would use to discriminate against her based on her age.

283. To be clear, there were vacancies in the agency that arose after the list for the Administrative Staff Analyst was established for which GITTENS was never considered and was repeatedly passed over.

284. GITTENS was repeatedly denied opportunities, specifically in  Human Resources and the Applicant Investigative Unit (AIU), where it was clear that there were a number of vacancies. By this time, it was extremely obvious to GITTENS that WYNTER, SIMON and PINNOCK wanted her out of the agency.

285. Accordingly, GITTENS experienced discrimination based on her age, since in each instance for which PINNOCK, WYNTER and SIMON failed to provide her with "call letters," they filled those same positions with younger, lesser qualified candidates.

286. In each instance that these positions were filled with lesser qualified candidates, GITTENS experienced a disparity of pay between $20K to $70K a year.

287. To date, Defendants have yet to comply with DCAS's Rules and Regulations and the New York Civil Service Law: they have yet to send GITTENS a call letter; they have yet to provide her with an opportunity to interview for any positions that fall under the Administrative Staff Analyst title; and they have also failed to provide her with any explanation as to why she has not received CNS letters.

288. This failure to comply with either the DCAS Rules or Regulations and the New York Civil Service Laws is indicative of not only the age-based animus towards GITTENS, but also reflects a policy and custom of age-based animus towards DOC employees as a whole.

289. Upon information and belief, the named Defendants engaged in these same antics with other employees at DOC who had over 20 years with the agency or who fell under other protected categories under the law.

290. As alleged in the ADAMS-FLORES complaint Defendants have a policy and custom of ignoring the "call letter" aspect of the civil service examination hiring process.[3]

291. As alleged in the ADAMS-FLORES complaint, Defendants engaged in this conduct when they sought to camouflage their discriminatory animus and cronyism.

---

[3] Former Deputy Commissioner Nichole Andres-Flores, filed a complaint of discrimination against the DOC on or about December 24, 2018.  Adams-Flores v. City of New York et. al., 18-CV-12150(JMF) (S.D.N.Y. Dec. 24, 2018).

292. PINNOCK, WYNTER, SIMON and PEMBERTON have consistently evidenced a callous disregard towards complying with the laws and regulations for which they are entrusted to administer.

293. WYNTER, SIMON and PINNOCK permitted PEMBERTON to act in this self-interested manner when he picked himself over GITTENS off of the civil service list.

294. PINNOCK, SIMON and WYNTER allowed PEMBERTON to engage in this conduct because they wanted to push GITTENS out of the agency.

295. SIMON, WYNTER and PINNOCK all supervised PEMBERTON, they all approved promotional and personnel decisions, yet none of them took any steps to ensure that PEMBERTON complied with the City's Civil Service or EEO Policy when he discriminated against GITTENS based on her age.

296. PINNOCK and WYNTER have yet to provide any legitimate reason for not picking GITTENS for any of the applicable positions on the list.

297. PINNOCK and WYNTER  have also yet to provide GITTENS with any notice for any positions under the Administrative Staff Analyst title both within DOC and at other City agencies as prescribed by the Civil Service Laws and the City's Personnel Regulations.

### *Age Based Hostile Work Environment Under Pemberton, Wynter and Pinnock*

298. PEMBERTON managed approximately 10 staff people along with GITTENS.

299. PEMBERTON became GITTENS's supervisor in August 2016, and from the inception of his tenure, he engaged in an age based discrimination and created an age based hostile work environment.

300. In October 2016, PEMBERTON articulated his age-based animus when he said that GITTENS did "substandard" work and that she lacked the ability to do the complex work of an Administrative Staff Analyst.

301. Upon information and belief, PEMBERTON only complained about the older employees in his unit that he managed; he only deemed their work substandard.

302. Consistent with this sentiment, during PEMBERTON's tenure in HR he has not hired anyone over 40 to work within the unit.

303. Also consistent with this sentiment, PEMBERTON attempted to give GITTENS tasks and standards that were beneath her civil service title in December 2016.

304. Additionally, PEMBERTON either constantly ignored or complained about the work of the employees with over 20 years at DOC that he supervised.

305. PEMBERTON treated Penny Hunter Freeman (FREEMAN), Jackie Welch (WELCH) and GITTENS differently than the younger staff persons he managed.

306. FREEMAN, WELCH and GITTENS were all over 40.

307. PEMBERTON would talk to and provide professional opportunities for Sherbrina Watson (WATSON), Melissa Charles-Hinds (HINDS), Claude Lyons (LYONS), Sultan Ulton (ULTON) and Shonda Martinez (S. MARTINEZ).

308. Upon information and belief, WATSON, HINDS, LYONS, ULTON and S. MARTINEZ were all under 40.

309. On a daily basis, PEMBERTON would ignore FREEMAN, WELCH and GITTENS. PEMBERTON would regularly exclude them from unit work and would not impart information to them that would further their ability to function within the unit.

310. FREEMAN applied for three salary increases under PEMBERTON and WYNTER.  To date, neither WYNTER nor PEMBERTON have responded to her requests.

311. Meanwhile younger staff persons within PEMBERTON's unit have received salary increases and responses from WYNTER and PEMBERTON when they sought raises.

312. After GITTENS complained of discrimination, GITTENS was targeted even more.

313. GITTENS would experience a hostile work environment based on her age under WYNTER, SIMON, PINNOCK and PEMBERTON.

314. Due to the stress and harassment, GITTENS would miss more and more days of work.  Her health would deteriorate due the stress, abuse and harassment which took place on a daily basis under PEMBERTON.

315. GITTENS would deplete her leave balances due to Defendants' conduct and her ensuing illnesses.

316. WYNTER was aware of and also participated in the abuse of GITTENS and other older employees in PEMBERTON's unit.

317. WYNTER and PINNOCK supervised PEMBERTON.

318. PEMBERTON, PINNOCK and WYNTER also retaliated against FREEMAN after she complained of discrimination to DOC's EEO Office.

319. PINNOCK, SIMON and WYNTER had a policy and custom of retaliating against employees who filed complaints of discrimination.

320. PEMBERTON, SIMON, PINNOCK and WYNTER would remove staff from the  Bulova Building and have them work in facilities on Rikers Island.  Accordingly, staff became even more fearful about complaining.

321. PEMBERTON would ignore or demean PLAINTIFF on countless occasions.

322. PEMBERTON would harass PLAINTIFF to the point that Plaintiff began to miss more and more days from work due to stress induced illnesses.

323. Between December 2018 to February 2019, Plaintiff took leave from DOC because of the ongoing harassment, anxiety and stress she experienced under PEMBERTON and WYNTER.

324. Overall, PEMBERTON and WYNTER would deny PLAINTIFF and other similarly situated workers with over 20 years of employment at DOC numerous opportunities for advancement in the HR Unit and throughout the agency.

### *GITTENS Experiences Retaliation Under the ADEA, 1st Amendment and 1983 After She Filed An  EEOC Charge & Lawsuit*

325. GITTENS did not file an internal EEO complaint within DOC because the agency's EEO Office had a reputation for not addressing or investigating complaints of discrimination.

326. DOC's EEO Office is regularly referred to as the "Office of Unsubstantiation," meaning that the office would either do nothing when it received complaints of discrimination, or would find that there had not been a violation of either the agency or City's EEO policies.

327. In essence, DOC employees have expressed the sentiment that they do not have access to internal recourse. Accordingly, many DOC employees along with GITTENS filed externally with the EEOC, State Division of Human Rights ("SDHR") and or other administrative agencies.

328. GITTENS and her co-workers complained to the named defendants at a town hall meeting about age based discrimination and retaliation at the agency on May 29, 2015.

329. In June 2015, GITTENS was passed over for 3 positions for which she was qualified by the named Defendants.

330. GITTENS filed a charge with the EEOC in October 2017.

331. Since GITTENS filed a charge with the EEOC, she has experienced on going retaliation from PEMBERTON and WYNTER.

332. In December 2017, PEMBERTON claimed that GITTENS had failed to complete 22RS (which capture employees' personnel and disciplinary histories; 22Rs are necessary for promotions and other personnel actions) in a timely manner.  PEMBERTON reported her to PINNOCK and WYNTER.

333. When GITTENS complained about PEMBERTON's retaliatory conduct in the wake of her EEOC complaint to PINNOCK and WYNTER, neither PINNOCK nor WYNTER addressed her complaint.

334. GITTENS provided PINNOCK and WYNTER with written proof that PEMBERTON attempted to manufacture performance-based deficiencies against her.  The names of the employees he listed that allegedly had incomplete or late 22Rs had either already been completed or had been listed multiple times.

335. Despite proving the fallacy of PEMBERTON's allegations, and despite her complaint of retaliation, PINNOCK and WYNTER failed to act.

336. PEMBERTON also became more hostile towards GITTENS. He refused to speak to her at all.

337. After PEMBERTON's unsuccessful attempt to defame her performance with the 22Rs, and after managing GITTENS for over a year without any tasks and standards, within weeks of GITTENS's  EEOC charge, PEMBERTON created a list of tasks that were beneath and out of GITTENS' civil service title.

338. With the implementation of these tasks and standards that were out of and beneath her civil service title, PEMBERTON  and WYNTER demoted GITTENS for her complaints of discrimination.

339. Plaintiff went from performing managerial and substantive work to clerical tasks.

340. On August 10, 2018, WYNTER through her Subordinate Sherbrina Watson (WATSON), attempted to have GITTENS accept another set of Tasks and Standards that were beneath her civil service title.

341. PLAINTIFF signed the tasks and standards under protest.

342. Despite signing the tasks and standards under protest, GITTENS complied with this second demotion and performed the out of title work and lower level work.

343. It was clear that WYNTER gave GITTENS these tasks and standards in retaliation for her EEOC complaint and to further thwart any opportunities PLAINTIFF may have for professional development within the agency and at other City Agencies.

344. Despite being put on notice of these events, PINNOCK failed to address PLAINTIFF's complaints and allegations against PEMBERTON and WYNTER.

***GITTENS Experiences Even More Retaliation and Hostility After She Files The Lawsuit Herein Against the Agency and Individually Named Defendants***

345. GITTENS filed the lawsuit herein on or about January 9, 2019.

346. PEMBERTON sent GITTENS an email when she got back from sick leave, that  stated she needed to turn in her time sheets.

347. On February 14, 2019, she heard some rumbling behind her.  PEMBERTON said that GITTENS was rude and disrespectful.  PEMBERTON asked about the location of the corrective interview form.  PEMBERTON then said "Lorraine I'd like to see you in the conference room."

348. PEMBERTON was talking loud enough that other employees heard what he was getting ready to do. PEMBERTON was about to bring her up on charges about her time and leave, a little over a month after she filed a lawsuit against him and the agency.

349. On the way to the conference room, her co-worker, Robert Smith (SMITH), who also heard PEMBERTON, approached GITTENS and said, "if that is a disciplinary meeting, you are entitled to representation."

350. PEMBERTON didn't realize that she had sent in doctors' notes before she returned.

351. PEMBERTON embarrassed and humiliated GITTENS in front of her co-workers. He also tried yet again to bring her up on unwarranted disciplinary charges

352. GITTENS would later learn from SMITH and other co-workers that WYNTER and PEMBERTON were conspiring "to get her" on time and leave the day before on the 13th of February.

353. GITTENS' co-workers also overheard PEMBERTON and WYNTER talking; GITTENS was told by these co-workers that from their conversation, WYNTER and PEMBERTON "were out to get her."

354. GITTENS and the other DOC employees with over 20 years of experience in PEMBERTON's unit would also be managed by Jody-Ann Cross (CROSS).

355. Upon information and belief, CROSS is under 40 years old, and is younger than PLAINTIFF and her similarly situated comparators in PEMBERTON's unit.

356. Upon information and belief, CROSS has less experience than PLAINTIFF and her similarly situated comparators.

357. Upon information and belief, CROSS is less qualified than PLAINTIFF for the position she holds.

358. PLAINTIFF was denied the opportunity to apply for CROSS's position.

359. Upon information and belief Defendants placed CROSS in the Community Associate /Community Coordinator civil service title to circumvent the civil service laws.

360. Again, Defendants were required to fill fill any Administrative Staff Analysts positions occupied by provisional employees with eligible civil servants from the established civil service list that Plaintiff is on.

361. As it stands the civil service list that would have applied to CROSS's position remains open. This is the same civil service Administrative Staff Analyst list that Plaintiff and PEMBERTON were on.

362. PEMBERTON acted in the same capacity as CROSS and was PLAINTIFF's supervisor.

363. In order to avoid placing PLAINTIFF in CROSS's and PEMBERTON's position and in order to circumvent the civil service law, named defendants placed CROSS in a lower and different civil service title and placed her over GITTENS and the rest of the unit.

364. The named Defendants placed CROSS in this position in direct violation of the Long Beach decision, the Civil Service Law and the City's Personnel Regulations.

365. Although CROSS is PLAINTIFF's direct supervisor, she shouldn't be because she is in a lower civil service title and makes less money.

366. In fact CROSS is in a lower civil service title than all of the older workers in the unit, yet she manages all of the persons in the unit.

367. CROSS approves their time and leave, and assigns the employees in the unit along with GITTENS work.

368. It is clear and plausible, that the lengths that DEFENDANTS have gone through to place CROSS in this position is indicative of their discriminatory animus and cronyism.

***PINNOCK, WYNTER and PEMBERTON Preside Over a Policy of Retaliation for Protected Activities***

369. PEMBERTON, PINNOCK, SIMON and WYNTER have consistently retaliated against DOC employees that engage in protected activities.

370. PEMBERTON, PINNOCK and WYNTER retaliated against FREEMAN after she complained of discrimination to DOC's EEO Office.

371. One tactic that PEMBERTON, PINNOCK and WYNTER would use to retaliate against DOC employees, would be to  remove them from the central office/ the Bulova Building and have them work in the facilities on Riker's Island. Accordingly, staff became even more fearful about complaining.

372. Working at Riker's Island was not only less prestigious, it was also more dangerous and more physically taxing.  Workers would have to park their cars in a lot and then be physically transported to the island on a daily basis.

373. For example, Carolyn Maraj (MARAJ), complained in writing that the rescission of her permanent promotion may have been based on her race and or national origin in or about October 20, 2016.

374. In or about October 25, 2016 she met with former Commissioner Joseph Ponte (PONTE) to express her concerns face to face.

375. In or about December 9, 2016, PONTE, WYNTER, SIMON and PINNOCK retaliated against her.  The aforementioned extended her probationary period and then they eventually forced her to work back in one of Rikers's Correctional facilities.

376. Working in the actual Correctional facilities is a less desirable job. Working in the facilities reduced the likelihood of promotion amongst the executive administrative staff.

377. Additionally, the facilities are more dangerous for uniformed staff, who are exposed to violence from inmates unlike if they are permitted to work at the Headquarters/Bulova Building.

378. In or about December 9, 2016, PONTE, WYNTER, SIMON and PINNOCK retaliated against MARAJ.  The aforementioned extended her probationary period and then they eventually forced her to work back in one of Rikers' Correctional facilities.[4]

379. PINNOCK and WYNTER would also retaliate against Nichole Adams-Flores (ADAMS-FLORES), Deputy Commissioner for Health and Affairs of DOC.

380. After ADAMS-FLORES filed a charge with the EEOC, she was prohibited from speaking to outside agencies, she was also not allowed to respond to staff at a Public Hearing regarding her Division.

381. ADAMS-FLORES would also be denied the ability to speak at external events, despite the fact that she was the most qualified at the agency to do so.  Instead the agency sent a lesser credentialed unqualified white male to the American Correctional Association Conference.

382. Similar to the MARAJ lawsuit,  the ADAMS-FLORES lawsuit is rife with allegations against PINNOCK and WYNTER.

383. The ADAMS-FLORES complaint, describes PINNOCK and WYNTER's callous disregard of civil service laws; it also describes cronyism, discriminatory hiring and promotional practices and retaliation.[5]

---

[4] Carolyn Maraj filed a lawsuit alleging race and national origin discrimination against Commissioner Ponte, Jeff, Thamkittikasem, Claudette Wynter and the Department of Correction.  Maraj v. City of New York, 17-CIV-1456 (E.D.N.Y. June 7, 2017).

[5] Adams-Flores v. City of New York et al... 18-CV-12150 (JMF), (S.D.N.Y. December 24, 2018).

## VI.   REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS

384.   If PLAINTIFF prevails, she is entitled to an award of attorney and expert fees and costs

pursuant to 42 U.S.C. § 1988.

## VII.   DEMAND FOR TRIAL BY JURY

385.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, PLAINTIFF demands a

trial by jury in this action.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM OF RELIEF
### DISPARATE TREATMENT
### IN VIOLATION OF THE ADEA and DISPARATE IMPACT NYSHRL
### AND NYCHRL[6]

386.   Plaintiff hereby re-alleges and incorporates by reference each and every allegation set

forth in the foregoing paragraphs as if fully set forth herein.

387.The acts of the named defendants had a disparate impact on employees over the age of 40 at

DOC:

　　a.   Employees with over 20 years of work experience at DOC like Plaintiff, who were

over the age of 40 were paid less than their comparators.

　　b.   Employees with over 20 years of work experience at DOC who were over the age of

40, who applied to positions and promotions within the agency were denied by

PEMBERTON, PINNOCK, SIMON and or WYNTER.

---

[6] Plaintiff's ADEA claims are not against the individually named defendants, just the City of New York.
Additionally, the DOC is not a party to this matter.

c.  Employees with over 20 years of work experience, who were over the age of 40 were regularly marginalized, harassed, yelled at and pushed into retirement by PEMBERTON, PINNOCK, SIMON and WYNTER.

d.  JACKSON and MOSHIAVILI are only two examples of the dozens of other employees like PLAINTIFF that were subjected to this abuse.

e.  The intentionality of Defendants' animus can be seen in their repeated violation of the Civil Service Law and the <u>Long Beach</u> decision.  Defendants changed the civil service titles of employees who previously served in Administrative Staff Analyst positions temporarily to avoid placing PLAINTIFF and other permanent DOC employees with over 20 years of experience in those positions.  These DOC employees had taken the Administrative Staff Analyst examination and or applied for these vacancies when they became available.  However, due to Defendants' age-based animus they engaged in extraordinary efforts to avoid hiring PLAINTIFF and her similarly situated comparators; DOC employees with over 20 years of experience at DOC over the age of 40 were denied job opportunities at the upper echelons of management and pay; they were also denied  promotional opportunities.

f.  Defendants' ongoing cronyism had a disparate impact on workers with over 20 years of experience at DOC who are of retirement age.  Due to Defendants' retaliation and discriminatory animus, these employees have been denied promotional and job opportunities both within DOC and at other City agencies.

388. As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional opportunities and job opportunities. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## SECOND CLAIM OF RELIEF
## DISPARATE IMPACT AND DISCRIMINATION
## IN VIOLATION OF ADEA, NYSHRL and NYCHRL

389. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

390.    Plaintiff is 57 years old  and is a member of a protected class.

391.    Plaintiff is qualified for the positions she applied to and that were vacant both before and after the examination for Administrative Staff Analyst was offered.

392. Plaintiff suffered adverse employment actions:

    a.  She was demoted in terms of her responsibilities, job functions and or  tasks;

    b.  PLAINTIFF was assigned clerical tasks by PEMBERTON and WYNTER although she had previously performed managerial work and had outstanding job evaluations.

    c.  PLAINTIFF was repeatedly denied promotions and job opportunities for which she applied.

    d.  PLAINTIFF was paid anywhere from 20K to 70K less than her comparators who were hired into the positions she applied to and for which she was eligible for as a civil servant who passed the Administrative Staff Analyst Exam.

    e.  PLAINTIFF'S comparators were younger and less qualified.

    f.  PLAINTIFF performed work that was out of her civil service title, it was a lower level title and again consisted of menial tasks.

## THIRD CLAIM OF RELIEF
## DEFAMATION, CRONYISM AND DISCRIMINATION
## IN VIOLATION OF 14th AMENDMENT, NYSHRL and NYCHRL[7]

***Defendants' Wanton Disregard of the Civil Service List, Cronyism Had a Disparate Impact on DOC Employees of Retirement Age with over 20 years of Experience at DOC***

393. Upon information and belief Plaintiff was the lowest paid employee with her experience and qualifications managed by PEMBERTON.

394. Upon information and belief, Plaintiff and other situated employees over the age of 40 with over 20 years of experience at DOC were paid lower than their younger similarly situated comparators.

395. Upon information and belief, Defendants failed to promote any DOC employees with over 20 years of experience to fill internal vacancies at DOC.

    a.   Consistent with this practice Defendants failed to hire Plaintiff for any of the vacancies for which she applied.  Instead Defendants repeatedly hired and fired younger less qualified candidates to fill the positions.

    b.   Also consistent with Defendants' discriminatory age-based animus, Defendants passed over Plaintiff from an established civil service list of 17 DOC employees; Plaintiff was the only employee who was not picked to fill any of the numerous vacancies that she was eligible for as a permanent civil servant.

    c.   Further evidence of Defendants' animus was shown when they allowed PEMBERTON to preside over the hiring process, despite his clear conflict of interest. A blatant instance of this conflict was when he chose himself over PLAINTIFF for

---

[7] ADEA CLAIMS ARE NOT AGAINST INDIVIDUALLY NAMED DEFENDANTS, JUST THE CITY OF NEW YORK.  ADDITIONALLY, HRA IS NOT A PARTY TO THIS MATTER.

the supervisory position he occupied when he managed Plaintiff. PEMBERTON was

allowed to engage in this egregious conduct despite the fact that PLAINTIFF had

more years of experience both within City government and at DOC in HR.

396. In violation of Section 61 of the New York Civil Service Law and Plaintiff's due process,

Defendants failed to inform GITTENS of her non selection for the positions she eligible for

at DOC or at other City Agencies in the Administrative Staff Analyst title.

397. As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional opportunities

and job opportunities. Plaintiff has also suffered mental anguish, emotional distress, loss of

enjoyment of life, and has incurred damages.

### FOURTH CLAIM OF RELIEF
### HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF ADEA,  1983, NYSHRL and NYCHRL

398. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set

forth in the foregoing paragraphs as if fully set forth herein.

399. PLAINTIFF has experienced a continuous violation of her civil rights  since she was

physically assaulted in BARRETO's office in 2012.

400. Since 2012, BARRETO has taken steps to ensure that PLAINTIFF has been denied job and

promotional opportunities within the agency.

401. Since 2015, BARRETO became aware of the other named Defendants' age-based animus

defamed PLAINTIFF to them and worked in concert with them to discriminate against

GITTENS.[8]

---

[8] Plaintiff only seeks recovery for those events that took place after August 2014.  Again she filed her
charge with the EEOC in October 2017 and with her claims under § 1983 and the New York City Human
Rights Laws she is entitled to recover for any actions from 2014 to present.

402. Fully aware of the other named Defendants' age based animus BARRETO falsely defamed Plaintiff's performance and mental state to PEMBERTON, WYNTER and SIMON.

403. Evidence of BARRETO's knowledge of the other named defendants' animus can be seen when she disclosed the named Defendants' age-based animus to GRIFFITH.

404. As a result of BARRETO's defamatory and fallacious statements, PLAINTIFF was denied job and promotional opportunities, and was stigmatized within the agency to SIMON and PEMBERTON.

405. Based on BARRETO's defamatory statements, PEMBERTON told GITTENS that she lacked the ability to do the complex work of an Administrative Staff Analyst.

406. PEMBERTON made this statement and then callously placed himself in the position over GITTENS.

407. PINNOCK, PEMBERTON and WYNTER worked in concert to harass and marginalize PLAINTIFF since August 2016.

408. PINNOCK, PEMBERTON and WYNTER would use BARRETO's statements as pretext for their age based animus.

409. To date, none of the named defendants have evaluated or provided any written evidence of Plaintiff's alleged performance deficiencies.

410. Instead on multiple occasions, the named Defendants have attempted to manufacture baseless disciplinary charges and performance deficiencies to serve as a pretextual basis for their discriminatory and retaliatory adverse employment actions.

411. PLAINTIFF'S health has also deteriorated due to the age based hostile work environment and retaliation she has experienced.

412. Defendants' ongoing harassment has made PLAINTIFF dread coming to work. PLAINTIFF fears that she will be pushed out of her job like JACKSON, MOSHIAVILI and other workers at DOC with over 20 years of experience and of retirement age.

413. WYNTER and SIMON have made statements that express their disdain for DOC workers with over 20 years of experience at the agency.  They have called these DOC employees, dead men and idiots; they have stated their intention to get rid of these DOC employees because they did not fit the image of the agency; and they have worked in concert with DOC management to repeatedly pass them over for job and promotional opportunities within the agency.

414. PLAINTIFF and other employees with over 20 years of experience at DOC either experienced physical violence or were threatened with physical violence by the named Defendants as described herein.

415. PLAINTIFF has seen several of her co-workers die due to exacerbations of their medical conditions because of the age based hostile work environment they have experienced at DOC.

416. PLAINTIFF herself has experienced insomnia, anxiety, further reduction in her ability to ambulate, weight gain and emotional distress because of Defendants' ongoing harassment, verbal attacks and humiliation.

417. As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## FIFTH CLAIM OF RELIEF
## RETALIATION

## IN VIOLATION OF 1st AMENDMENT, § 1983, ADEA, NYSHRL and NYCHRL

418. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

419. PLAINTIFF engaged in protected activities when she complained of discrimination at town hall meetings, filed a complaint with the EEOC and filed the lawsuit herein.

420. Defendants knew of PLAINTIFF's protected activities.  PLAINTIFF complained to WYNTER and SIMON on separate occasions, she also complained at town hall meetings where the named Defendants were in attendance.

421. Plaintiff spoke as an ordinary citizen on a matter of public concern. She advocated against age discrimination, cronyism and nepotism at the DOC.

422. PLAINTIFF consistently experienced adverse employment in close proximity to her protected activities:

    a. On May 29, 2015 she complained of discrimination, cronyism and nepotism at DOC. In June 2015 she was denied interviews and job opportunities on three separate occasions; on at least two occasions within days of the May 29, 2015 town hall meeting.

    b. Upon information and belief, each of the positions for which GITTENS applied in June 2015, each were filled with younger, less qualified cronies of the named defendants.

    c. GITTENS filed an EEOC charge in October 2017, within weeks of this charge she was demoted and given tasks and standards that were beneath her civil service title. Despite years of managerial experience and satisfactory or better performance in that capacity, the named defendants assigned GITTENS clerical tasks within several

weeks of her EEOC charge..   The tasks and standards would prevent PLAINTIFF

from being promoted and would prevent her from being eligible for managerial

positions both within DOC and at other City agencies.

d.   PEMBERTON and WYNTER would attempt to bring PLAINTIFF up on

manufactured disciplinary charges within a month of her filing the lawsuit herein.

GITTENS filed her lawsuit on January 9, 2019, and PEMBERTON and WYNTER

sought to write her up on  or about February 14, 2019.

423. The causal connection between PLAINTIFF's protected activities and DEFENDANTS'

conduct can be seen in the consistent temporal proximity between PLAINTIFF's complaints

and the adverse employment actions she consistently experienced within a month of her

protected activities.

424. Furthermore, Defendants' actions would dissuade a reasonable person from complaining

about discrimination to DOC's management, filing a charge with the EEOC or a lawsuit

against the agency.

425. As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job

opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional distress,

loss of enjoyment of life, and has incurred damages.

**SIXTH CLAIM OF RELIEF**
**MONELL LIABILITY/1983**

426.  PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set

forth in the foregoing paragraphs as if fully set forth herein.

427. DOC/CITY failed to address PLAINTIFF's multiple complaints of discrimination.

428. PINNOCK, WYNTER and SIMON at all times relevant were final policy makers as it

pertained to personnel decisions that could affect PLAINTIFF's employment conditions.

429. At all times relevant PINNOCK, WYNTER and SIMON had the ability to hire, fire and demote PLAINTIFF.

430. At all times relevant PINNOCK, WYNTER and SIMON had the ability to stop the discriminatory and retaliatory behavior of DOC management and failed to do so.

431. PINNOCK, WYNTER and SIMON had the ability to address the allegations of cronyism and discrimination that were made to DOI, the unions, the EEO Office and state agencies and failed to do so.

432. DOC/CITY's failure to act was so common that their internal EEO Office became known as the Office of Unsubstantiation due to their failure to address and or investigate complaints of discrimination.  This amounted to a policy and custom of failing to investigate complaints of discrimination.

433. The underlying violations of PLAINTIFF's civil rights have been established. The Complaint is rife with allegations where the individually named Defendants personally participated in the discriminatory and retaliatory conduct PLAINTIFF experienced.

434. The CITY has a widespread policy  or custom of cronyism, age discrimination and a failure to investigate these allegations once they are filed with DOI.

435. After complaints of cronyism and nepotism, in June 2017, Commissioner of the New York City Department of Design and Construction (DDC), Feniosky Pena Mora (PENA MORA) stepped down.

436. Similar to the employees at DOC, the DDC staff filed complaints with DOI, that upon information and belief were not investigated or acted upon.

437. Upon information and belief,  PENA MORA hired the wife of Council person Ydanis Rodriguez at the behest of Mayor de Blasio.[9]

438. Between 2010 and 2011, employees at the Department of Information Technology and Telecommunications filed several complaints of discrimination and cronyism with DOI.

439. DOI selectively investigated the complaints of cronyism at DoITT despite an expose by the Village Voice.

440. DOI would ignore the complaints of racial discrimination and cronyism made by people of color against white managers and executives.

441. Upon information and belief both Geneith Turnbull (TURNBULL) and Ricardo Morales (MORALES) filed lawsuits against the City that alleged discrimination, demotions of older employees and cronyism.

442. TURNBULL's salary was reduced by $100K when she complained of discrimination and refused to engage in cronyism.

443. MORALES was terminated on the spot when he provided unfavorable testimony to the FBI and other government agencies about Mayor de Blasio's  favorable treatment of a vendor.

444. Upon information and belief the City settled TURNBULL's lawsuit to avoid any additional exposure and to avoid the taint of liability.

445. Upon information and belief, MORALES's lawsuit remains pending in the Southern District of New York.

---

[9] "DeBlasio Slammed in Hire of Councilman's Wife," in DNAInfo by James Fanelli dated January 14, 2016 https://www.dnainfo.com/new-york/20160114/washington-heights/de-blasio-slammed-over-commissioners-hire-of-councilmans-wife/

446. Further evidence of the City's attitude towards complaints of discrimination and how they are handled can be seen in Mayor de Blasio's statement about a hyper-complaint environment amongst city workers.

447. As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## SEVENTH CLAIM OF RELIEF
## INDIVIDUAL LIABILITY UNDER § 1983

448. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

449. The named Defendants directly participated in the constitutional violations under the 1st and 14th Amendments of the Constitution of the United States.  They worked in concert to deny PLAINTIFF of job and promotional opportunities at DOC and at other City agencies.

450. The named Defendants worked in concert to ensure that PLAINTIFF worked in an age based hostile work environment by ignoring her complaints of age discrimination as well as the complaints that her similarly situated co-workers made as well.

451. SIMON and WYNTER attacked older employees who complained of age-based discrimination and cronyism at DOC.

452. PINNOCK repeatedly signed off on hires that were discriminatory and that were in violation of the civil service law.

453. PINNOCK, SIMON and WYNTER engaged in the crony based and discriminatory hires of their colleagues, friends, family members and or associates.

454. The hiring practices of PINNOCK, SIMON, WYNTER and PEMBERTON had a disparate impact on older workers at DOC with over 20 years of experience.

455. The hiring practices of PINNOCK, SIMON, WYNTER and PEMBERTON resulted in the disparate treatment of older workers at DOC with over 20 years of experience.

456. As a result of the foregoing,  Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## EIGHTH CLAIM OF RELIEF
## AIDING AND ABETTING
## NYSHRL & NYCHRL

457. PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

458. The underlying violations of PLAINTIFF' civil rights have been established.  The Complaint is rife with allegations where the individually named Defendants personally participated in the discriminatory and retaliatory conduct alleged.

459.  As a result of the foregoing,  Plaintiff has lost wages, benefits, promotional and job opportunities, and bonuses. Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## IX.   PRAYER FOR RELIEF

 WHEREFORE, PLAINTIFF  prays that this Court grant her judgment containing the following relief:

      a.   Impanel a jury to hear PLAINTIFF's claims;

      b.   Costs and disbursements of this action;

c.   An award of damages of $1 million to compensate PLAINTIFF for her monetary losses and damages, including PLAINTIFF'S loss of past and future earnings, bonuses, compensation and other employment benefits.

d.   An award of damages of $1 million to compensate PLAINTIFF for the mental anguish, humiliation, embarrassment, treatment and emotional injury she endured for each cause of action;

e.   An award of damages in an amount to be determined upon the trial of this matter to compensate PLAINTIFFF for violations of her rights under: the 1st and 14th Amendments of the United States Constitution; ADEA; 42 U.S.C. §§ 1983 and 1988; the New York State Executive Law; and New York City Human Rights Law;

f.   An award of punitive damages to be determined at trial for each cause of action, by reason of the wanton, unrepentant, reckless and egregious conduct of the individually named defendants herein;

g.   An order prohibiting Defendants from continuing or maintaining the policy, practice and/or custom of discrimination and retaliation based on age and protected activities respectively; and

h.   Such other and further relief as this Court may deem just and proper.

Dated: Queens, New York
    August 1, 2019                                        Respectfully submitted,

                                                                /s/

                                            _____
                                            SPECIAL HAGAN, ESQ.
                                            LAW OFFICES OF SPECIAL HAGAN
                                            196-04 Hollis Avenue
                                            Saint Albans, New York 11412
                                            (917) 337-2439
                                            special@haganlawoffices.net