UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LORRAINE A. GITTENS-BRIDGES,

Plaintiff,

v.

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION; GARLAND
BARRETO; AUDWIN PEMBERTON; NADENE
PINNOCK; DINA SIMON; and CLAUDETTE
WYNTER, in their official and individual capacities
and as aiders and abettors,

Defendants.

**OPINION AND ORDER**

19 Civ. 272 (ER)

Ramos, D.J.:

Lorraine A. Gittens-Bridges ("Gittens") brings this action against her employer,

The City of New York ("City") and her supervisors at the New York City Department of

Correction ("DOC"),[1] Garland Barreto ("Barreto"), Audwin Pemberton ("Pemberton"),

Nadene Pinnock ("Pinnock"), Dina Simon ("Simon"), and Claudette Wynter

("Wynter"),[2] for age discrimination, cronyism, and retaliation in the workplace.  Before

the Court are Defendants' motions to dismiss the Second Amended Complaint ("SAC")

and to strike certain matters included in the SAC pursuant to Rules 12(b)(6) and 12(f) of

the Federal Rules of Civil Procedure, respectively.  Doc. 72.  Also before this Court is

Gittens' motion for leave to amend.  Doc. 93.  For the reasons set forth below,

---

[1]  Despite the SAC listing DOC in the caption, Gittens maintains that DOC has never been a party and
agrees to its termination.  Docs. 59 at 1, 46 n.6; 73 at 27; 93 at 47.

[2]  Barreto, Pemberton, Pinnock, Simon and Wynter will be referenced as the "Individual Defendants" and,
together with the City as the "Defendants."

Defendants' motion to dismiss is GRANTED in part and DENIED in part, Defendants'

motion to strike is DENIED, and Plaintiff's motion for leave to amend is DENIED.

I.      **Factual and Procedural Background**

      A.      **Gittens' Career with DOC until Supervised by the Individual
Defendants**

      Gittens, a 1984 graduate of Cornell University School of Industrial Relations, is

57 years old and has worked for the DOC since 1986.  Doc. 59 at ¶¶ 19, 88-89.  Over the

last 33 years, Gittens has been promoted three times and became an Associate Staff

Analyst in 1993.  *Id.* at ¶¶ 20, 90-91, 101.  She has held several titles, including Acting

Assistant Director of Personnel, Career Counselor, Senior Supervisor and Acting

Assistant Director of Recruitment.  *Id.* at ¶¶ 103, 282.  Her responsibilities have ranged

from supervising and training staff, overseeing recruitment and hiring, editing agency

advertisements, and preparing reports and drafting correspondence for senior

management.  *Id.* at ¶ 103.  She also participated in job fairs, career days and related

community events and was a union delegate.  *Id.* at ¶¶ 103, 207.  Gittens received

accolades for her work, including letters of commendation and designation as "Employee

of the Month."  *Id.* at ¶ 102.  On performance reviews administered prior to the time she

came to be supervised by the Individual Defendants, Gittens consistently received an

"Outstanding" rating.  *Id.* at ¶ 93.

      Barreto was Gittens' direct supervisor in 2011, and then became her indirect

supervisor in 2012.[3]  *Id.* at ¶¶ 108-09.  Simon,[4] who started at the DOC in 2014, hired

---

[3] During the relevant time period, Barreto was either Acting Deputy Commissioner or Director of
Personnel Operations.  *Id.* at ¶ 35.

[4] Simon's title was First Deputy Commissioner or Deputy Commissioner of Human Resources during all
relevant times.  *Id.* at ¶ 69

Wynter[5] and both indirectly supervised Gittens.  *Id.* at ¶¶ 70, 81, 130, 146.  Pinnock was also Gittens' indirect supervisor.[6]  *Id.* at ¶ 61.  Pemberton, who was also hired by Simon, was Gittens' direct supervisor starting in August 2016.[7]  *Id.* at ¶¶ 47, 299.

While under the supervision of the Individual Defendants, Gittens has not received a performance review since 2011, which runs counter to New York City's Personnel Rules and Regulations requiring yearly evaluations.  *Id.* at ¶¶ 95-96, 109, 409. Without performance reviews, Gittens cannot advance in title or pay.  *Id.* at ¶ 98.

**B.   Gittens' Soured Relationship with Barreto**

In 2012, Gittens was directly supervised by Dounia Alfred ("Alfred"), and indirectly supervised by Barreto.  *Id.* at ¶¶ 109-10.  From June 2012 until April 2013, Alfred accused Gittens of deficient performance and harassed her.  *Id.* at ¶ 112.  During the first week of April 2013, Alfred asked Gittens to write a memorandum but gave Gittens no guidance as to what was expected.  *Id.* at ¶¶ 113-14.  When Alfred was unhappy with the memorandum Gittens drafted, she berated Gittens and Gittens complained to Barreto.  *Id.* at ¶¶ 115-16.  During a subsequent meeting with Barreto, Alfred and Gittens, Alfred took Gittens by the arms and violently shook her.  *Id.* at ¶¶ 118-20.  Barreto failed to intervene during the altercation.  *Id.* at ¶ 122.  Afterwards, Gittens filed a police report about the incident, which Barreto dismissed as "gossip" in an April 2013 email.[8]  *Id.* at ¶ 123.  Gittens was hospitalized for two weeks following the

---

[5] At all relevant times, Wynter was Assistant Commissioner of Human Resources.  *Id.* at ¶ 80.

[6] Pinnock was Deputy General Counsel until 2016 when she became Deputy Commissioner of Human Resources and was responsible for signing off on all personnel actions at the DOC.  *Id.* at ¶¶ 60, 213-14.

[7] Pemberton was hired as the Director of Payroll and Timekeeping, his post during all relevant times.  *Id.* at ¶¶ 46, 152.

[8]  Gittens provides no information as to how, if at all, the police report was resolved.

altercation, took medical leave from the DOC from April 2013 until July 2013, and sought therapy for the psychological trauma she endured. *Id.* at ¶¶ 125-27. Since then, Barreto has maligned Gittens to every new supervisor she has gotten, telling Wynter, Simon, Pinnock and Pemberton that Gittens was a poor performer and had "checked out," meaning, presumably, that she purposefully does not engage with her responsibilities and does the bare minimum required of her job. *Id.* at ¶¶ 41-42.

### C.     Defendants' Hiring Practices

When Simon began working for the DOC in September 2014, she hosted agency-wide town hall meetings, conducted brown-bag lunches, and circulated surveys. *Id.* at ¶¶ 130, 133. While at first it seemed that Simon was interested in addressing employee concerns about discrimination, her objective eventually seemed to be gaining knowledge of employee job descriptions so she could phase out those near retirement age with over 20 years of experience in order to hire her friends and family as replacements.[9] *Id.* at ¶¶ 133, 138. Simon hired Wynter, her close friend, as Assistant Commissioner. *Id.* at ¶¶ 146-47. Simon also hired Pemberton as Director of Payroll and Timekeeping and then, together with Wynter, they hired twelve more directors who all made over $100,000 salaries, and several other employees.[10] *Id.* at ¶ 152. Upon information and belief, all of these hires were friends, family, or former colleagues of Defendants and had less

---

[9] Staff members with over 20 years of experience are eligible for a full pension. *Id.* at ¶ 139.

[10] Those hired by Simon, Wynter and Pemberton include: Executive Director Deborah Stewart, Branding and Marketing; Directors Fabrice Armand, Strategic Partnerships & Community Engagement; Armando Chabran, Human Resources Data Analytics and Classification; Ayinde Williams, Human Resources and Operations; Dahlia Grant, Employee Services; Chikera Beckford, Special Projects; Deputy Directors Mitaben Brahmbhatt, Operations; Pamela Daniels, Central Timekeeping Unit; Sherbreina Watson, Payroll; Kassandra King, Labor Relations; and other employees Shalimar Aldafari, Melissa Andre, Malika Granville, Christine Paulino, Dane Ching, Clinton Dowding, Christopher Howard, Willy De Los Santos, Tolani Elumade, and Lateef Taylor Sr. *Id.* at ¶¶ 148-49, 152.

experience than the internal DOC applicants for the positions, at least some of which had over 20 years of experience and were over 40 years old.[11]  *Id.* at ¶¶ 149, 153-54, 159.

> ### D.   Defendants' Failure to Promote Gittens and Attitudes towards Employees over the Age of 40 with 20 Years of Experience

On November 7, 2014, Gittens applied for the first time to be the Director of Recruitment.  *Id.* at ¶ 160.  Gittens interviewed for the position but Lakisha Grant, who was younger and had less experience than Gittens, was hired.  *Id.* at ¶¶ 161-62.  When Grant did not work out in that position, Simon re-advertised the job and Gittens was interviewed for a second time.  *Id.* at ¶¶ 163-64.  Darlene Martinez, who was younger and less qualified than Gittens, was hired.  *Id.* at ¶ 165.  When the position became vacant for a third time it was not posted and Ayinde Williams, who is also younger, less qualified, and a friend of a person involved in filling the position, was hired and promoted to Director of Human Resources as an Administrative Staff Analyst.  *Id.* at ¶¶ 161, 166-71. Gittens attributes Simon's failure to post the position to Simon not wanting to consider Gittens for the job because of her age.  *Id.* at ¶¶ 175-76.

From November 2014 until July 2015, Gittens applied for numerous other positions to no avail.  *Id.* at 177-78.  Gittens wrote to Simon on January 7, 2015 to request an interview for a Project Manager position but received no response.  *Id.* at ¶¶ 178-79.  On January 8, 2015, Gittens wrote to Simon again requesting an interview for another Project Manager position in Human Resources Organizational Learning and Development, and again was ignored.  *Id.* at ¶¶ 180-81.

---

[11] Dominique McGuire, Pinnock's god-sister, had little to no experience but was hired to supervise three employees with over 20 years of experience.  *Id.* at ¶¶ 240-41.  Each of the employees she supervised was over 50 years old.  *Id.*  McGuire's pay exceeds the cap applicable to her title.  *Id.* at ¶¶ 242-43.

In April 2015, Gittens was interviewed by Barreto for a position in Special Projects. *Id.* at ¶¶ 182-83. During the interview, Barreto told Gittens, "I didn't know you had done all of this community service. I thought you had checked out." *Id.* at ¶ 184.

At a town hall meeting held on May 29, 2015, Gittens asked why she had been passed over for so many positions. *Id.* at ¶¶ 217, 221. Within days, in early June 2015, she applied to three more positions but younger, less experienced employees were hired instead. *Id.* at ¶ 187. Gittens wrote Simon for a third time on June 3, 2015 requesting an interview for the Director of Strategic Partnerships and Community Engagement position, but Simon again did not respond. *Id.* at ¶¶ 188-89. Fabrice Armand, who is younger and less experienced, was hired instead. *Id.* at ¶ 190. On June 4, 2015, Gittens applied for the Director of Special Projects job but was not interviewed. *Id.* at ¶ 191. Beckford, a younger candidate with less experience, was hired instead. *Id.* at ¶ 192.

When Gittens asked why she had been passed over for these positions during a July 23, 2015 meeting, Simon told her that Barreto had disparaged her work and mental health. *Id.* at ¶¶ 194-201. When Gittens requested examples of her own poor performance, Simon escorted Gittens out of her office. *Id.* at ¶ 198. Gittens viewed Barreto's comments about her mental health and performance as mere pretext for age-based discrimination and felt she could not advance her career under Simon, Wynter or Pinnock. *Id.* at ¶¶ 200-03.

As an example of her supervisors' bias more generally, Gittens alleges that during a December 2015 meeting of executive staff, Wynter stated that she wanted to rid the DOC of employees with more than 20 years of experience because they were fat, old and did not comport with the agency's new image. *Id.* at ¶ 205. Wynter had been overheard

calling older workers "dead men" and it was rumored that both Simon and Wynter referred to older employees as "idiots."  *Id.* at ¶¶ 210, 245.

### E.     Defendants' Continued Refusal to Promote Gittens Despite Civil Service Exam List Procedures

On August 17, 2016, a list was established based on the Civil Service Exam No. 5517 for the Administrative Staff Analyst position.  *Id.* at ¶¶ 248, 250.  Gittens and Pemberton both took the exam and both scored 77.545.  *Id.* at ¶¶ 248-49.  Under Civil Service Law, an agency is required to select one of the top three candidates on the list for any open position.  *Id.* at ¶ 251.  A provisional employee who occupies a position covered by the established list must be replaced by an employee on the list.  *Id.* at ¶ 252. Simon, Pinnock and Wynter did not observe these rules and conventions.  *Id.* at ¶ 253. For example, a position for an Administrative Staff Analyst opened up that month.  *Id.* at ¶¶ 259, 299.  Despite the conflict of interest, Pemberton presided over the list and picked himself over Gittens for the promotion.  *Id.* at ¶ 256.  Upon information and belief, he is younger and less qualified than Gittens.  *Id.* at ¶ 258.

Because that was the only vacancy within Pemberton's unit at that level, Gittens alleges that she should have been considered for other openings consistent with that title not only within DOC but across other City agencies.  *Id.* at ¶ 259.  Indeed, she should have received a "call letter" which would have notified her of other vacancies for Administrative Staff Analysts, but she did not and was therefore not given the opportunity to apply for those positions.  *Id.* at ¶¶ 260-61.  Had she been considered for any of those positions but not selected, she would also have received "considered but not selected" ("CNS") letters, which she did not.  *Id.* at ¶¶ 266-68.

F.       **Conditions under Pemberton's Direct Supervision and Defendants' Continued Skirting of Civil Service Law**

When Pemberton began supervising Gittens in August 2016, she felt that he discriminated amongst his ten supervisees on the basis of age. *Id.* at ¶¶ 298-99. Supervisees Penny Hunter Freeman, Jackie Welch and Gittens were all over 40 years old and Pemberton ignored them, frequently withholding information useful for their work. *Id.* at ¶¶ 305-06, 309.  In contrast, Pemberton spoke to the younger employees and provided them with professional opportunities. *Id.* at 307.  While younger employees were also given salary increases, Freeman was denied a raise three times without a cited reason. *Id.* at ¶¶ 310-11.  Pemberton never hired anyone over the age of 40 and said the work of those with over 20 years of experience was substandard. *Id.* at ¶¶ 301-04.

Pemberton ignored Gittens, demeaned her saying that she did substandard work, and judged her incapable of handling the tasks of an Administrative Staff Analyst. *Id.* at ¶¶ 300, 321.  In the Fall of 2016, Pemberton informed Gittens that she was not hired off of the list. *Id.* at ¶ 265.  But it was not until June 2017 that Gittens learned at a union meeting that she was the *only* person out of 17 on the list to be not hired, even though she had scored higher than many of them. *Id.* at ¶¶ 264, 276.

DOC had at least 10 provisional employees serving as temporary Administrative Staff Analysts who should have been replaced by eligible civil servants who had passed the exam and were on the list. *Id.* at ¶¶ 267, 271.  The Individual Defendants circumvented the rule that provisional employees must be replaced with civil servants by labeling them as "temporary" and have done the same on at least 10 separate occasions throughout 2016 and 2017. *Id.* at ¶¶ 272-73.  Gittens qualified for all 10 positions but they were instead filled with younger, less qualified individuals. *Id.* at ¶¶ 274, 280.

For example, Gittens is also supervised by Jody-Ann Cross who is under 40 years old and less qualified than her.  *Id.* at ¶¶ 354-55.  Though Cross has a lower salary and has a lower title than Gittens and therefore should not supervise her, Gittens was denied the opportunity to apply for Cross' job.  *Id.* at ¶¶ 358, 365-66.  Cross' title, Community Associate/Community Coordinator, circumvents Civil Service Law because her position would otherwise be covered by the list.  *Id.* at ¶ 359.

### G.    Gittens' Formal Complaints

Gittens alleges that she did not file an internal complaint with the DOC Office of Equal Employment Opportunity ("EEO") because it has a history of not investigating employee complaints of discrimination.  *Id.* at ¶ 325.  According to Gittens, the EEO was known among DOC employees as the "Office of Unsubstantiation" because the office would either do nothing or not find a policy violation.  *Id.* at ¶ 326.

Instead, Gittens filed complaints externally with the United States Equal Employment Opportunity Commission ("EEOC"), her union, the Department of Investigation ("DOI"), the State Division of Human Rights ("SDHR"), and other administrative agencies.  *Id.* at ¶¶ 141, 327.  In her DOI complaint,[12] Gittens alleged that Simon, Wynter, and Pinnock hired their close friends, relatives, and associates, which cost the DOC at least a million dollars and had a disparate impact on DOC employees over the age of 40 with 20 years of experience. *Id.* at ¶ 142.  When the DOI failed to investigate her complaint, Gittens alleges that the Defendants became emboldened to continue to engage in age discrimination and cronyism in hopes of pushing out older employees.  *Id.* at ¶¶ 143-45.

---

[12]  Gittens does not specify when her DOI complaint was filed beyond that she and other employees filed complaints "[i]n October through December 2017, and in March 2018."  *Id.* at ¶ 141.

Gittens filed her complaint with the EEOC on October 20, 2017. *Id.* at ¶ 330; Doc. 74-1.[13]  In the complaint, Gittens identified two instances of being passed over for the Administrative Staff Analyst role:  on June 20, 2017 by Pemberton, and on June 29, 2017 by Wynter.  Doc. 74-1 at 3.  She also reported the Human Resources Division position that she applied for three times but that she had only been allowed to interview for twice and that had always gone to younger employees, and the Director of Special Programs position that she had interviewed for but had gone to the younger Beckford.  *Id.* at 3-4.  In addition, she described Wynter's complaints about older workers as "old [and] fat [and] don't fit the new image of the agency" and how Wynter wanted "employees of 20 years out."  *Id.* at 3.  Finally, she explained how she had passed the test for Administrative Staff Analyst and had learned at a June 29, 2017 union meeting that she was the only employee not to be hired off of that list despite never having been advised of any work performance issues by Wynter.  *Id.* at 4.  Gittens alleged that "Wynter stated she wanted [Gittens] and others out" and attributed any complaints of poor work performance by Wynter to be pretext for discrimination "because of [her] age [and] weight."  *Id.*

Following the filing of the EEOC complaint, Gittens alleges that she experienced retaliation.  *Id.* at ¶ 331.  In December 2017, Pemberton accused her of deficient performance and when she showed that he was wrong, he created a list of job responsibilities for her, known as tasks and standards, which were beneath her civil

---

[13] The Court takes judicial notice of Gittens' EEOC charge.  *Cappelli v. Jack Resnick & Sons, Inc.*, No. 13-CV-3481 (GHW), 2014 WL 4188084, at *2 (S.D.N.Y. Aug. 22, 2014) ("Judicial notice may be taken of public filings, such as an EEOC charge.") (citations omitted).  *See also* Doc. 73 at 4 n.2.

service title.[14]  *Id.* at ¶¶ 332, 334-35, 337.  She had been working without formal tasks and standards for over a year, but was assigned these tasks and standards within weeks of her complaint.  *Id.* at 337.  In essence, Pemberton demoted her by requiring that she perform clerical tasks despite her longstanding work as a manager.  *Id.* at ¶¶ 338-339.  At a certain point, Pemberton refused to speak to Gittens at all.  *Id.* at ¶ 336.  When Gittens complained specifically about Pemberton's retaliation, neither Pinnock nor Wynter did anything to stop the abuse.  *Id.* at ¶¶ 333, 344.

## H.    Gittens' Leave of Absence and Filing of the Instant Case

Gittens was so stressed by her work environment under Pemberton, she missed work, depleting her reserve of leave days, and her health deteriorated.  *Id.* at ¶¶ 314-15, 322.  Between December 2018 and February 2019, during which time Gittens filed the instant complaint, Gittens took a leave of absence because of her stress and anxiety over the ongoing harassment.  Docs. 1, 59 at ¶ 323.

When Gittens returned from leave, Pemberton sent Gittens an email about turning in her timesheets.  Doc. 59 at ¶ 346.  On February 14, 2019, just five weeks after the filing of the complaint in this case, Pemberton told Gittens that she was rude and disrespectful and asked to meet with her about her timesheets.  *Id.* at ¶¶ 346-47.  Having not realized that she had already submitted doctors' notes excusing her absences, Pemberton threatened to discipline her during their meeting.  *Id.* at ¶¶ 348, 350.  Gittens was embarrassed because her colleagues could hear their meeting and had also heard Pemberton conspire with Wynter about confronting Gittens the previous day.  *Id.* at ¶¶ 348-53.

---

[14]  Gittens was also assigned tasks and standards beneath her title in December 2016 and August 2018.  *Id.* at ¶¶ 303, 340.

I.     **Allegations of Discrimination and Retaliation of Other DOC Employees**

Pemberton, Simon, Wynter, and Pinnock would also allegedly transfer staff who complained about discrimination to the DOC facility at Rikers Island, which Gittens alleges is a less prestigious and more dangerous assignment.  *Id.* at ¶¶ 319-20, 372.  Ita Jackson spoke out about Simon's and Wynter's discrimination in hiring at meetings and town halls.  *Id.* at ¶¶ 220, 232.  Jackson was then marginalized, transferred to Rikers Island, and forced into early retirement.  *Id.* at ¶ 233.  After Althea Cicero and Mary Gainey similarly complained, Cicero was demoted in title and pay and Gainey was transferred.  *Id.* at ¶¶ 223, 234, 238-39.

Michelle Roman expressed concerns over discriminatory hiring practices at a town hall.  *Id.* at ¶¶ 217, 220.  Simon yelled at Roman and had to be physically restrained from attacking her.  *Id.* at ¶ 222.  Within a few weeks, Roman was transferred.  *Id.* at ¶ 223.  At another staff meeting, Makvala Moshiavili became visibly upset as she spoke about the blatant ageism, cronyism, and pay disparities she experienced at DOC under Simon and Wynter.  *Id.* at ¶¶ 225-29.  Subsequently, her responsibilities and access to personnel programs decreased, she became isolated, and she retired.  *Id.* at ¶ 230.

From October to December 2017 and in March 2018, a number of DOC employees filed complaints against Simon, Wynter and Pinnock with their unions and the DOI.  *Id.* at ¶ 141.  In their complaints, they alleged that Simon, Wynter and Pinnock hired their close friends, relatives and associates, costing the City over a million dollars and disparately impacting employees over the age of 40 with more than 20 years of experience.  *Id.* at 142.

**J.      Other Lawsuits against the City and News Reports on City Hiring Practices**

Gittens discussed four other lawsuits in the SAC alleging discrimination in City agencies.  *Id.* at ¶¶ 373-83, 441-45.  Former DOC Deputy Commissioner for Health Affairs Nichole Adams-Flores filed a complaint against the City of New York and others on December 24, 2018 alleging discrimination and retaliation.  *Adams-Flores et al. v. The City of New York et al.*, No. 18-CV-12150 (JMF).  Specifically, Adams-Flores alleges that her complaints were ignored by the EEO in an "ongoing pattern or practice," and that she was retaliated against by being excluded from meetings, denied information, and had her responsibilities minimized.  No. 18-CV-12150 Doc. 65 at ¶¶ 6, 106, 128.  Her complaint is still pending.

In February 2017, Carolyn Maraj also sued the City, Wynter and others for rescinding her permanent employment at the DOC and retaliation.  *Carolyn Maraj v. The City of New York et al.*, No. 17-CV-1456 (RJS) (KNF).  Maraj alleged she was demoted in violation of the Civil Service Law and despite good performance reviews and sent to work at Rikers Island in retaliation for her complaints.  No. 17-CV-1456 Doc. 28 at ¶¶ 21, 28, 34, 45, 56.  The parties reached a settlement in August 2017.

Geneith Turnbull brought suit against the City and others on January 10, 2018. *Turnbull v. City of New York et al.*, No. 18-CV-193 (AKH) (SN).  Turnbull, 56, pleaded that she was demoted from her position as Deputy Commissioner of the Office of Citywide Procurement in the New York City Department of Citywide Administrative Services ("DCAS"), and replaced by someone in their 30s with less experience, in retaliation for her complaints of discrimination.  No. 18-CV-193 Doc. 1 at ¶¶ 3, 10, 42-49.  In June 2019, the parties stipulated to dismiss the case.

Finally, former Deputy Commissioner in charge of Asset Management at DCAS, Ricardo Morales, brought suit alleging whistleblower retaliation by the City and others in February 2018. *Morales v. City of New York et al.*, No. 18-CV-1573 (JGK) (DCF) Doc. 1 at ¶ 2. His case is still pending.

Gittens also alleges, based on news reports, that Feniosky Pena-Mora stepped down as head of the New York City Department of Design and Construction amidst complaints of cronyism following his hiring of a councilman's wife.[15] Doc. 59 at ¶¶ 435-37. She similarly alleges that, when discussing complaints filed by Department of Education employees, Mayor Bill de Blasio was quoted as saying, "'It is a known fact that there's been a bit of a hyper complaint dynamic—sometimes for the wrong reasons.'"[16]

### K.    Procedural History

Gittens filed the initial complaint on January 9, 2019 and amended for the first time on April 16, 2019. Docs. 1, 32. On August 5, 2019, Gittens' filed the SAC alleging, *inter alia*, discrimination, retaliation and hostile work environment under the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. § 1983, the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Doc. 59. On September 18, 2019, Defendants moved to dismiss the complaint and to strike those portions citing allegations in other civil rights lawsuits against the City. Doc. 72.

---

[15] James Fanelli, "De Blasio Slammed Over Commissioner's Hire of Councilman's Wife," DNAinfo.com, https://www.dnainfo.com/new-york/20160114/washington-heights/de-blasio-slammed-over-commissioners-hire-of-councilmans-wife/ (Jan. 14, 2016). Doc. 59 at ¶ 437 & n.9.

[16] "Mayor de Blasio: Many city workers' complaints 'not real,'" Fox5 NY, https://www.fox5ny.com/news/mayor-de-blasio-many-city-workers-complaints-not-real (Apr. 26, 2018). Doc. 59 at at ¶ 4 & n.1.

## II.        Motion to Strike under Rule 12(f)

The Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Despite this authority, the Second Circuit has held that "courts should not tamper with the pleadings unless there is a strong reason for so doing."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  Motions to strike are disfavored and not frequently granted.  *Low v. Robb*, No. 11-CV-2321 (JPO), 2012 WL 173472, at *8 (S.D.N.Y. Jan. 20, 2012).  "To prevail in such a motion, defendants must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  *Ruiz v. New Avon LLC*, No. 18-CV-9033 (VSB), 2019 WL 4601847, at *17 (S.D.N.Y. Sept. 22, 2019); *see also Lipsky*, 551 F.2d at 893.

Defendants argue that Gittens' references to the *Adams-Flores*, *Maraj*, *Turnbull* and *Morales* lawsuits must be stricken because, since they have not been adjudicated, they are immaterial to Gittens' *Monell* claim.  Docs. 73 at 5-6; 106 at 4.  In so arguing, Defendants rely primarily on *Lipsky v. Commonwealth United Corp.*, where the Second Circuit struck allegations regarding a consent judgment between the Securities and Exchange Commission and the defendant.[17]  551 F.2d at 894.

Here, Gittens alleges that her allegations regarding the four other actions are relevant to her *Monell* claims against the City for deliberate indifference in its failure to supervise.  Doc. 93 at 20-21, 25.  She further pleads that these allegations may lead to the discovery of admissible evidence.  *Id.* at 19, 22.  Each of the cases referenced in the

---

[17] That some of the cases Defendants rely on employed Rule 9 of the Federal Rules of Civil Procedure, rather than Rule 8, makes no difference in the motion to strike context.  Docs. 73 at 24; 106 at 4-5.

complaint involved allegations of retaliation by City employees and implicates the City's knowledge of it, which bears on Gittens' *Monell* claims. *Ruiz*, 2019 WL 4601847, at *17 (denying motion to strike relevant complaints because "evidence of past discriminatory practices of an employer is generally relevant in employment discrimination claims") (citation omitted). *See also Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 236-37 (S.D.N.Y. 2019) (rejecting motion to strike reference to settlements because they were "directly relevant to and form the basis of the claims against" the defendants). In addition, "while the allegations themselves may not be admissible evidence, investigation and discovery on these claims may well lead to admissible evidence establishing Defendant's alleged pattern and practice of discrimination." *Rodriguez v. City of New York*, No. 16-CV-214 (ENV) (ST), 2016 WL 3264166, at *3 (E.D.N.Y. June 13, 2016) (refusing to strike mention of other lawsuits from complaint); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 & n.13 (S.D.N.Y. 2014) ("The Federal Rules of Civil Procedure permit discovery on relevant matters that appear "reasonably calculated to lead to the discovery of admissible evidence.") (citing Rule 26(b)(1)). In addition, Defendants do not demonstrate any prejudice arising from these allegations. *Rodriguez*, 2016 WL 3264166, at *3.

Because motions to strike are disfavored, the allegations are relevant and could lead to fruitful discovery, and Defendants claim no prejudice, Defendants' motion to strike is denied.

## III.     Motion to Dismiss under Rule 12(b)(6)

### A.     Standard

When ruling on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), district

courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To satisfy the pleading standard under Fed. R. Civ. Pro. 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Thus, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### B. Threshold Questions

Defendants raise several procedural bars to Gittens' claims. Defendants argue that Gittens' claims under the ADEA are limited to events occurring 300 days before her EEOC complaint was filed. Doc. 73 at 3. Defendants further assert that the three-year statute of limitations on her claims under the 14th Amendment, § 1983, NYSHRL and NYCHRL place limitations on her allegations and that those claims were not tolled by the filing of her EEOC complaint. *Id.* at 3-4. Defendants also contend that Gittens' hostile work environment claim is barred by her failure to exhaust it administratively. *Id.* at 4-5. Finally, Defendants reason that the ADEA preempts Gittens' § 1983 age discrimination claims. The Court addresses each potential limitation in turn below.

### i. Gittens' ADEA Failure to Promote and Retaliation Claims from Prior to December 24, 2016 are Time-Barred

Defendants are correct that Gittens' failure to promote and retaliation claims must be limited in scope to the incidents dating from December 24, 2016, 300 days before submission of her EEOC complaint on October 20, 2017. Doc. 73 at 3. In *Nat'l R.R.*

*Passenger Corp. v. Morgan*, Morgan alleged several discriminatory and retaliatory acts from the time of his hiring through the date he was fired, but the Supreme Court found that only those discrete acts occurring 300 days before Morgan filed his EEOC charge were actionable.  536 U.S. 101, 114 (2002).  Rejecting the argument that these instances were continuing violations, the Supreme Court held instead that each instance of failure to promote or retaliation is a discrete act and that "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."  *Id.* at 112, 114.  *See also Gindi v. New York City Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (summary order).

Gittens argues in opposition that the City's failure to promote her was a continuing violation because she was continually not hired off of the list and did not know that she was the only one not hired off of it until June 2017.[18]  Docs. 59 at 250, 276, 361; 93 at 35.  However, as the Second Circuit confirmed in *Chin v. Port Authority of New York & New Jersey*, "[d]iscrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."  685 F.3d 135, 157 (2d Cir. 2012) (discussing failure to promote and collecting cases).[19]

---

[18]  While it is true, as Defendants point out, that the complaint alleges that Pemberton told Gittens that she had not been hired off of the list in the Fall of 2016, the complaint further alleges that Gittens was not aware that she was the *only* person not selected off of that list until June 2017.  Docs. 59 at 265, 276; 106 at 2 n.2.

[19] The cases Gittens relies on to the contrary predate *Morgan* and *Chin* and, in any event, either declined to apply the continuing violation doctrine or applied it to wholly inapposite circumstances.  *Harris v. City of New York*, 186 F. 3d 243, 250 (2d Cir. 1999) (reversing dismissal of failure to promote claim because plaintiff's allegations left open the timing of the employer's failure to act and thus the possibility that "some discriminatory act that did occur within the statute of limitations"); *Van Zandt v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1998); *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992).

Thus, to the extent Gittens' failure to promote and retaliation claims under the ADEA predate December 24, 2016, they are time barred and dismissed.

### ii.     Statute of Limitations

While Gittens' claims under the 14th Amendment, § 1983, NYSHRL and NYCHRL are subject to a three-year statute of limitations,[20] time was tolled with respect to the NYSHRL and NYCHRL claims by the filing of her EEOC complaint on October 20, 2017. *Shojae v. Harlem Hosp. Ctr.*, 764 F. App'x 113, 114 n.2 (2d Cir. 2019) (summary order) (noting that while the Second Circuit has not addressed whether the statute of limitations is tolled on claims under the NYSHRL and the NYCHRL while an EEOC complaint pends, that it is the "clear trend" among the District Courts) (citing *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *3-4 (S.D.N.Y. Jan. 23, 2019) and *Cameron v. N.Y.C. Dep't of Educ.*, No. 15-CV-9900 (KMW), 2018 WL 1027710, at *11 (S.D.N.Y. Feb. 21, 2018)). *See also* Docs. 73 at 3-4; 93 at 26-27.[21]

Thus, to the extent Gittens' claims under the 14th Amendment and § 1983 rely on events prior to January 9, 2016, they are dismissed. However, Gittens' claims under the NYSHRL and NYCHRL dating from October 20, 2014 forward are timely. *Torres v. New York Methodist Hosp.*, No. 16-CV-1264 (PKC) (PK), 2016 WL 3561705, at *8 (E.D.N.Y. Jan. 7, 2016) (accepting allegations from three years prior to the date of her

---

[20] *Lugo v. City of New York*, 518 F. App'x 28, 29 (2d Cir. 2013) (NYSHRL and NYCHRL three-year statute of limitations); *Rodriguez v. Mt. Vernon Hosp.*, No. 09-CV-5691 (GBD) (JLC), 2011 WL 3163506, at *4 (S.D.N.Y. July 27, 2011) (14th Amendment and § 1983 three-year statute of limitations).

[21] Gittens does not argue that her claims under § 1983 are not tolled by her EEOC complaint. Doc. 106 at 7 n.4. *See, e.g.*, *Nadolecki v. New York State Dep't of Taxation and Fin.*, No. 09-CV-3888 (SJF) (ETB), 2011 WL 2446491, at *12 (E.D.N.Y. May 17, 2011) (citing *Harper v. Hunter College*, No. 95-CV-10388 (JFK), 1999 WL 147698, at *3 (S.D.N.Y. Mar. 15, 1999)).

EEOC complaint as timely where plaintiff did not allege how long her EEOC complaint was pending).

### iii.   Gittens' Hostile Work Environment Claim is Exhausted.

"'Exhaustion of administrative remedies through the EEOC is an essential element of the . . . ADEA statutory scheme[] and, as such, a precondition to bringing such claims in federal court.'" *Tanvir v. New York City Health & Hosps. Corp.*, 480 F. App'x 620, 621 (2d Cir. 2012) (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).  A claim that was not squarely presented to the EEOC, however, may still be exhausted by an EEOC complaint when it is "reasonably related" to the claims raised before the agency.  *Tanvir*, 480 F. App'x at 621.  A claim is reasonably related to a claim raised before the EEOC "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."  *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (citation omitted)).  Recognizing that EEOC complaints are frequently filed by lay people, the Second Circuit has said that "[t]he central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases."  *Id.*

In *Williams v. New York City Housing Authority*, the Second Circuit found that plaintiff's EEOC complaint regarding retaliation was so laced with evidence of sex discrimination that both claims were exhausted.  *Id.* at 69, 71.  Here, too, Gitten's EEOC complaint lays the groundwork for a hostile work environment claim by describing the atmosphere of age-based animosity at DOC.  Gittens specifically asserted that her immediate supervisor, Pemberton, discriminated against her and that Wynter stated "she

wanted [Gittens] and others out" and that she wanted "all the old employees of 20 years

out.  They are old [and] fat [and] don't fit the new image of the agency."  Doc. 74-1 at 3-

4.  She also wrote that Jackson and Moshiavili were forced to retire following complaints

of being passed over for jobs and discrimination.  *Id.* at 5.

       To be sure, Defendants are correct that Gittens highlights several discrete acts of

failure to promote in her EEOC complaint, which would not ordinarily exhaust a hostile

work environment claim.  *See, e.g.*, *Bowman v. New York State Hous. and Cmty.

Renewal*, No. 8-CV-11596 (ER), 2020 WL 1233701, at *7 (S.D.N.Y. Mar. 13, 2020)

("Generally, presenting a disparate treatment or retaliation claim to the EEOC will not

exhaust a hostile work environment claim.") (citation omitted);  *Ray v. New York State

Ins. Fund*, No. 16-CV-2895 (NRB), 2018 WL 3475467, at *6-7 (S.D.N.Y. July 18, 2018).

Doc. 73 at 4-5.  However, Gittens' EEOC complaint describes more than those instances

and, with respect to Pemberton's discrimination, Wynter's explicit comments, and the

retaliation experienced by those who complained, relies on the same facts as the SAC to

support her hostile work environment claim.  *Salerno v. Town of Bedford, N.Y.*, No. 05-

CV-7293 (GEL), 2008 WL 5101185, at *6 (S.D.N.Y. Dec. 3, 2008) (noting the

reasonably related standard "focus[es] on the relationship between the *facts* alleged in the

EEOC charge and those asserted in the federal complaint, not on the similarity or

dissimilarity of the *legal theories* asserted by the plaintiff in the administrative and

judicial complaints") (emphasis in original).  Though Gittens did not use the words

"hostile work environment" in her EEOC complaint, she identified two harassing

comments and discrimination on the part of her direct supervisor, which suggests a

pervasiveness of the attitudes described in Wynter's comments, and an atmosphere of

retaliation for complaining, all of which supports her hostile work environment claim. *See, e.g.*, Docs. 59 at ¶¶ 204-05, 225-33, 298-324, 405-07, 412-13; 93 at 28-29. *Acheampong v. New York City Health and Hosps. Corp.*, No. 11-CV-9205 (LTS) (SN), 2015 WL 1333242, at *10 (S.D.N.Y. Mar. 25, 2015) (sustaining a hostile work environment claim where, *inter alia*, plaintiff alleged he had been subjected to derogatory comments and constant bad behavior by his employer).[22]

Thus, Gittens' hostile work environment claim was administratively exhausted and is properly before this Court.

### iv.    Gittens' ADEA Claims Do Not Preempt Her § 1983 Claims of Age Discrimination

Defendants argue that Gittens' § 1983 claims are preempted by her ADEA claims. Doc. 73 at 11-12.  But, as Defendants recognize, while the Second Circuit has not decided this question, the trend in this District is to permit both claims to proceed simultaneously.  *Shapiro v. New York City Dep't of Educ.*, 561 F. Supp. 2d 413, 420 (S.D.N.Y. 2008); *Purdy v. Town of Greeburgh*, 166 F. Supp. 2d 850, 867-68 (S.D.N.Y. 2001); Doc. 73 at 11-12.  As courts in this District have recently noted, "courts within the Second Circuit have consistently held that the ADEA does not preclude age discrimination actions brought pursuant to Section 1983 so long as such claims are brought to vindicate distinct violations of constitutional rights."  *Wu v. Metro-North Commuter R.R.*, No. 14-CV-7015 (LTS) (FM), 2015 WL 5567043, at *9 (S.D.N.Y. Sept.

---

[22] Neither that Gittens labels her hostile work environment claim as "retaliatory" for the first time in opposition, nor that Gittens did not select the "retaliation" box on her EEOC complaint is dispositive.  Doc. 106 at 4.  *Massaro v. Bd. of Educ. of City Sch. Dist. of City of New York*, 774 F. App'x 18, 21 (2d Cir. 2019) (holding not selecting retaliation on EEOC complaint is not determinative of exhaustion) (citing *Williams*, 458 F.3d at 70-71 ("The 'reasonably related' exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering.") (citation omitted)).

22, 2015); *see also Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 288 (S.D.N.Y. 2019) ("In the absence of clear guidance, judges in this District have allowed plaintiffs to assert claims of age discrimination under § 1983."); *Kunick v. New York City Dep't of Educ.*, No. 15-CV-9512 (VSB), 2017 WL 4358764, at *10 (S.D.N.Y. Sept. 29, 2017) (finding at motion to dismiss stage "it is sufficient for Plaintiff to allege a colorable argument that her constitutional rights were violated.").  Accordingly, Defendants' motion to dismiss Gittens' § 1983 claims on preemption grounds is denied.

### C.    *Monell* Liability under § 1983

A municipality may be held liable for constitutional violations under § 1983 when "'the challenged acts were performed pursuant to a municipal policy or custom.'" *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d. Cir. 2015) (citing *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)).  The four theories by which a plaintiff may establish a policy or custom are:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Pryor v. City of New York*, No. 16-CV-8232 (VSB), 2018 WL 4538904, at *4 (S.D.N.Y. Sept. 21, 2018) (citing *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010).

Gittens pleads two customs that she alleges establish deliberate indifference:  the failure to investigate complaints of discrimination and failure to prevent retaliation.  Doc. 93 at 20-25.  Establishing deliberate indifference for such failures to supervise requires

showing the need for better supervision was obvious.  *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *19 (S.D.N.Y. March 26, 2015).  Plaintiffs may demonstrate that the need for supervision was obvious "by showing . . . repeated complaints of civil rights violations, and deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Id.* (citation omitted).  Essentially, this is a method "to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."  *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citation omitted).

A municipality's failure to act "amounts to deliberate indifference" where a policymaker "knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights."  *Reynolds v. Giuliani*, 506 F. 3d 183, 192 (2d Cir. 2007) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).  The policymaker need not be the final decisionmaker for all purposes, but must be the "final policymaker for the local government in a particular area, or on the particular issue involved in the action." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (*McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997)).

Defendants argue that deliberate indifference is not specifically alleged or supported by sufficient facts, and that, in any event, Pinnock, Wynter and Simon are not final policymakers sufficient to sustain Gittens' claim.  Docs. 73 at 14-16; 106 at 7-8.

To establish deliberate indifference for failure to investigate complaints, Gittens alleges that she and other coworkers filed complaints with the EEOC, their unions, the SDHR, and the DOI, which Pinnock, Simon and Wynter could have but never addressed. Doc. 59 at ¶¶ 141-44, 327, 431.  She also explains that the DOI failed to investigate her complaint, and that the EEO is known as the Office of Unsubstantiation among DOC employees because of their notorious failure to investigate.  *Id.* at ¶¶ 143, 432.

To establish deliberate indifference for failure to prevent retaliation, she contends that her complaints about Pemberton's retaliation of functionally demoting her, embarrassing her in front of her colleagues, erroneously confronting her with work and time entry disputes, and eventually refusing to speak to her following filing her EEOC complaint, went unaddressed by Pinnock and Wynter.  *Id.* at ¶¶ 332-353.  In addition, Gittens pleads that Pemberton, Simon, Wynter and Pinnock had a pattern of retaliating against employees who complained of discrimination by demoting them, isolating them until they felt forced to retire, and transferring them to less desirable postings, and identified several employees who experienced this retaliation, including Jackson, Roman, Moshiavili, Cicero, and Gainey.  *Id.* at ¶¶ 217-35, 320.

She also highlights four lawsuits against the City alleging retaliation at various City agencies, including DOC, and two news articles:  one about patronage at a City agency and one quoting Mayor de Blasio on a widespread practice of complaints at the Department of Education.  *See supra* Part I.J.  In *Adams-Flores*, *Maraj*, and *Turnbull*, the retaliation followed complaints of discrimination.  *Id.*

Gittens' only specific allegation of failure to investigate discrimination is her own unsubstantiated DOI complaint.  But she provides no basis for belief that it, or any of the

other cases she cites that she was not party to, were not investigated beyond insinuation. *Tieman*, 2015 WL 1379652, at *21 ("Plaintiff does not offer any allegations plausibly establishing that the City failed to investigate the listed complaints"); Doc. 106 at 8. Moreover, "[t]o hold a municipality liable on the basis of a single act, . . . the plaintiff must show that the official is a 'final policymaker with respect to the particular conduct challenged in the lawsuit.'" *Hagan v. City of New York*, 39 F. Supp.3d 481, 505 (S.D.N.Y. 2014) (citing *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)). In *Bey v. City of New York*, this District held that the DOI Commissioner was a final policymaker who shares responsibility with the DOC agency heads for disciplining DOC employees. No. 99-CV-3873 (LMM) (RLE), 2009 WL 2924429, at *21 (S.D.N.Y. Sept. 9, 2009). Because the DOI Commissioner is not a party to this action, and none of the Individual Defendants are DOC "agency heads,"[23] this claim fails.

Gittens does allege at least five instances of retaliation against her personally, and nine instances of other City employees experiencing similar retribution but, even if those are sufficient to draw an inference of the obvious need for supervision, Pinnock, Wynter and Simon are not final policymakers. Gittens alleges, citing no authority, that they were final policymakers because they could hire, fire and demote her, and could have addressed the complaints of her and her coworkers but did not do so. *Id.* at ¶¶ 428-31; Docs. 93 at 25-26; 106 at 9. However, "[t]he critical characteristic of final policymakers

---

[23] While fending off Defendants' arguments against her aiding and abetting claims, Gittens writes, "As defined by *Velez*, the aforementioned [Individual Defendants] all had final authority over significant matters: they were all Commissioner level staff with the ability hire, fire, promote and or discipline staff at the agency" with no actual citation to *Velez*. Doc. 93 at 46-47. If this mention of *Velez* is an oblique reference to *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005) cited elsewhere in her brief, it does not support her position. In *Velez*, the Second Circuit considered whether the plaintiff, a former community board member, was a policymaker for the purposes of a First Amendment exception, not whether defendants were policymakers for *Monell* liability. *Id.* at 95.

when employment is at issue is whether the municipal official has authority to formulate

the rules governing personnel decisions rather than authority to make decisions pursuant

to those rules—e.g., the hiring and firing of subordinates." *Chin v. New York City Hous.*

*Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008) (citing *Pembaur v. City of Cincinnati*,

475 U.S. 469, 483 n.12 (1986)).  According to the City Charter, final authority for

personnel decisions resides with the Personnel Director.  *Soto v. Schembri*, 960 F. Supp.

751, 759 (S.D.N.Y. 1997).  Moreover, final authority with respect for discipline for

discrimination rests with the DOI Commissioner and DOC agency heads.  *Bey*, 2009 WL

2924429, at *21.  As a result, this theory of *Monell* liability similarly fails.

     Accordingly, Defendants' motion dismiss Gittens' *Monell* claims against the City

and the Individual Defendants in their official capacities is granted.[24]

### D.    Disparate Treatment under the ADEA, § 1983, NYSHRL, and NYCHRL

     As the Supreme Court has said, "[d]isparate treatment is the most easily

understood type of discrimination.  The employer simply treats some people less

favorably than others because of their . . .  protected characteristics."  *Hazen Paper Co. v.*

*Biggins*, 507 U.S. 604, 609 (1993) (citations omitted).  The ADEA prohibits

discrimination based on "inaccurate and stigmatizing stereotypes" about employees over

the age of 40 and specifically forbids employers from "fail[ing] or refus[ing] to hire or . .

. discharge[ing] any individual or otherwise discriminat[ing] against any individual with

---

[24] Allegations against the Individual Defendants in their official capacities are treated as allegations against the City and are thus dismissed.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  However, Gittens' Section 1983 allegations against the Individual Defendants in their personal capacities, which do not require "a connection to governmental 'policy or custom'" and which Defendants have not challenged, remain active.  *Id.*; Doc. 59 at ¶¶ 448-56.

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  *Id.* at 610; 23 U.S.C. §§ 623(a), 631(a).

ADEA claims are analyzed using the same framework espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) for proving a claim under Title VII. *Reeves v. Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. 133, 141 (2000); *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008).  A prima facie claim under the ADEA is established when plaintiffs "'demonstrate membership in a protected class, qualification for their position, an adverse employment action, and circumstances that support an inference of age discrimination.'"  *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018) (quoting *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007)).  For a claim to survive a motion to dismiss, however, a plaintiff need not establish every factor of a prima facie case and must only allege "facts which plausibly suggest that (1) the employer took an adverse action and (2) age was the 'but for' cause of that adverse action."  *Boonmalert*, 721 F. App'x at 32 (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Swierkiewicz v. Sorema*, 534 U.S. 506, 515 (2002) (holding pleading a prima facie case of discrimination not necessary to survive a motion to dismiss); *Littlejohn*, 795 F.3d at 310 (acknowledging the tension between *Swierkiewicz* and *Iqbal* and holding "[t]o the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal.*") (emphases in original); *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 52-

53 (S.D.N.Y. 2019) (evaluating the case law and applying "the 'minimal inference' standard described in *Littlejohn*" and "not requir[ing] the Plaintiff to plead 'but-for' causation").  *See also* Doc. 93 at 31.

Disparate treatment claims under the § 1983 and NYSHRL are evaluated under the same standard.  *Boonmalert*, 721 F. App'x at 32; *Doran v. New York State Dep't of Health Office of Medicaid Inspector Gen.*, No. 15-CV-7217 (PKC) (SN), 2017 WL 836027, at *10 (S.D.N.Y. Mar. 2, 2017).  Claims under the NYCHRL, however, are evaluated separately.  *Id.*  The NYCHRL "does not require either materially adverse employment actions or severe and pervasive conduct," but instead focuses "on unequal treatment . . . regardless of whether the conduct is 'tangible' (like hiring or firing) or not[.]" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013) (citations omitted).

Defendants argue that Gittens failed to plead facts giving rise to an inference of age-based animus.  Doc. 73 at 17.  Specifically, Defendants urge that allegations that those hired instead of Gittens were "younger" and "less experienced" are conclusory and that, in any event, Gittens fails to provide their credentials to assess their experience levels.  *Id.* at 17-18.  In support of this proposition, Defendants cite several cases where there are no allegations aside from the hired employees being younger and less experienced, but that is not this case, where instances of ageist comments and more favorable treatment for younger employees are specifically cited.[25]  "An inference of

---

[25] *See, e.g., Sauveur v. Fed'n of Org.*, No. 18-CV-2328 (AMD) (SIL), 2019 WL 2994449, at *4 (E.D.N.Y. July 9, 2019) ("The complaint is devoid of allegations regarding any discrimination based on the plaintiff's gender or sex or national origin."); *Wang v. Palmisano*, 157 F. Supp. 3d 306, 340-41 (S.D.N.Y. 2016) (finding, without more allegations such as ageist remarks, that allegations of younger, less qualified people being hired instead of plaintiff are insufficient); *Ndremizara v. Swiss Re Am. Holding Corp.,* 93 F. Supp. 3d 301, 316-17 (S.D.N.Y. 2015) (same).

discrimination can arise from circumstances including, but not limited to, . . . [an employer's] invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group . . . ." *Littlejohn*, 795 F.3d at 312 (citation omitted). Here, Gittens alleges that Wynter labeled older employees "dead men" and that Simon and Wynter referred to older employees as "idiots." [26] *Id.* at ¶¶ 210, 245. Gittens also alleges more favorable treatment of younger employees. Gittens, Freeman and Welch were all over 40 and ostracized by Pemberton, who ignored them, complained about their work product, and withheld critical information from them about their tasks. *Id.* at ¶¶ 301-09. Meanwhile, Pemberton favored younger employees, providing them with professional opportunities and salary increases. *Id.* at ¶ 307, 310-11.

Moreover, "an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn*, 795 F.3d at 312-13. Gittens alleges that Pemberton gave her tasks beneath her title despite the fact that she had performed managerial work since 1993 while giving younger workers tasks that were managerial and for which they were unprepared. *Id.* at ¶¶ 51-52, 338-39. "The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage . . . , including at the pleading stage." *Littlejohn*, 795 F.3d at 313. *See also Mooney v. City of New York*, No. 18-CV-328 (DLC), 2018 WL 4356733, at *3 (S.D.N.Y. Sept. 12, 2018) (citing *Vega*, 801 F.3d at 86) (holding a plaintiff "is not required to present detailed evidence about comparators at [the

---

[26] In addition, Gittens' allegations concerning Wynter's comments at the December 2015 executive staff meeting that she wanted to root out DOC employees with more than 20 years of experience because they were fat, old and did not comply with the agency's new image are timely under the NYSHRL and NYCHRL. Doc. 59 at ¶ 205.

motion to dismiss] stage, but the [complaint] must contain a factual allegation that similarly situated comparators exist."); Doc. 73 at 19.

Defendants further contend that pleading "upon information and belief" is insufficient to sustain a disparate treatment claim. Doc. 73 at 18-19. However, the Supreme Court has "expressly disavow[ed] that Rule 8(a) requires any plaintiff . . . to plead 'specific facts.'" *Boykin*, 521 F.3d at 215 (citing *Twombly*, 550 U.S. at 570). Moreover, "[p]leading on the basis of information and belief is generally appropriate" where the information is "particularly within [the defendant's] knowledge and control." *Boykin*, 521 F.3d at 215. Here, the specific age and credentials of Gitten's comparators are uniquely within Defendants' knowledge.

An inference of discrimination against older employees can also be inferred from Defendants' repeated circumvention of the Civil Service Laws in denying Gittens promotional opportunities. Doc. 93 at 32, 34. Specifically, Gittens explains that Defendants prevented her from career advancement by not giving yearly performance reviews since 2011 as required under the New York City Personnel Rules & Regulations. Doc. 59 at ¶¶ 95-96, 108. Gittens further alleges that following the August 2016 establishment of the list, she was passed over at least 10 times for positions occupied by provisional employees who are required to be replaced within nine months by those on the list, and continues to be passed over. *Id.* at ¶¶ 271-74, 361. *City of Long Beach v. Civil Serv. Emps. Ass'n, Inc.*, 8 N.Y.3d 465, 470-71 (2007) ("With respect to provisional appointments, the Civil Service Law authorizes such appointments only when there is no eligible list available for filling a vacancy in a competitive class, and then only for a maximum period of nine months.") (citing N.Y. Civ. Serv. Law §§ 65(1), 65(2)). She

also describes how Defendants set new titles for positions occupied by provisional employees who had not taken the Civil Service Exam so that those provisional employees could remain in those roles.  *Id.* at ¶¶ 269-71.  Gittens was the only one of 17 people who passed the examination to not be promoted.  *Id.* at ¶ 264.

Accordingly, Defendants' motion to dismiss Gittens' disparate treatment claim under the ADEA, § 1983, NYSHRL and NYCHRL is denied.[27]  And, because Gittens' request for leave to amend relates solely to this issue that survives Defendants' motion to dismiss, her motion for leave to amend is denied.  Doc. 93 at 38.

## E.   Disparate Impact and Discrimination under the ADEA, NYSHRL, and NYCHRL

Claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another" and do not require "[p]roof of discriminatory motive."  *Hazen Paper Co.*, 507 U.S. at 609.  To establish a prima facie case of disparate impact under the ADEA and NYSHRL, the plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices."  *Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 479 (S.D.N.Y. 2019) (citing *Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011)); *Gordon v. City of New York*, No. 14-CV-6115 (JPO), 2018 WL 4681615, at *22 (S.D.N.Y. Sept. 28, 2018).  Under the NYCHRL, a plaintiff must allege "(1) 'a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the

---

[27] Because the Court find discrimination sufficiently pleaded, there is no need to address Defendants' remaining argument that cronyism is not actionable absent discrimination.  Doc. 73 at 20.

detriment of any group protected by the provisions of this chapter'; and (2) 'the covered

entity fails to plead and prove as an affirmative defense that each such policy or practice

bears a significant relationship to a significant business objective of the covered entity or

does not contribute to the disparate impact.'" *Teasdale v. New York City Fire Dep't*, 574

F. App'x 50, 51-52 (2d Cir. 2014) (citing N.Y.C. Admin. Code § 8–107(17)(a)(1)-(2)).

Defendants argue that Gittens fails to put forth an age-neutral policy or to allege

that Defendants' policies caused an adverse effect for anyone but her.  Doc. 73 at 6-7.

However, Gittens specifically pleads that Defendants' "ongoing cronyism had a disparate

impact on workers with over 20 years of experience at DOC who are of retirement age"

and cited over 20 examples of younger, less-qualified family and friends of the Individual

Defendants who were hired over older, longstanding employees.  Docs. 59 at ¶¶ 152-59,

387(f); 93 at 38-40.  *Hagan v. City of New York*, 39 F. Supp. 3d 481, 499 (S.D.N.Y.

2014)  (identifying cronyism as a race-neutral policy sufficient to support a disparate

impact theory).[28]  Gittens further alleges that the ongoing cronyism was facilitated by

Defendants' violation of the Civil Service Law and the nine-month rule regarding short-

term provisional employees set out in *Long Beach*, 8 N.Y.3d at 470-71, also a facially-

neutral policy.[29]  Docs. 59 at ¶ 387(e); 93 at 39.

Gittens also pleads two examples, Althea Cicero and Mary Gainey, who were

---

[28]  The authority Defendants cite to the contrary, *Attenborough v. Constr. and Gen. Bldg. Laborers Local 79*, 691 F. Supp. 2d 372, 381, 384 (S.D.N.Y. 2009), rejected the evidence of cronyism's disparate impact at summary judgment, not the pleading stage.

[29]  That Gittens pleads Defendants' violation of the Civil Service rules and cronyism as rooted in "age-based animus" is not necessarily inconsistent with a disparate impact claim.  Docs. 59 at ¶¶ 387(e), 387(f); 73 at 6-7; 106 at 12.  While Gittens need not plead a discriminatory motive to establish disparate impact, no authority says she cannot assert one, especially given that discrimination and disparate impact are often raised in the alternative.  *Hazen Paper Co.*, 507 U.S. at 609; *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992) ("Both the disparate treatment and disparate impact theories can be invoked in a given case to establish ADEA liability, since they are simply alternative doctrinal premises for a statutory violation.") (citation omitted).

denied the opportunity to apply for the position now occupied by Wynter's best friend,

Grant, who is younger and less qualified than them.  Doc. 59 at ¶¶ 234-35.  Though these

examples are anecdotal, and Gittens provides no statistics in support of her claim, they

are enough to "nudge" her claim from "conceivable to plausible to proceed."  Doc. 106 at

13-14; *Wallace v. Esper*, No. 18-CV-6525 (RA), 2019 WL 4805813, at *7 (S.D.N.Y.

Sept. 30, 2019) (citation omitted); *New York 10-13 Ass'n v. City of New York*, No. 98-

CV-1425 (JGK), 1999 WL 177442, at *6 (S.D.N.Y. Mar. 30, 1999) ("Although the

present record contains no statistical evidence of disparate impact, on a motion to dismiss

the plaintiffs have sufficiently alleged that age and retirement status in this case are

correlated.  Therefore, the plaintiffs have stated a claim under the disparate impact

theory.").

Accordingly, Defendants' motion to dismiss Gittens' disparate impact claim is

denied.

### F.    Due Process Claims

Section 1 of the 14th Amendment provides that no State "shall . . . deprive any

person of life, liberty, or property, without due process of law."  To state a claim of such

deprivation under § 1983, a plaintiff must allege that the defendant denied her a

"constitutionally protected liberty or property interest."  *Martinez v. O'Leary*, No. 11-

CV-1405 (ENV) (JLO), 2013 WL 3356983, at *3  (E.D.N.Y. July 3, 2013).

A property interest springs from state law and requires that plaintiff "'have more

than an abstract need or desire for it.  [She] must have more than a unilateral expectation

of it.  [She] must, instead, have a legitimate claim of entitlement to it.'"  *Clubside, Inc. v.*

*Valentin*, 468 F.3d 144, 152 (2d Cir. 2006) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Here, as Defendants point out, Gittens has failed to allege a property interest sufficient to require due process safeguards. Doc. 73 at 24. Construing every inference in Gittens' favor, the complaint alleges that she was a permanent employee whose assignments were beneath her title and who was denied several promotions and consideration for promotions to replace provisional employees despite the Civil Service Law. Doc. 59 at ¶¶ 248-80, 303, 337-42. But there is no property interest in a demotion in task but not title or pay. *See Costello v. McEnery*, No. 91-CV-3475 (PKL), 1994 WL 410885, at *4 (S.D.N.Y. Aug. 3, 1994) ("a reassignment to a different position at equal pay and rank is not a removal or disciplinary penalty requiring a hearing") (citing *Galatti v. Dutchess Cty*, 64 N.Y.2d 1163, 1165 (N.Y. 1985)); *Matter of Alston v. Bertoni*, 138 A.D.3d 1304, 1305 (3d Dep't 2016) ("It is also well settled that an employee's displeasure with a work assignment, absent an impact on his or her civil service grade or title, salary or benefits, does not implicate Civil Service Law § 75.") (also citing *Galatti*). Nor is there a property interest in job applications or promotions. *Richardson v. New York City Bd. of Educ.*, 711 F. App'x 11, 15 (2d Cir. 2017) ("The default rule in this Circuit is that prospective government employment is not a protected property interest.") (citing *Abramson v. Pataki*, 278 F.3d 93, 100 (2d Cir. 2002) and *MacFarlane v. Grasso*, 696 F.2d 217, 221-22 (2d Cir. 1982) ("It is obvious that these statutes and regulations, taken together, did not entitle MacFarlane to the . . . vacancy. Instead, they merely established his eligibility to be considered for the job, as a person who would qualify . . . if appointed.")). Indeed, Gittens cites no authority that she was entitled to a promotion, only that she was qualified for one. *Guida v. Police Dep't of the City of New York*, No. 96-CV-355 (JSM), 1997 WL

269508, at *2 (S.D.N.Y. May 20, 1997) (citing *Grossman v. Schwartz*, 514 F. Supp. 421, 422-23 (S.D.N.Y. 1981) ("Because under state law plaintiff has no right to promotion nor could he in any way compel his appointment or promotion to a position, he has no property interest sufficient to invoke federal due process guarantees.")).

Nor does Gittens state a claim for deprivation of her liberty interest.  A liberty interest sufficient to implicate due process concerns may be asserted by alleging a "stigma plus" claim.  *Velez*, 401 F.3d at 87 (citation omitted).  A stigma plus claim requires (1) the public utterance by a government official of a false statement about plaintiff that is provably false and injurious to her reputation and (2) "some tangible and material state-imposed burden in addition to the stigmatizing statement."  *Id.  See also Segal v. City of New York*, 459 F.3d 207, 212 (2006).

Defendants characterize Gittens' allegations of defamation as poor performance reviews and argue they were not sufficiently publicized to support her claim.  Doc. 73 at 26.  But Gittens' allegations were more than that she was given poor performance evaluations.  Gittens alleges that Barreto told the other Individual Defendants that she was checked out, that all of the Individual Defendants stopped writing her performance reviews which impeded her upward mobility at DOC and was against Civil Service Law, and stopped promoting her despite her getting the same score on Civil Service Exam No. 5517 as Pemberton.  Doc. 59 at ¶¶ 42, 90-98, 201, 249, 402.  This was in stark contrast to her prior performance reviews, which were "Outstanding" and her history of promotions at DOC before the Individual Defendants supervised her.  *Id.* at ¶¶ 90-93.  Moreover, she was the only person not hired off of the list established with Civil Service Exam No. 5517, and she received no call letters listing other available positions or CNS letters

noting that she had been considered for other postings at her level. *Id.* at ¶¶ 264-74. A fair inference from the lack of CNS letters is that the Individual Defendants publicized their negative opinion of Gittens. Gittens has thus stated a claim that Defendants "denigrate[d her] competence as a professional and impugn[ed her] professional reputation in such a fashion as to effectively put a significant roadblock in [her] continued ability to practice . . . her profession" in satisfaction of the stigma requirement. *Segal*, 459 F.3d at 212 (citation omitted). But, her subsequent loss of promotional opportunities while still employed by DOC cannot satisfy the "plus" requirement. *Schlesinger v. New York City Transit Auth.*, No. 00-CV-4759 (SAS), 2001 WL 62868, at *7 (S.D.N.Y. Jan. 24, 2001) (citing *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630 (2d Cir. 1996)); *see also Velez*, 401 F.3d at 87-88.

In alternative, even if there had been a deprivation of liberty or property, Gittens' claim still fails because New York would provide her adequate process to remedy her loss via an Article 78 petition. *Hughes v. City of New York*, 680 F. App'x. 8, 10 (2d Cir. 2017); *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996). Accordingly, Defendants' motion to dismiss Gittens' due process claims under the 14th Amendment is granted.

### G.   Retaliation under the ADEA, 1st Amendment, § 1983, NYSHRL, and NYCHRL

Asserting a cognizable claim of retaliation requires pleading that "(1) the plaintiff was engaged in an activity protected under the ADEA; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken." *Wanamaker v. Columbia Rope Co.*, 108 F.3d 462, 465 (2d Cir.

1997); *see also Vega*, 801 F.3d at 91 (asserting the same standard for retaliation claims under § 1983); *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016) (asserting same standard for 1st Amendment retaliation); *Fraiberg v. 4kids Entm't, Inc.*, No. 07-CV-01411 (GBD), 2008 WL 821820, at *2 (S.D.N.Y. Mar. 26, 2008) (applying *Wanamaker* to ADEA and NYSHRL retaliation claims).  A retaliation claim under the NYCHRL differs in that it does not necessitate a materially adverse change in employment "provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."  N.Y.C. Admin. Code 8-107(7).

Gittens alleged three protected activities that were met with adverse actions. First, she pleaded that, following her complaints about discrimination, nepotism and cronyism at the May 29, 2015 town hall meeting, she was denied at least three promotions, two of which occurred within days of her complaints.[30]  Doc. 59 at ¶ 422(a). Second, she claimed that, after she filed her EEOC complaint in October 2017, she was essentially demoted by assignment of tasks unbefitting of her title and had to defend her work against Pemberton's harsh attacks.  *Id.* at ¶¶ 332-35, 422(c).  Finally, she asserts that within weeks of filing the instant lawsuit on January 9, 2019, Pemberton and Wynter conspired about, and Pemberton ultimately confronted her with, a timesheet dispute for which Pemberton threatened to discipline her.  *Id.* at ¶ 422(d).  Defendants do not challenge that any of these instances were protected activities.[31]

---

[30] The retaliation following Gittens' May 29, 2015 complaints is time-barred under § 1983 and the ADEA, but not time-barred under the NYSHRL or NYCHRL.  *See supra* Part III.B.i-ii.

[31]  As Gittens rightfully points out, her criticism of rampant cronyism, nepotism and discrimination at DOC is a matter of public concern and therefore protected speech.  Doc. 93 at 42-43; *Hagan*, 39 F. Supp. 3d at

Defendants do, however, challenge the causal connection between Gittens' first two examples of protected activities and the alleged retaliation because she pleads that she had been passed over for promotions before the town hall and had previously been assigned work beneath her title prior to her protected activities. Docs. 73 at 21-22; 106 at 14. While this is true, *see* Doc. 59 at ¶¶ 160-77, 303, Gittens is correct that these adverse actions happened in such close proximity to her protected activities that the inference of retaliation arises. Doc. 93 at 41. After the May 29, 2015 town hall, she was denied three positions that June, two of which occurring within days of the town hall. Doc. 59 at ¶ 422(a). And, in December 2017, following her filing of the EEOC complaint on October 20, 2017, she was confronted by Pemberton with work he wrongly believed she had not done and given tasks and standards beneath her title. Doc. 59 at ¶¶ 338, 422(c). In this context, events within days, and less than two months, of each other are sufficiently close in time to support an inference of causation. *Littlejohn*, 795 F.3d at 319-20 ("Littlejohn's allegations that the demotion occurred within days after her complaints of discrimination are sufficient to plausibly support an indirect inference of causation."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 113-14 (S.D.N.Y. 2012) (finding a causal connection may be indirectly established by pleading the protected activity was in as close a proximity as two months to the adverse employment action).

Defendants reason that any inference of causation from the adverse action closely following the protected activity is undercut where the adverse action alleged is a mere continuation of the employer's course of conduct from prior to the protected activity. Doc. 73 at 21. But the cases employing this reasoning, including the one on which

---

506 (finding speech protected where it "focuses upon cronyism, systemic discrimination, corruption, and fraud. Each of these subjects is of interest to the public.").

Defendants rely, dismiss at the summary judgment stage or where there is no other evidence of retaliation. *See, e.g.*, *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding summary judgment appropriate "[w]here timing is the *only* basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, [because] an inference of retaliation does not arise.") (emphasis added); *Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467 (MKB), 2015 WL 5692860, at *26 (E.D.N.Y. Sept. 28, 2015) (rejecting retaliation claim on a continuation theory at summary judgment). Not so here. Gittens points out several instances of retaliation against other employees in the SAC: Roman, Cicero, Gainey. Moshiavili and Jackson were all transferred, demoted, or effectively forced to retire following their criticism of the DOC. Docs. 59 at ¶¶ 222-39, 320, 93 at 44.

Defendants also argue that Pemberton's criticism of Gittens' work and assignment of Gittens to tasks beneath her title following the filing of her EEOC complaint are not adverse employment actions. Docs. 73 at 22; 106 at 14. Defendants are wrong. In *Caskey v. Cty. of Ontario*, the Second Circuit held that assigning "significantly diminished material responsibilities" is an adverse employment action. 560 F. App'x 57, 59 (2d Cir. 2014) (summary order). Recently, this District accepted that allegations an employer "harshly criticize[d its employees'] work" and transferred them following protected activities constituted adverse employment action. *Isbell v. City of New York*, 316 F. Supp. 3d 571, 592-93 (S.D.N.Y. 2018). "Moreover, where protected activity is followed by minor adverse adjustments in the terms of employment, it becomes more plausible that an ensuing adverse employment action was caused by the protected activity." *Hagan*, 39 F. Supp. 3d at 503 (citation omitted).

However, Defendants are correct that Gittens has failed to state a claim of retaliation following the filing of this lawsuit because Defendants were not served until after the alleged adverse employment acts occurred and because threats of discipline are not an adverse employment action.  Docs. 28, 73 at 22-23.  *Littlejohn*, 795 F.3d at 320 n.17 ("Littlejohn's formal EEOC proceedings beginning in October 2011, however, are not causally connected to her demotion because those proceedings began more than six months after her demotion in March.  Thus, her demotion cannot have occurred in retaliation for them."); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (dismissing retaliation claims because "courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (citation omitted).

Accordingly, Defendants' motion to dismiss Gittens' retaliation claim is granted with respect to the threats of discipline following the filing of the instant lawsuit, Doc. 59 at ¶ 422(d), and otherwise denied.

## H.    Hostile Work Environment under the ADEA, § 1983, NYSHRL, and NYCHRL

To adequately plead a claim of hostile work environment, a plaintiff must allege that the harassment she experienced in the workplace "was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Walsh*, 375 F. Supp. 3d at 478 (ADEA); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (§ 1983 and NYSHRL).  She must also provide "a basis for imputing the conduct creating the hostile work environment to the employer."  *Walsh*, 375 F. Supp. 3d

at 478 (citing *Feingold v. New York*, 366 F.3d 138, 149-50 (2d Cir. 2004)).  Allegations

that supervisors were aware of a hostile work environment and did nothing to stop it is

sufficient basis to impute employee conduct to the employer in this context.  *Feingold*,

366 F.3d at 152.

When evaluating a hostile work environment claim, "courts must consider the

totality of the circumstances, including the frequency of the discriminatory conduct, its

severity, whether it is physically threatening or humiliating, or a mere offensive

utterance, and whether it unreasonably interferes with a plaintiff's job performance."

*Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 59 (S.D.N.Y. 2019) (citation

omitted).  There are also objective and subjective components:  "the misconduct shown

must be severe or pervasive enough to create an objectively hostile or abusive work

environment and the victim must also subjectively perceive that environment to be

abusive."  *Walsh*, 375 F. Supp. 3d at 478 (citation omitted).  The incidents may not be

merely "episodic; they must be sufficiently continuous and concerted in order to be

deemed pervasive."  *Id.* (citation omitted).  The acts comprising the hostile work

environment must also be because of the plaintiff's protected characteristics.  *Colon v.

Fashion Institute of Tech.*, 983 F. Supp. 2d 277, 292 (S.D.N.Y. 2013) (citation omitted).

The NYCHRL was intended to be more protective and requires only unequal

treatment on the basis of plaintiff's protected characteristic.  *Bermudez*, 783 F. Supp. 2d

at 579.  However, "petty, slight, or trivial inconveniences are not actionable."  *Id.* (citing,

*inter alia*, *Williams v. New York City Hous. Auth.*, 61 A.D. 3d 62, 80 (1st Dep't 2009)).

An employer is liable for the discriminatory acts of an employee if the employee

"exercised managerial or supervisory responsibility." N.Y.C. Admin. Code. § 8-107(13)(b)(1).

Defendants argue that Gittens fails to state a claim of hostile work environment because the Alfred incident and Simon's tirade against Roman were not age-related, that criticism about job performance is insufficient, and that Pemberton ignoring Gittens is conclusory, none of which are compelling because they isolate distinct acts from the totality of the circumstances Gittens alleges.  Doc. 73 at 9-11.[32]

The totality of circumstances weighs in favor of Gittens' claim at this stage. Gittens provides background information that since her altercation with Alfred in 2013, Barreto has spread an unfounded rumor that she is "checked out" and unable to carry out the complex work of an Administrative Staff Analyst.  Doc. 59 at ¶¶ 42, 109-24, 184, 405.  She further explained that the attitude of her supervisors at the DOC was to get rid of employees like her who were over the age of 40.  Her evidence includes comments by Wynter in December 2015 that employees with those characteristics were "old and fat"

---

[32]  The cases upon which Defendants rely are inapposite as they generally involved fewer or less serious allegations, or were at the summary judgment stage where plaintiffs have a higher burden.  *See, e.g.*, *Isbell*, 316 F. Supp. 3d at 591-92 (granting dismissal motion where hostile work environment claim was based on criticism, use of a sarcastic tone, denial of training, refusal of overtime, refraining from talking to plaintiff, and denying use of DOC vehicle); *Todoverto v. McDonald*, No. 13-CV-4922 (JCM), 2016 WL 3826281, at *13 (S.D.N.Y. July 7, 2016) (finding safety warnings and daily comments about old age were not sufficient to support a hostile work environment claim at summary judgment); *Harrison v. State Univ. of New York Downstate Med. Ctr.*, No. 16-CV-1101 (RRM) (CLP), 2018 WL 4055278, at *11-12 (E.D.N.Y. July 6, 2018) (dismissing five incidents of uncertainty over sick leave and hostile interactions as "quintessentially episodic" and "rooted in conduct that amounts to nothing more than workplace dynamics—that is, personal enmity or personality conflicts."); *Allessi v. New York State Dep't of Corr. and Cmty. Supervision*, 16 F. Supp. 3d 221, 228-29 (W.D.N.Y. 2014) (dismissing claim as "sporadic" where one harassing comment was made at an unspecified time and other comments were just described as "sarcastic"); *Kishia Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234 (BMC), 2014 WL 5587349, at *8-9 (E.D.N.Y. Nov. 3, 2014) (rejecting hostile work environment claim on summary judgment because discriminatory statements made outside of plaintiff's presence were inadmissible hearsay); *Sosa v. Medstaff, Inc.*, No. 12-CV-8926 (NRB), 2014 WL 4377754, at *6 (S.D.N.Y. Sept. 4, 2014) (granting motion for judgment on the pleadings where boss was critical and made at least two racially-charged comments); *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 415-17 (E.D.N.Y. 2013) (finding claims defendant embarrassed plaintiff, forced him back to work following disability leave, made a politically incorrect statement, hit him on the back when he was late to a meeting, and made him wait three hours for another meeting insufficient to support a hostile work environment).

and "didn't fit the agency's new and more youthful image." *Id.* at ¶ 205. Wynter also

frequently referred to those employees as "dead men" and both Wynter and Simon often

called them "idiots." *Id.* at ¶¶ 210, 245. Employees feared being transferred by

Pemberton, Simon, Wynter, and Pinnock to work at Rikers Island if they complained of

such discrimination, which happened to at least two employees. *Id.* at ¶¶ 233, 320, 378.

Moreover, starting from when Pemberton began supervising Gittens in August 2016, he

ignored her, Freeman and Welch—his only over 40-year-old supervisees—and withheld

information critical to their job performance. *Id.* at ¶¶ 298-309. By contrast, he gave

younger employees professional opportunities and raises, and would not explain denial of

a raise to Freeman. *Id.* at ¶¶ 307, 310-11. He also demeaned Gittens and said that she

did subpar work and could not handle higher-level tasks. *Id.* at ¶¶ 300, 321. Prior to her

supervision by the Individual Defendants, Gittens had an "Outstanding" rating on her

performance reviews. *Id.* at ¶ 93. Under their supervision, however, Gittens was

functionally demoted. *Id.* at ¶¶ 338-339. She was also denied several promotions in

favor of younger and provisional employees, and was not given a yearly evaluation, in

contravention of Civil Service Laws and the City's Personnel Rules and Regulations. *Id.*

at ¶¶ 248-80. Gittens experienced such stress and anxiety from Pemberton's behavior

towards her that she missed work, her health deteriorated, and she took a leave of absence

from December 2018 and February 2019. *Id.* at ¶¶ 314-15, 322-23. These allegations are

sufficient to plead a hostile work environment claim. *Hazen Paper Co.*, 507 U.S. at 604

(noting ADEA meant to curb "inaccurate and stigmatizing stereotypes about older

workers' productivity and competence"); *Zoulas*, 400 F. Supp. 3d at 60 (finding

comments that age affected plaintiff's work performance coupled with other

discriminatory behavior like changing her classroom but not the classroom of younger

employees, denying her professional development opportunities, and having other

teachers harass her, was sufficient to plausibly allege a hostile work environment); *Rosen*

*v. New York City Dep't of Educ.*, No. 18-CV-6670 (AT), 2019 WL 4039958, at *8

(S.D.N.Y. Aug. 27, 2019) (sustaining claim where, *inter alia*, plaintiff was highly

experienced, but her duties were transferred to younger employees and other older

teachers experienced similar discrimination).

   For the first time in her opposition papers, Gittens characterizes her hostile work

environment claim as a *retaliatory* hostile work environment claim and argues that she

experienced a hostile work environment in retaliation for speaking out about age

discrimination and cronyism at the May 29, 2015 town hall meeting.  Doc. 93 at 28-30.

Because a plaintiff may not raise claims not pleaded in the complaint in her opposition

papers, the Court declines to consider it.  *Williams v. U.S. Info. Sys., Inc.*, No. 11-CV-

7471 (ER), 2013 WL 214318, at *4 n.4 (S.D.N.Y. Jan. 17, 2013) (collecting cases).

   Even if the Court were to consider Gittens' retaliatory hostile work environment

argument, it would fail.  Like a hostile work environment claim, a retaliatory hostile work

environment is established "by showing that the incidents of harassment following

complaints were sufficiently continuous and concerted to have altered the conditions of

his employment."  *Villar v. City of New York*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015).

Like a retaliation claim, one must also show a causal connection to the protected activity.

*Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 316 (S.D.N.Y. 2016);

*Marquez v. City of New York*, No. 14-CV-8185 (AJN), 2016 WL 4767577, at *15

(S.D.N.Y. Sept. 12, 2016).

Here, Gittens failed to show a causal connection between the May 2015 town hall meeting and Pemberton's behavior fifteen months later as her supervisor in August 2016. Doc. 106 at 4 n.3, 16.[33]  The only substantive case on which Gittens relies for this claim, *Wallace v. Esper*, is inapposite as there plaintiff alleged that defendants explicitly referenced her complaints to federal agents from a month prior as they physically attacked her.  No. 18-CV-6525 (RA), 2019 WL 4805813, at *3, 10 (S.D.N.Y. Sept. 30, 2019).  There is no analogous close temporal relationship here.

Accordingly, Defendants' motion to dismiss is denied with respect to Gittens' hostile work environment claim.

## I.       Aiding and Abetting under NYSHRL and NYCHRL

Both NYSHRL and NYCHRL make it unlawful for coworkers to aid or abet age discrimination in the workplace.  N.Y. Exec. Law § 296(6); N.Y. Admin. Code § 8-107(6).  To be liable for aiding and abetting under either, the defendant must have "actually participated in the conduct giving rise to the claim of discrimination."  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687-88 (S.D.N.Y. 2012) (citation omitted).

Defendants' sole challenge to Gittens' aiding and abetting claim is that there is no underlying violation of the NYSHRL and NYCHRL sufficient to support it.  Doc. 73 at 26-27.  Because Gittens alleges that the Individual Defendants participated directly in the discrimination, retaliation, and hostile work environment against her, and those claims survive Defendants' motion to dismiss, this claim survives as well.  Doc. 93 at 46-47.

Thus, Defendants' motion to dismiss the aiding and abetting claim is denied.

---

[33] Defendants' other argument for dismissal, that the retaliation must be against Gittens herself, is unpersuasive as she clearly argues both that Pemberton retaliated against her and others similarly situated. Docs. 93 at 30, 106 at 17.

## IV.    Conclusion

In sum, Defendants' motion to dismiss is GRANTED with respect to

- her retaliation and failure to promote claims under the ADEA based on conduct predating December 24, 2016;
- her claims under the 14th Amendment and § 1983 based on conduct predating January 9, 2016;
- her claims under the NYSHRL and NYCHRL based on conduct predating October 20, 2014;
- her *Monell* claim against the City and the Individual Defendants in their official capacities;
- her due process claims; and
- her claim for retaliation resulting from the filing of this lawsuit.

and DENIED as to all other claims.  Defendants' motion to strike is DENIED and

Gittens' motion for leave to amend is DENIED.

The Court respectfully directs the Clerk to terminate the DOC as a party and

the Individual Defendants as parties in their official capacities.  The Clerk is further

directed to terminate the motion, Doc. 72.

SO ORDERED.

Dated:    June 11, 2020
          New York, New York

_____
Edgardo Ramos, U.S.D.J.