UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LORRAINE A. GITTENS-BRIDGES,

                Plaintiff,

– against –

THE CITY OF NEW YORK; GARLAND BAR-
RETO; AUDWIN PEMBERTON; NADENE PIN-
NOCK; DINA SIMON; and CLAUDETTE
WYNTER, in their individual capacities and as aid-
ers and abettors,

                Defendants.

**OPINION AND ORDER**

19 Civ. 272 (ER)

Ramos, D.J.:

    Lorraine A. Gittens-Bridges ("Gittens") brings this action against her employer,
the City of New York ("City") and her supervisors at the New York City Department of
Correction ("DOC"),[1] Garland Barreto ("Barreto"), Audwin Pemberton ("Pemberton"),
Nadene Pinnock ("Pinnock"), Dina Simon ("Simon"), and Claudette Wynter Hamilton
("Hamilton"),[2] for age discrimination and retaliation in the workplace.  Before the Court
is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure.  Doc. 143.  For the reasons set forth below, the motion is GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

    The Court assumes familiarity with the facts and holdings in its June 11, 2020
opinion granting in part and denying in part Defendants' motion to dismiss the second

---

[1]  Despite the second amended complaint ("SAC") listing DOC in the caption, Gittens agreed that the DOC
was never a party to this case, and it was terminated as a defendant in June 2020 upon resolution of the
City's motion to dismiss.  *See* Doc. 137 at 1 n.1.

[2]  Barreto, Pemberton, Pinnock, Simon and Hamilton will be referenced as the "Individual Defendants" and,
together with the City as the "Defendants."  Claudette Wynter Hamilton explained at her deposition that she
married in July 2019 and took the name Hamilton at that time.  Doc. 150-5 (Hamilton Dep.) at 18–20.
Accordingly, the Court refers to her as Hamilton.  References to Wynter in the prior opinion and in the
record are to the same person.

amended complaint ("SAC").  Doc. 137.  The following facts are undisputed unless otherwise indicated and are construed in favor of Gittens as the non-moving party.[3]  *See*

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017).

---

[3] The facts are drawn from Defendants' Rule 56.1 statement, Doc. 145, and from the parties' evidentiary submissions.  In answering a motion for summary judgment pursuant to Fed. R. Civ. P. 56, litigants in this District are required by the Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.  *See* Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  The Court's Individual Practices further require the party opposing a motion for summary judgment to reproduce each entry in the moving party's Rule 56.1 Statement and set out her response directly beneath it.  *See* Individual Practices Rule 2(C)(i).  These rules are intended to assist the Court by narrowing the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination.  *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").  Plaintiff's counsel's Response to Defendants' Rule 56.1 Statement, Doc. 189, and Rule 56.1 Counterstatement of Disputed Facts, Doc. 186, do not comply with these requirements and are entirely unhelpful to the Court.  They tend to obfuscate the relevant facts rather than identifying the key factual disputes.

First, Plaintiff's 56.1 response statement purports to deny certain factual assertions—for example, as hearsay—that are not actually in dispute and are not hearsay.  Her responses are largely irrelevant to the facts set out in Defendants' 56.1 statement.  For example, Plaintiff objects to a nonparty's date of birth, based on information in DOC business records, as hearsay.  Doc. 189 ¶ 76.  She frivolously claims several times that statements of fact are inadmissible for a certain purpose when those facts are, in fact, admissible and supported by the record.  *See, e.g.,* Doc. 189 ¶¶ 44, 76, 84.  Second, Plaintiff's 56.1 response improperly interjects arguments and immaterial facts in response to facts asserted by Defendants, without specifically controverting Defendants' statements of fact.  Plaintiff repeatedly responds to Defendants' statements with, "Admit and object," admitting the statement of fact but then arguing without support that "[t]he statement of fact is inadmissible for purposes of proving the truth of the matter asserted[.]"  *See* Doc. 189 ¶¶ 14, 60, 76, 81, 84, 164, 165.  "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact."  *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 458 n. 1 (S.D.N.Y. 2011); *see also Costello v. New York State Nurses Ass'n,* 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses where plaintiff failed to specifically dispute defendant's statements); *Buckman v. Calyon Secs.,* 817 F. Supp. 2d 322, 328 n. 42 (S.D.N.Y.2011) ( "56.1 statements not explicitly denied by plaintiff are deemed admitted"); *Geoghan v. Long Island R.R.,* No. 06 Civ. 1435 (CLP), 2009 WL 982451, at *5–6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").  Third, Plaintiff repeatedly asserts the wrong standard of review.  For example, Plaintiff claims that for purposes of the summary judgment motion, "the Court must accept the facts as established as true by the non-movant."  Doc. 189 ¶ 159; *see also* ¶¶ 46, 97, 170.  While the Court must construe ambiguities in favor of Plaintiff as the non-movant, there is no requirement that the Court simply accept her version of events as true.  Fourth, Plaintiff's 56.1 response improperly asserts new allegations or arguments not otherwise made.  Plaintiff requests that the Court reconsider its dismissal of her *Monell* claims against the City based on Hamilton's deposition testimony regarding the DOC's compliance with certain provisions of Civil Service Law, even though she never brought such claims as part of her *Monell* claim in the first place.  Docs. 189 ¶ 3, 137 at 23–27.  Fifth, Plaintiff's submission appears to be incomplete, as several of her responses cite to unspecified

portions of counsel's declaration, and several references to unspecified supporting materials are inexplicably highlighted in various colors. *See, e.g.*, Doc. 189 ¶¶ 33, 59, 129, 133, 142, 145–47.

Furthermore, counsel requests that the motion for summary judgment be denied due to purported deficiencies in Defendants' document production, which she raises in her October 2021 Rule 56(d) declaration, Doc. 185, submitted over a year after the close of discovery. While discovery was ongoing, Plaintiff's counsel repeatedly brought discovery disputes to the Court's attention. At the pre-motion conference held on August 13, 2020, counsel did not raise any purported discovery deficiencies to the Court and agreed that discovery was complete:

> The Court:  And I take it both sides agree that discovery is complete, correct, Ms. Hagan?
> Ms. Hagan:  Yes. Yes, your Honor.

Doc. 141 at 5 (Aug. 13, 2020 Hr'g Tr.). Accordingly, Plaintiff's discovery application is denied, and the Court disregards counsel's Rule 56(d) declaration. "It is well established that 'the trial court may properly deny further discovery' under Rule 56(d) 'if the nonmoving party has had a fully adequate opportunity for discovery.'" *Moccia v. Saul*, 820 F. App'x 69, 70 (2d Cir. 2020) (summary order) (quoting *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)).

Finally, the balance of Plaintiff's evidentiary submission suffers from further deficiencies. First, Gittens has submitted the declaration of nonparty Carol Porter, who according to her declaration worked at the Applicant Investigations Unit within the DOC. Doc. 188-25. The Porter Declaration purports to provide information about the hiring of Ayinde Williams, who Plaintiff claims was hired improperly by some of the Individual Defendants through irregular channels. However, Plaintiff did not disclose Porter's name as a witness as part of the initial disclosures required under Rule 26. *See* Doc. 199. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." This preclusionary rules applies to motions for summary judgment. *Fleming v. Verizon New York, Inc.*, No. 03 Civ. 5639 (WHP), 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006) (citations omitted). Plaintiff has not made any argument that consideration of Porter's declaration would be harmless or is otherwise justified. Accordingly, the Court does not consider the Porter declaration. Second, Gittens' 33-page declaration, Doc. 187-1, includes several assertions that are hearsay, conclusory, or speculative. *See, e.g.*, Doc. 187-1 ¶ 65 ("The sign was posted by Mrs. Simon's younger crony hires to let the long tenured workers know that we were not only excluded from sitting in the area, that we were not amongst the clique of younger favored employees, that they were better than us."); ¶ 105 ("Daniela Aleman and Emily Shermatova confided in me that Mrs. Simon did not want the younger new DOC employees to engage the long tenured employees. Both Ms. Aleman and Ms. Shermatova told me that she referred to us as idiots."); ¶ 163 ("[Individual Defendants] would change the names of positions to avoid hiring people like me:  long tenured DOC employees on established civil service lists."); ¶ 173 ("When Ms. Barreto made that statement, it was clear that she had reviewed my medical records and knew that I had been in the hospital due to the psychological distress that I experienced in the wake of Ms. Alfred's assault.") To the extent the declaration contradicts or embellishes Gittens' deposition testimony, the Court disregards it. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citation omitted); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (noting that district court was free to disregard hearsay statements and speculation in affidavits); *Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS) (HBP), 2007 WL 163112, *4–5 (S.D.N.Y. Jan. 24, 2007) (disregarding inadmissible portions of plaintiff's affidavit in analyzing motion for summary judgment); *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 568–69 (E.D.N.Y.1999) (same); *Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 406–07 (W.D.N.Y.2010) (plaintiff's affidavit that disputes her own prior sworn testimony must be disregarded), *aff'd*, 660 F.3d 98 (2d Cir. 2011); *Jeffreys v. City of New York*, 426 F.3d 549, 554–55 (2d Cir. 2005) (same) (citing *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468–71 (S.D.N.Y. 1998) (Sotomayor,

### A.  Gittens' Employment with DOC

Gittens was born on July 3, 1961.  Doc.187-1 (Gittens Decl.) ¶ 1.  She graduated

from Cornell University with a degree in Industrial and Labor Relations in 1984, and she

began working for the DOC in 1986 as an office associate.  Doc. 150-2 (Gittens Dep.) at

12, Doc. 145 (Def.'s 56.1) ¶ 5.  Gittens has been promoted three times after taking civil

service examinations, and she earned the title of associate staff analyst in 1993.  Doc. 145

¶¶ 6–8.  Gittens is assigned to the DOC Operational Review Unit, and her current title is

associate staff analyst.  She is a member of the Organization of Staff Analysts union.  *Id.*

¶¶ 9–11.

---

J.), *aff'd,* 205 F.3d 1324 (2d Cir. 2000)).  For the same reasons, the Court disregards those portions of the declaration of nonparty Althea Cicero, who worked at the DOC as an administrative staff analyst, that contain inadmissible hearsay, are conclusory, or are immaterial to Gittens' claims.  Doc. 187-33.  Cicero's declaration largely discusses statements and actions by nonparty Dahlia Grant, which are not relevant to Gittens' claims.  Defendants also point out that certain exhibits were not produced to them, were not Bates stamped, or were dated after the close of discovery (Docs. 187-7 and 188-13) and therefore should be disregarded.  Doc. 198 at 2 n.1.  The Court notes that Docs. 187-7 and 188-13—Simon's Appointment Announcement and the New York Court of Appeals decision *City of Long Beach v. Civ. Serv. Emps. Ass'n, Inc.*, 8 N.Y.3d 465 (2007)—are publicly available and considering them at this juncture does not prejudice Defendants.

Although the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention, *Holtz,* 258 F.3d at 73, the net result of Plaintiff's submission has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record—including thousands of pages of deposition testimony and DOC records in the instant case—to ensure that Gittens' claims receive thorough and just consideration.  This problematic submission is particularly galling in light of the repeated extensions the Court granted Plaintiff's counsel, see below, and Defendants' counsel's professional courtesy in consenting to said extensions.

In sum, for the reasons set forth above, and as explained further below where necessary, in analyzing the instant motion, the Court has disregarded:  (1) Plaintiff's Rule 56(d) declaration; (2) averments in Plaintiff's 56.1 response and 56.1 counterstatement of disputed facts that are not denials of the specifics facts asserted by Defendant, or that are not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments; (3) the improper portions of the Gittens and Cicero Declarations; (4) the Porter Declaration; and (5) other evidentiary submissions that are not relevant to the case at bar, such as the April 2017 Department of Investigations report into misuse of agency vehicles by DOC commissioner Joseph Ponte and other high-ranking DOC staff, none of whom are parties to or directly connected to Plaintiff's complaint, Doc. 187-8.

**B. Events Giving Rise to Gittens' Suit**

*1. 2013 Incident*

In 2013, Gittens' supervisor at the Operations Review Unit was Dounia Alfred. *Id.* ¶ 12. At that time, Garland Barreto, who is the same age as Gittens, served as the DOC Director of Personnel Operations. *Id.* ¶¶ 12–15. Gittens attended a meeting with Alfred and Barreto in April 2013 to discuss an assignment. *Id.* ¶ 17. According to Gittens, during the meeting, Alfred assaulted her by violently shaking her by the arms, and Barreto did nothing to intervene even though Gittens screamed for help.[4] Doc. 150-2 at 162–63. Barreto did not take any corrective actions after the incident. *Id.* at 163–64. A week after that meeting, Gittens went to the hospital and was hospitalized for depression from approximately late April to early May 2013. She also filed a police report, but the police did not contact her after she filed the report. *Id.* at 164–67.

*2. Simon's Appointment as Deputy Commissioner of Human Resources*

In approximately August 2014, Simon began working at the DOC. She had previously worked as the Director of Human Resources ("HR") in the City Comptroller's Office. Doc. 151-1 (Simon Dep.) at 20–21. In September 2014, she officially started as the Deputy Commissioner of HR, which role she held until October 2015. Doc 145 ¶¶ 27–29. From October 2015 to January 2016, she served as Acting First Deputy Commissioner, and in January 2016, she was promoted to First Deputy Commissioner. *Id.* ¶ 181; Doc. 148 (Simon Decl.) ¶ 2. Simon was on leave from the DOC from November 2016 to July 2020.[5] Docs. 145 ¶ 207, 148 ¶ 2, 151-1 at 88.

According to Simon's testimony, one of her goals as Deputy Commissioner of HR was "to build a recruitment unit that can recruit corrections officers," because the agency had over 3,000 vacant staff positions. Doc. 151-1 at 40–41. She testified that at the time

---

[4] According to Barreto, Alfred lightly touched Gittens' arm at the meeting to ask if she was alright and did not shake her by the arms. Doc. 145 ¶¶ 18–20.

[5] While Gittens purports to dispute this statement by citing to the April 2017 Department of Investigation report about the misuse of City-owned vehicles, Doc. 189 ¶ 207, that report did not mention Simon, and she does not actually dispute that Simon was on leave.

she began working in HR, the department was not functioning well in hiring, recruiting, processing paychecks, etc., and so she sought to hire staff to execute her vision for the department.  *Id.* at 41–42.  At around the same time, the DOC received three years' funding from the Mayor's Office to establish a recruitment unit.  *Id.* at 42.

As of September 9, 2014, when Simon began working as Deputy Commissioner of HR, Gittens wrote that her job duties were:  (1) DOC career counselor; (2) drafting and submitting summaries of first step disciplinary conferences for non-uniform DOC employees who had been arrested; and (3) special projects.  Doc. 145 ¶¶ 31–32.  Based on feedback from Patricia LeGoff, DOC Assistant Commissioner of Equal Employment Opportunity, and Maria Guccione, Director of Labor Relations, Simon determined that Gittens was not effectively serving as career counselor and that she was not timely completing the first step summaries.  *Id.* ¶¶ 33–34, 40–41; Doc. 151-1 at 120–22.   Simon removed the responsibility for first step conferences from Gittens, instead creating new a position to oversee the conferences, for which she hired Melissa Andre, an attorney with experience in labor relations.  Doc. 145 ¶¶ 35–36.  Simon does not have a direct relationship with Andre but is friends with Andre's sister.[6]  *Id.* ¶¶ 37–39.  Simon removed Gittens from the career counseling role and replaced her with Carolyn Maraj, who had a master's degree in business administration.  *Id.* ¶¶ 42–44.

After Simon joined the DOC, the remaining Individual Defendants joined the HR Department.  Simon interviewed and hired Pemberton as the Director of Payroll, Timekeeping, and Benefits in March 2015.  Doc. 145 ¶¶ 86–90; Doc. 150-3 (Pemberton Dep.) at 16.  Pemberton was born in 1962.  Doc. 145 ¶ 211.  Simon testified that she did not know Pemberton before he was hired to work at the DOC; he had worked at several other City agencies since 1984.  *Id.* ¶ 89; Doc. 150-3 at 12–19.  Hamilton, who was born

---

[6] Gittens' 56.1 counterstatement of disputed facts claims that Andre was Simon's "crony," that Defendants failed to produce the job vacancy notice and interview/applicant log for this position in discovery, and that "Andre is Haitian and is the sister of one of Defendant Simon's friends."  Doc. 186 ¶¶ 80–83.

in 1961, was hired as Assistant Commissioner of HR Operations and began working for the DOC in September 2015.  Doc. 145 ¶¶ 79, 82–84.  Hamilton had previously held a similar position at the City's Administration for Children's Services ("ACS").  *Id.* ¶¶ 80–81.  When Hamilton began working at the DOC, she directly supervised Pemberton and Barreto.  *Id.* ¶ 83.  In January 2016, when Simon was promoted, Pinnock replaced Simon as DOC Deputy Commissioner of HR.  *Id.* ¶ 181.  Before that, from 2009 to 2016, she had served as DOC Deputy General Counsel.  *Id.* ¶ 182.

### 3.   *Gittens' 2014–2015 Job Applications*

The DOC, and particularly the HR Department, posted several job openings in 2014 and 2015.  Gittens applied for many of the new openings, but she was not selected for any of them.  In October 2014, Gittens applied for the Director of Recruiting position. She was interviewed by Maraj in November 2014.  *Id.* ¶¶ 45–46.  Maraj's interview evaluation noted that Gittens had inadequate managerial and supervisory skills.  Doc. 150-13.  Furthermore, Simon testified that she did not believe Gittens' résumé was accurate, because as of fall 2014, Gittens was not performing many of the duties she had listed on it.  Doc. 145 ¶¶ 48–51.  Lakisha Grant, who was born in 1971 and who according to her application materials had a master's degree in HR management, was selected for the position.  *Id.* ¶¶ 52–54.  Simon testified that she was not related to or friends with Grant, but that she knew Grant had worked at the City's Department of Citywide Administrative Services ("DCAS").[7]  *Id.* ¶ 55; Doc. 151-1 at 150–52.

In late October 2014, the Recruiting Manager position was posted with two available openings, and Gittens applied for the position.  Docs. 145 ¶¶ 56–57, 150-17. She was not selected for either position.  Diane Crotti, who was born in 1957, was selected for one of the positions, and Chikera Beckford, who was born in 1977 and who

---

[7] Without citing to any evidence in the record beyond Simon's deposition testimony, Gittens objects to this statement as hearsay and "raises the objection herein to the extent that the statement of fact attempts to establish that Mrs. Grant was not any of the Defendants' cronies."  Doc. 189 ¶ 55.  Accordingly, Gittens fails to establish a genuine dispute of material fact.

according to her application had prior experience as a supervisor in HR recruitment and employee relations, was selected for the other.  Doc. 145 ¶¶ 58–61.  Beckford was not related to or a friend of Simon, although Simon knew her through her previous work at DCAS.[8]  *Id.* ¶ 63; Doc. 151-1 at 150–51.

In November 2014, Gittens applied for the Project Manager/Lead Analyst position.  Doc. 145 ¶¶ 67–68.  That position was ultimately never filled and was later reposted as a Computer Specialist (Software) position.  Gittens did not apply for the Computer Specialist position.  *Id.* ¶¶ 69–70; Doc. 149 (Hamilton Decl.) ¶ 10.[9]  Glenn Yarris applied and was selected for the position.[10]  Doc. 145 ¶ 71.

In late December 2014, the Project Manager/HR Organizational Learning and Development position was posted, and Gittens applied for the position in early January 2015.  *Id.* ¶¶ 72–73.  She was not selected for the position.  A contemporaneous email from DOC employee Christine Allen, one of Simon's reports, to Simon stated that Gittens did not have the required training or project management experience and that her application was a "time waster."[11]  Docs. 145 ¶ 73, 150-27, 151-1 at 28.  Geraldine Penn,

---

[8] Again without citing to any evidence in the record beyond Simon's deposition testimony, Gittens "contends that Ms. Beckford was a younger less experienced non tenured DOC employee, and that Defendant Simon hired her based [on] cronyism and age based animus."  Doc. 189 ¶ 63.  Gittens fails to establish a genuine dispute of material fact.

[9] While Gittens challenges the Hamilton Declaration as not based on her personal knowledge since Hamilton did not begin working at DOC until September 2015, *see, e.g.*, Doc. 189 ¶ 69, Hamilton makes clear in her declaration that the facts included are based on both her personal knowledge and her review of DOC records.  Doc. 149 ¶ 1.

[10] While Gittens purports to dispute and object to this statement in Defendants' 56.1 statement, her response fails to raise a genuine dispute of fact.  Instead, she speculates that Defendants changed the title of the position in order to avoid the requirements of the New York Court of Appeals decision *City of Long Beach v. Civ. Serv. Emps. Ass'n, Inc.*, 8 N.Y.3d 465 (2007), which held that the New York Civil Service Law only authorizes provisional appointments when there is no eligible list available for filling a vacancy in a competitive class, and then only for a maximum period of nine months, and in order to make Gittens ineligible for the position.  Doc. 189 ¶ 71.

[11] The email, dated January 12, 2015, from Allen to Simon, included Gittens' resume as an attachment and reads in full:  "With all due respect, Boss Lady . . . Please see attached.  Ms. Gittens has no training or Project Management experience to speak of.  Not even if I stretch my imagination.  She is not even close to equaling the 'B' list candidates for this position.  I can and will confidently defend my position to opt not to select her to interview, if anyone questions me.  I, fairly and without bias, reviewed and selected the

who was born in 1964, was selected for the position. Doc. 145 ¶¶ 74–76. According to Penn's application, she had previously served as Deputy Director of Workforce Development Division at the City's Human Resources Administration ("HRA"), where she administered and planned yearly training sessions for over 15,000 staff.[12] *Id.* ¶ 75.

In March 2015, the Assistant Commissioner of HR Operations position was posted. *Id.* ¶ 77. Gittens applied for the position in April 2015 but was not selected. *Id.* ¶ 78. Hamilton—who, like Gittens, was born in 1961—was hired instead. *Id.* ¶¶ 79, 84. According to Hamilton's résumé, she had a master's degree in HR management and had served as Assistant Commissioner in the Office of Personnel Services at ACS. *Id.* ¶¶ 79–81. Hamilton began working at DOC on September 28, 2015, and directly supervised Barreto, who managed Personnel Administration, and Pemberton, who managed Payroll, Timekeeping and Employee Services. *Id.* ¶¶ 82–83.

### 4. *May 2015 Town Hall and Incidents of Alleged Retaliation*

On May 29, 2015, Gittens attended a town hall meeting for the HR Department with Simon and with several other DOC employees including Michelle Roman, Ita Jackson, Michael Perry, Mary Gainey, and Robert Smith. *Id.* ¶ 107; Doc. 150-2 at 44–48, 69–70. Gittens testified that she and her colleagues spoke out at the town hall because "we started to see all these people being hired," and "[w]e're seeing all these younger people coming in making all these high salaries and we're applying for these jobs and nothing happens." Doc. 150-2 at 46. At the town hall, Roman challenged Simon about her hiring practices. When Roman spoke out, Simon "tried to literally attack Michelle Roman," and "looked like she was going to pull of her earrings and fight with Michelle to

---

qualified candidates for interview. She is not qualified and I ain't scaird [sic] to say so. This is a time-waster. May I not . . .?" Simon responded, "I agree." Doc. 150-27.

[12] While Gittens objects to Defendants' relevant statements of fact, she also notes that she has not alleged that Penn's hiring is the basis for any of her discrimination claims. Doc. 189 ¶¶ 74–75.

the point where she had to be restrained." [13]  *Id.* at 47.   Gittens testified that Jackson, Smith, and Perry were also upset at the meeting, and that Jackson complained.   *Id.* at 47–52, 57, 69–70.   Gittens, too, spoke out at the meeting, informing Simon that she and her colleagues wanted the opportunity to advance, and that leadership should let the established DOC employees know how they could improve in order to be considered for the new positions.  *Id.* at 47–48.  When Gittens explained that she wanted one of the new positions, Simon responded, "[D]on't worry, mommy, don't worry, mommy.  If you have a problem. . . my door is open." [14]  *Id.* at 48.

At another time after the May 2015 town hall meeting, Gittens was told that her co-worker, Makvala Moshiashvili, went to Simon and complained about the "different people being hired" at the agency.[15]  Docs. 145 ¶ 114, 150-2 at 72.  At a later meeting attended by Hamilton, Moshiashvili, and others, Moshiashvili began to cry because her access to the Payroll Management System had been removed.[16]  Doc. 150-2 at 73–75.  Gittens did not ask Moshiashvili why she had been denied access to the Payroll Management System, but she testified that given the open workspace in the office, she could see that Moshiashvili was distressed, and she overheard other workers comment

---

[13] In her deposition testimony, Simon denied that any exchanges between her and aggrieved employees became combative, denied that she ever reached to take off her earrings, and denied that she had ever been stopped or restrained at a meeting.  Doc. 151-1 at 163–64.  The deposition testimony of nonparty witness Mykel Isbel, who testified that she went to a number of DOC town hall meetings, a number of which became "very chaotic" and "contentious," supports Gittens' version of events.  Doc. 187-24 (Isbel Dep.) at 165–67.  Isbel testified that at some meetings, Simon became aggressive, raised her voice, and had to be physically stopped.  *Id.*

[14] Simon denied making this statement or referring to any coworker or employee as "ma" or "mommy."  Doc. 151-1 at 175–76.

[15] Gittens testified, "Makvala didn't directly tell me but the other workers were saying did you see what they did with Makvala.  She went to Ms. Simon and she explained they took the access from her to be able to do her work."  Doc. 150-2 at 75.

[16] Gittens' deposition testimony is not clear whether she was present at the meeting or heard about it later.

that after Moshiashvili confronted Simon, Simon had denied her access to certain systems.[17]  *Id.* at 74–75.

Jackson complained about Simon's management at the May 2015 town hall meeting, and in August 2015 she complained that some of Simon's staff had put up a sign in front of their workspace that read, "The White House."  Docs. 145 ¶¶ 110, 187-25, 187-28.  On August 27, 2015, Jackson received a memorandum of correction for "exhibit[ing] unprofessional behavior by voicing her opinion loudly near Commissioner Simon's conference room while the chief of staff and outside city officials were trying to conduct a meeting," Doc. 187-29, and shortly thereafter she was transferred from the central DOC office to a position at Rikers Island, Doc. 145 ¶¶ 110–12.  Roman and Gainey were transferred in 2015 from the DOC health benefits section to DCAS, according to Defendants as part of a citywide initiative to consolidate the administration of City employees' health benefits.[18]  *Id.* ¶¶ 157–64.  Cicero attests in her declaration that, at some unspecified time, she asked Hamilton for an increase in pay and instead got a demotion in salary and title.  Doc. 187-33 (Cicero Decl.) ¶¶ 23, 30.

In June 2015, soon after the May 29, 2015, town hall, Gittens applied and was rejected for three other positions.  Gittens applied for the position for HR Special Projects on approximately June 3, 2015.  Doc. 145 ¶¶ 125–26.  Barreto interviewed Gittens for the position.  *Id.* ¶ 127.  According to Gittens, Barreto made a comment during the interview, "I didn't know you had done all this community service.  I thought you had

---

[17] Simon claims that she in fact increased Moshiashvili's salary, and that she removed her access to the Payroll Management System because she did not need it to do her job and had been using the system improperly to look up other employees' salaries.  Doc. 145 ¶¶ 122–23; Doc. 148 (Simon Decl.) ¶¶ 3–4.

[18] In her 56.1 response, Gittens disputes Defendants' explanation because she "declared that she never heard of any Citywide Initiative to centralize employee benefits. [ . . .] A reasonable juror could determine that their 'transfer' to another City agency was in retaliation for their protected activities and not because of a Citywide initiative."  Doc. 189 ¶ 159.  Her response is speculative, and the evidence she cites does not support and is not relevant to her assertion.

checked out." [19]  Doc. 150-2 at 180–81.  Gittens was not selected for the position.
Beckford was hired, and she began in that role in July 2015.[20]  Doc. 145 ¶ 129.

The Director of Strategic Partnerships and Community Engagement position was
posted on May 20, 2015, and Gittens applied for it on approximately June 3, 2015.  *Id.*
¶¶ 130–132.  The position sought a candidate who could increase the DOC's visibility
through community engagement and outreach.  *Id.* ¶ 131.  Fabrice Armand, who was
born in 1982 and according to his application materials had experience in marketing,
advertising, and public relations, was selected for the position.  *Id.* ¶¶ 133–34.  Simon
testified that she was not related to or friends with Armand.[21]  *Id.* ¶ 135.

On June 12, 2015, the Director of HR position was posted, and Gittens applied for
it.  *Id.* ¶¶ 139–40.  She was interviewed but not selected for the position.  *Id.* ¶ 141.
Darlene Martinez, who was born in 1976 and who according to her application materials
was previously Director of HR at the City's Business Integrity Commission, was selected
for the position.[22]  *Id.* ¶¶ 143–44.  Martinez quit in January 2016; the position was
reposted, and Gittens did not apply for it again.  *Id.* ¶¶ 145–46.  Ayinde Williams was
selected for the position.[23]  *Id.* ¶ 147.

---

[19] In her declaration, Barreto denies making this comment.  Doc. 145 ¶ 28.

[20] In her 56.1 response, Gittens contends that Defendants have not proffered evidence establishing that
Beckford applied for and was selected for the position and points out that Beckford's employee profile
shows that she began working for the City in September 2017.  Doc. 188-30.  In any case, the parties do not
dispute that Gittens was not selected for the position.

[21] Gittens disputes this assertion on the basis that Armand, like Simon, is of Haitian descent, and "Simon
testified that she saw Mr. Armand at several Haitian community events. [ . . .] Mr. Armand's age and
professional experience, both of which were significantly less than Mrs. Gittens Bridges, could lead a
reasonable juror to believe that he was not the best candidate for the position and that he was hired because
he had met Ms. Simon at events in the Haitian community."  Doc. 189 ¶ 135.

[22] Gittens objects to this statement of fact on the grounds that Defendants have not produced an application
receipt for Darlene Martinez's application for the position, and that Defendants selected Martinez, who had
a lower civil service title, in order to avoid the *Long Beach* requirements.  Doc. 189 ¶¶ 142 – 43.

[23] Gittens testified that she believed Simon did not post the vacancy, and that Williams was transferred from
another unit to the Director of HR position because he was friends with Maraj.  Doc. 150-2 at 191–95.
Gittens testified that her friend, Carol Porter, told her that Williams was selected for the job through
irregular channels and that his resume showed that he had less experience than she did.  *Id.*  The Porter

On July 23, 2015, Gittens had a meeting with Simon and asked why she was not selected for the positions to which she had applied. *Id.* ¶¶ 152–53. At the meeting, Simon responded that Barreto had informed her that Gittens had been demoted, and Gittens asked for proof of her demotion, at which point the meeting concluded.[24] *Id.* ¶¶ 154–55.

### 5. *Ageist Comments*

Gittens testified that several co-workers told her that Hamilton and Simon had made derogatory comments about older, long tenured DOC workers. Gittens' co-worker, Nadia Griffith, told her that at a December 2015 meeting, Hamilton made a statement that she wanted "all old and fat workers [with] over 20 years of [tenure] out of the agency," and that "other people in the agency were told the same thing." Doc. 150-2 at 23–24. Gittens never heard either Hamilton or Simon refer to older DOC employees as "idiots," but her co-workers told her that Simon had referred to them this way. *Id.* at 78–80. Gittens declined to identify which co-workers told her this, except that Daniela Aleman told Gittens and others at some point in 2015 "that Ms. Emily had told [Aleman] that Ms. Simon said I don't want you getting too friendly with the older workers there because they are all a bunch of idiots."[25] *Id.* at 80. Gittens also testified that other co-workers had told her that Hamilton referred to older workers as "dead men." *Id.* at 25–26.

---

Declaration supports Gittens' version of events and claims that Williams did not apply for the Director of HR position through the agency's application portal, and instead was hired through a "backdoor" channel after Maraj submitted his résumé in person. Doc. 188-25. However, for the reasons discussed in note 3, above, the Court does not consider the Porter Declaration.

[24] Whether Gittens was demoted at any point after 2014 is in dispute. At her deposition, Simon denied ever demoting Gittens, but then at another point described Gittens as having been demoted. In a July 2015 email exchange with Pemberton, Simon stated that Gittens had been demoted. Docs. 151-1 at 109, 135, 325–28, 187-18. Gittens testified that she was never subjected to any disciplinary process that would have been a prerequisite for a demotion, and there was no paperwork in her personnel file that she had been demoted. Moreover, she never received a lower title. Doc. 150-2 at 226–28. Although whether Gittens was formally or informally demoted is in dispute, this discrepancy is immaterial since there is no dispute that Gittens was stripped of certain responsibilities after 2014 and denied promotions, are at the heart of her claims.

[25] Gittens testified that she did not recall Emily's last name, but her declaration provides the name as Emily Shermatova.

### 6. *Gittens' Job Performance*

In November 2014, Gittens was assigned to the Operational Audits and Military Leave Section, under the supervision of Aiysha Muhammad-Suluki.  Doc. 145 ¶ 64. Muhammad-Suluki was Gittens' immediate supervisor until August 2016, when she left the agency.  *Id.* ¶ 66.  As noted above, Pemberton began working in the HR Department in March 2015.  As Director of Payroll, Timekeeping, and Benefits, Pemberton supervised three older, long tenured DOC employees:  Gittens, Jacqueline Welch, and Penelope Hunter Freeman.  Docs. 150-2 at 108, 150-3 at 27.

At the time Pemberton began working at the agency, Gittens was tasked with updating 22Rs and command disciplines, which are essentially clerical tasks.[26]  Docs. 145 ¶ 91, 150-3 at 66.  Pemberton testified that Muhammad-Suluki assigned Gittens "stuff that we knew she could do," because Gittens was unable to perform assignments appropriate for an associate staff analyst.  Docs. 145 ¶ 65, 150-3 at 91.  At one point, Pemberton and Muhammad-Suluki had a conference with Gittens to discuss giving her more responsibility, and Muhammad-Suluki gave Gittens additional assignments so that she could take on associate staff analyst-level work.  Doc. 150-3 at 168–70.  Gittens was unable to complete the assignments because she was unable to use various systems necessary to carry them out, such as the New York City Automated Personnel System ("NYCAPS") or the City Human Resource Management System ("CHRMS"), and she was unable to run the necessary reports or conduct the necessary audits.[27]  Docs. 145 ¶¶ 101–106, 150-3 at 168–69.  When Gittens asked Pemberton for additional work at

---

[26] Form 22Rs are records of information about DOC employees, such as their name and other biographical information, start date, employment position, time and leave history, and any disciplinary history.  Doc. 145 ¶ 92.  The Form 22Rs are not updated automatically; instead, divisions within DOC submit a request for an updated 22R to the Human Resources Department.  *Id.* ¶¶ 93–94.  According to Pinnock's testimony, a command discipline refers to a record of disciplinary action taken against a uniformed DOC employee. Doc. 150-4 (Pinnock Dep.) at 196 – 97.

[27] In her 56.1 response, Gittens denied that this conference took place, denies that Muhammad-Suluki tasked her with running reports or conducting audits, and denies that Pemberton assigned her tasks consistent with her associate staff analyst title.  Doc. 189 ¶¶ 101–06.

another time, he assigned her to take minutes at staff meetings.  Doc. 150-3 at 85–86.
Gittens was "pretty good" at taking minutes but stopped after two staff meetings and
attended staff meetings inconsistently.  Doc. 150-3 at 86–87.

In July 2015, in response to Simon's request for his assessment of Gittens' work,
Pemberton described her as, "great, but she is slow to complete tasks.  However the tasks
are done correctly.  She also comes to work at 10 am, [s]he wants to do more.  She is an
old school secretary without computer skills."  Doc. 145 ¶¶ 148–49.

On March 28, 2016, Muhammad-Suluki emailed Gittens about certain incomplete
tasks.  *Id.* ¶ 183.[28]  Her email read in part, "I cannot justify the amount of overtime and
yet nothing has gone out to the commands.  This is your sole assignment and it should not
take this long to update the records."  Doc. 150-46.  In July 2016, Muhammad-Suluki
conducted a corrective interview with Gittens, and the corrective interview form noted
that Gittens had failed to update certain tracking spreadsheets as required.[29]  *Id.* ¶¶ 184–
85.  Ultimately, Gittens was not subject to any discipline or penalty as a result of the
corrective interview.  *Id.* ¶ 186.

In August 2016, Juanita Perez took over the role of Deputy Director of Payroll
and Timekeeping and became Gittens' immediate supervisor.  *Id.* ¶¶ 187–88.  Perez left
the agency in 2018, and Gittens was then supervised by Sherbreina Watson, who
Hamilton knew from working at ACS, and who had been interviewed for the position by
Pemberton and Hamilton.  *Id.* ¶¶ 191–92, 302–07.

---

[28] Gittens objects that Defendants have not proved the truth of what Muhammad-Suluki stated in the email.
Doc. 189 ¶ 183.

[29] In her 56.1 response, Gittens claims that Muhammad-Suluki "was forced to give her a corrective
interview," and claims that she informed her supervisor that she would be disputing the interview with her
union.  Doc. 189 ¶¶ 184–85.

In 2016, Gittens informed Pinnock that she was running for political office.[30]  *Id.* ¶ 193.  Pemberton testified that Gittens used DOC time and resources to run her political campaign instead of doing her job, and that he warned her, "Lorraine on the DL, you're not allowed to do this.  Please do that stuff somewhere else.  I don't want to get anyone in trouble for doing personal work on city time."[31]  *Id.* ¶¶ 194–96.  In late August 2016, Gittens requested intermittent leave, and Pemberton granted the request as long as she provided advance notice and completed her core work assignments.  *Id.* ¶¶ 198–99.  She then requested off the better part of four days in a row, and Perez wrote to Pemberton on September 8, 2016, "[w]e're going to have to speak with her.  This doesn't seem to be intermittent leave."  *Id.* ¶¶ 200–01.  On September 14, 2016, Pemberton responded that Gittens was not in compliance with the leave agreement and should be marked absent on future dates.  On September 16, 2016, Pemberton wrote to Pinnock that he was having difficulty with Gittens because she was not coming to work consistently, and Pinnock instructed him to institute progressive discipline.  Pemberton then spoke to Gittens about her attendance at work.  *Id.* ¶¶ 203–06.

In January 2017, Pemberton assigned Gittens tasks and standards; Perez had drafted tasks and standards for personnel in the payroll unit, including Gittens.  *Id.* ¶¶ 336–37.  According to Simon, assigning tasks and standards to HR Department employees was part of revamping the employee evaluation process, and best practice— which the department had not achieved—is to evaluate each employee on a yearly basis.  *Id.* ¶¶ 328–38.  Gittens considered the tasks and standards issued to her to be clerical and below her title.  Doc. 150-2 at 222–24.

---

[30] In her declaration, Gittens states that she is currently a member of Community Board 13, and that she ran in the contested September 2016 primary for the 29th Assembly District, but was not elected.  Doc. 187-1 ¶ 140.

[31] Gittens denies that she ever worked on her political campaigns at work.  Doc. 187-1 ¶ 141.

Gittens testified that Pemberton never gave her a performance evaluation, and that her last written evaluation was in 2000.  She alleges that not having a written performance evaluation hindered her job applications, because she did not have a record of her performance.  Doc. 150-2 at 11–12, 217, 223–24.

### 7.   *Civil Service Examination No. 5517*

In June 2015, Gittens took the open competitive and promotional examinations for the administrative staff analyst title.  Doc. 187-1 ¶ 149.  Gittens was one of 18 civil servants who passed the promotional exam, Civil Service Examination No. 5517.  Seventeen of the successful examinees—but not Gittens—were selected for promotion to administrative staff analyst.  Docs. 145 ¶ 211, 150-54.  Of the 17 civil servants who were promoted, 15 were over the age of 40 in 2016, and four were born in or before 1961, the year Gittens was born.  Docs. 145 ¶ 211, 150-54.  Gittens was not selected for promotion: the certification list marked her as "CNS," meaning "considered and not selected."  Docs. 145 ¶ 213, 150-54.  Pemberton passed the examination with the same score as Gittens and was selected for promotion.[32]  Doc. 150-54.  Hamilton recommended that Pemberton be appointed as administrative staff analyst based on his work in the HR Department.  Doc. 145 ¶ 216.  Pemberton informed Gittens in October 2016 that she was not selected for promotion because of her substandard work.  Specifically, Pemberton told her that she was not completing underlying associate staff analyst-level tasks,[33] did not complete her work on time, and was sometimes absent from work without informing her supervisors.  *Id.* ¶¶ 217–229.

---

[32] At his deposition, Pemberton testified that he attended college but did not receive a degree, but that he had enough college credits to qualify for the positions he held.  Doc. 150-3 at 12.  Gittens maintains that because he did not graduate from college, he should not have been eligible to sit for the administrative staff analyst examination and claims that "there is question of whether [he] lied in order to take the exam."  Doc. 189 ¶ 216; *see also* Doc. 186 ¶¶ 419–448.  Because the SAC does not challenge the City's procedures for administering the civil service exam, the Court declines to consider this argument.

[33] Gittens contends that by giving her clerical tasks below the level of her position and by failing to provide her with performance evaluations, Pemberton and her other supervisors prevented her from advancing in her career.  Doc. 150-2 at 223–25.

Gittens testified that she was informed by her union in April 2017 that she had not been selected for promotion from the list, and she filed a grievance with and complained to her union that she did not receive any call letters or CNS letters after taking the examination.[34]  *Id.* ¶¶ 230–235.  Gittens contends that the lack of call letters was in violation of New York's Civil Service Law.  Hamilton and Pinnock testified that it was not DOC's practice to issue call letters for promotional examinations such as Civil Service Examination No. 5517, because promotional examinations are only open to examinees within a particular agency, as opposed to open competitive examinations, which are open to more candidates.  *Id.* ¶ 236.

### 8.   *EEOC and Department of Investigations ("DOI") Complaints*

On October 20, 2017, Gittens filed a complaint with the EEOC alleging she had been passed over for promotion in favor of younger new hires.  *Id.* ¶ 244; Doc. 150-57. Pinnock, Hamilton, and Pemberton all testified that they were not aware that Gittens had filed a complaint with the EEOC.[35]  Doc. 145 ¶ 245.

On December 19, 2017, a DOC Records Analyst emailed Gittens and copied another employee requesting updated Form 22Rs for three employees.  *Id.* ¶ 246. According to email records, the same Records Analyst sent another email on December 28, and forwarded the follow-up message to Pemberton, who responded, "Noted.  We are checking and will get back to you shortly."  Docs. 145 ¶¶ 246–49, 150-58.  On January 8, 2018, a DOC Warden emailed Pinnock, Hamilton, and others that she had been waiting

---

[34] As explained in the Court's prior opinion, Gittens contends that after passing the administrative staff analyst examination, she should have received a "call letter" which would have notified her of other vacancies for administrative staff analysts, but she did not and was therefore not given the opportunity to apply for those positions.  Doc. 137 at 7.  Defendants maintain that Gittens was certified to other agencies, but that her number was not reached on the open competitive list.  Docs. 198 at 9, 199-2.  The SAC does not allege that Gittens passed two separate examinations, nor that that there is a difference between procedures for open competitive examinations as opposed to promotional ones.

[35] Gittens disputes this statement and claims that Pinnock's testimony suggests that as named respondents, Pinnock, Hamilton, and Pemberton would have been informed that she had filed a complaint with the EEOC.  Pinnock was familiar with agency practices based on her prior role as DOC Deputy General Counsel.  Doc. 189 ¶ 245.

for updated 22Rs for several weeks.  Pinnock emailed Pemberton to "please see that this [22R] is completed and get an explanation from staff as to why this wasn't done."  Doc. 145 ¶ 252.  Pemberton asked his assistant, Lisa Chattman-Perry, to look into the assignment, and she responded that Gittens had not completed the assignment. Pemberton spoke to Gittens and directed her to update the 22R tracking spreadsheet to indicate which forms she had completed.[36]  Doc. 145 ¶¶ 253–57.  On January 10, 2018, Gittens emailed Pemberton, copying Pinnock and Hamilton, "[a]s per your request, here is the proof pertaining to the 22R spreadsheet you gave me on Wednesday, December 27, 2017."  *Id.* ¶ 258.  Gittens' email took issue with Pemberton's assertion that she had not completed the Form 22Rs and updated the tracking spreadsheet as requested; her email pointed out that several of the entries that Pemberton indicated had not been completed were in fact repeat names, and she attached copies of emails showing that she had completed the work as requested.  Doc. 150-63.  On January 16, 2018, and again on January 18, 2018, the DOC Records Analyst emailed Gittens about the status of the three 22R reports requested on December 19, 2017.  Docs. 145 ¶¶ 262–63, 150-64.  Gittens responded that the Form 22Rs had been reassigned to another coworker while she was out sick, but that the coworker was not aware of the assignment, and added, "[s]ince we are all trying to do our own work and backfill for our deceased coworker, I will process these 22R's as requested before I became sick.  I am working on several 22Rs and my other responsibilities.  I cannot promise you that these 22Rs will be completed today.  As soon as I complete them, I will let you know."  Doc. 150-64.

An anonymous, unsigned complaint, dated March 2018, was submitted to the New York City Department of Investigation ("DOI") Complaint Bureau.  Doc. 188-7.

---

[36] Gittens maintains in her 56.1 response that a number of the Form 22Rs had been assigned in error to her former co-worker Jacqueline Welch.  Doc. 189 ¶ 257.  Welch passed away in 2017 after falling on her way to work.  Docs. 150-2 at 154, 187-24 at 63.  Gittens and Isbel both testified that Welch had complained about discriminatory treatment towards older workers by Pemberton.  Docs. 150-2 at 155–58, 187-24 at 56–63.

The DOI complaint requested an investigation into the DOC HR Department's violation of City conflicts of interest law, and it alleged cronyism[37] and nepotistic hiring practices by Simon, Pinnock, and others. *See id.* The complaint asked the DOI to investigate the backgrounds of more than 20 people hired at the DOC, "including [their] social media accounts, educational qualifications, prior employment, residency compliance and . . . financial disclosure data." *Id.* at 5. While Gittens testified that she did not draft the complaint, she did testify to having "looked at it" before it was filed. Doc. 150-2 at 136, 225–26. She declined to identify the drafters of the DOI complaint at her deposition. *Id.* at 134–37. Gittens testified that she did not have direct knowledge that Simon hired Andre and Beckford because they were her relatives, and that the DOI complaint was the basis for some of her allegations of cronyism. Doc. 150-2 at 201–02.

In July 2018, Pemberton assigned Gittens another set of tasks and standards, which had been drafted by Watson.[38] Doc. 145 ¶¶ 339–40.

For much of December 2018 through early 2019, Gittens was absent from work with pneumonia. Doc. 145 ¶ 266. In approximately late January or early February 2019, Jodi Cross was hired and became Gittens' immediate supervisor. *Id.* ¶¶ 267–68. Cross' civil service title was community coordinator, a lower title than Gittens'. *Id.* ¶ 271; Doc. 150-2 at 119–20. Pemberton testified that he did not know Cross before she was hired, and that she was selected because she was an exceptional candidate who had experience with timekeeping records for other agencies. Doc. 145 ¶¶ 269–70.

---

[37] A court in this District has explained that "cronyism" refers to the practice of favoring one's friends in hiring and promotion decisions, just as nepotism refers to favoring one's family members. *See Attenborough v. Constr. and Gen. Bldg. Laborers' Loc. 79*, 691 F. Supp. 2d 372, 389 (S.D.N.Y. 2009). Courts have recognized that cronyism may be a facially neutral policy sufficient to support a disparate impact theory of discrimination. *Gittens-Bridges v. City of New York*, No. 19 Civ. 272 (ER), 2020 WL 3100213, at *16 (S.D.N.Y. June 11, 2020) (citing *Hagan v. City of New York*, 39 F. Supp. 3d 481, 499 (S.D.N.Y. 2014)).

[38] While Gittens disputes these statements, her responses are not relevant to Defendants' statements of fact and instead argue that Defendants are impermissibly trying to establish that the tasks and standards were not assigned to her in retaliation or as part of a "campaign to marginalize and push out long tenured workers by thwarting their career prospects." Doc. 189 ¶¶ 339–40.

On January 28, 2019, Pemberton emailed Gittens to remind her to submit an updated doctor's note for her absences.  Doc. 145 ¶ 273, 150-66.  On February 12, 2019, Hamilton emailed Pemberton and Watson noting that based on attendance records, Gittens had been absent a total of 392 hours from July 1, 2018, to February 2019, an absence rate of nearly 50% over a six-month period.  Doc. 150-65.  Pemberton testified that Hamilton asked him to write Gittens up and give her a corrective interview.  Doc. 150-3 at 191.  However, at the meeting, Gittens informed Pemberton that her husband was in the hospital, and Pemberton ended the interview.  *Id.* at 191–92.  Gittens testified that Pemberton and Watson asked her to send them doctor's notes for her absences, and she informed them that she had already submitted her doctor's notes to timekeeping, but also sent them additional copies of the notes.  Doc. 145 ¶¶ 278–81.  Pemberton and Gittens agree that she did not receive a write-up following the meeting.  *Id.* ¶ 281.

Gittens claims that Pemberton "rarely" said good morning to her and sometimes did not include her on emails and then asked why she had not completed certain work.  *Id.* ¶¶ 283–84.  Pemberton, on the other hand, testified that he thought that he and Gittens "were pretty cool work and personal friends."  Doc. 150-3 at 165.  Pemberton retired from the DOC in 2019.  Doc. 145 ¶ 288.

### C.  Procedural Background

Gittens brought this action on January 9, 2019.  Doc. 1.  Gittens filed her second amended complaint ("SAC") on August 5, 2019, following a conference on Defendants' anticipated motion to dismiss.  Doc. 59.  On September 18, 2019, Defendants moved to dismiss the SAC.  Doc. 72.  Plaintiff opposed the motion on November 12, 2019, having been granted three extensions of time to complete her submission.  Doc. 93.  On June 11, 2020, the Court granted in part and denied in part Defendants' motion to dismiss.  Doc. 137.  The Court dismissed Gittens' *Monell* claim against the City and against the Individual Defendants in their official capacities in its entirety, as well as her 14th

Amendment due process claims and her claim for retaliation for filing this action.  Doc. 137 at 47.

Furthermore, the Court's opinion held that Gittens' failure to promote and retaliation claims under the ADEA are limited to conduct that occurred on or after December 24, 2016; her § 1983 equal protection claims are limited to conduct that occurred on or after January 9, 2016; and her NYSHRL and NYCHRL claims are timely as to conduct that occurred on or after October 20, 2014.  Doc. 137 at 47.  Accordingly, the Court's analysis below is limited to claims within the relevant timeframes.

## II.   LEGAL STANDARD

### A.  General Summary Judgment Standard

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.* (citing *Warshawsky*, 559 F.3d at 137).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504

(S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya*, *Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). However, a motion for summary judgment cannot be defeated on the basis of conclusory assertions, speculation, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino*, *Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citation omitted).

### B. Additional Summary Judgment Standards for Employment Discrimination Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation." *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x. 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149

(2d Cir. 2004) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137.  A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'"  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

"[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer."  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citing *Budde v. H & K Distrib. Co.*, 216 F.3d 1071 (2d Cir. 2000)).

## III.   DISCUSSION

### A.  Defendants' Letter-Motion to Strike

Before turning to the merits of Defendants' motion for summary judgment, the Court will address their letter-motion to strike Plaintiff's untimely opposition brief, 56.1 statement, and declaration.  Doc. 197.  That application is granted.  Plaintiff's opposition to Defendants' motion was originally due December 11, 2020.  Doc. 141 at 10.  After several extension requests were granted, Plaintiff submitted her opposing papers, which consisted of counsel's Rule 56(d) declaration, her counterstatement to Defendants' 56.1 statement, a declaration of counsel with exhibits, and her response to Defendants' 56.1 statement, on October 22, 23, and 24, 2021, respectively, more than 10 months after the

original deadline.[39]  Docs. 185–89.  Notwithstanding the numerous extensions, each of which granted Plaintiff the entirety of the additional time she requested, she did not submit a memorandum of law in opposition to Defendants' motion by the filing deadline of October 22, 2021, in violation of Local Civil Rule 7.1.  Moreover, as Defendants note, Doc. 198 at 1, Plaintiff's counsel has failed to make any legal arguments opposing their motion for summary judgment:  her October 2021 submission does not include any citations to case law or statutes.  And her Rule 56.1 submissions are replete with accusations, argument, and speculation.  *See* n.3, above.

As such, Defendants are correct that counsel's deficient submission and complete failure to file a brief could merit the Court granting their motion in full.  "Failure to file a memorandum of law in opposition to the opposing party's motion is, by itself, a sufficient basis to grant the motion."  *Healthfirst, Inc. v. Medco Health Sols., Inc.,* No. 03 Civ. 5164 (RLC), 2006 WL 3711567, at *3 (S.D.N.Y. Dec. 15, 2006) (explaining the application of Local Civil Rule 7.1 (internal quotation marks and citation omitted)); *see also Hogue v. McDonald*, 16 Civ. 5841 (KBF), 2017 WL 570948, at *1 (S.D.N.Y. Feb. 13, 2017); *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (explaining that "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned," and that in all cases the district court "must provide an explanation sufficient to allow appellate review.")

---

[39] Plaintiff previously submitted a Rule 56.1 counterstatement on August 25, 2021, and thereafter requested a further extension to submit her opposition, because her August 25 submission was "in draft form."  Docs. 181, 183.  In its August 27, 2021, order, the Court laid out the several extensions granted Plaintiff's counsel, which have seriously delayed the progress of this case.  Doc. 184.  That order also directed Plaintiff's counsel to provide Gittens with a copy of the order and to file an affirmation that she had done by September 1, 2021.  *Id.*  Counsel never filed the requested affirmation and is therefore in direct violation of the Court's order.  For that reason, it is unclear to what extent, if at all, Gittens is aware of the months-long extensions her attorney has requested in her case.

Plaintiff then filed a further evidentiary submission and a memorandum of law opposing Defendants' motion for summary judgment on December 17, 2021—the very day Defendants' reply was due.  Docs. 193–95.  Counsel neither obtained consent from Defendants' counsel nor sought the Court's permission before submitting her late filing. Because Plaintiff's counsel filed the opposition on the deadline for Defendants' reply, Defendants obviously did not have an opportunity to review and respond to it. Accordingly, the Court grants the request and does not consider Plaintiff's untimely December 17, 2021, submission.  In fairness to Gittens, however, the Court will exercise its discretion to consider Defendants' motion on the merits.

### B.  Disparate Treatment under the ADEA, § 1983, NYSHRL, and NYCHRL

The ADEA prohibits discrimination based on "inaccurate and stigmatizing stereotypes" about employees over the age of 40 and specifically forbids employers from "fail[ing] or refus[ing] to hire or . . . discharge[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10 (1993); 29 U.S.C. §§ 623(a), 631(a).  Gittens' disparate treatment claims under the ADEA, § 1983, and NYSHRL are all analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (applying the framework to an ADEA claim); *Feingold*, 366 F.3d at 159 (§ 1983 claim); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL claim).

Plaintiffs establish a *prima facie* claim under the ADEA when they "demonstrate membership in a protected class, qualification for their position, an adverse employment action, and circumstances that support an inference of age discrimination."  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  Should the plaintiff meet her burden to establish a *prima facie* case of age discrimination, the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  "Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (citations omitted).  The plaintiff can survive the summary judgment stage "if the facts, taken in [her] favor, suffice to meet her burden of showing a triable issue as to whether her age was a 'but for' cause" of the adverse employment action.  *Id.*; *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Likewise, to survive summary judgment in a § 1983 case, a plaintiff must show "but for" causation.  *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).   The "but for" standard "is not equivalent to a requirement that age was the employer[']s only consideration," but instead that the adverse employment action "would not have occurred without it."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (internal quotation marks and citation omitted).  The NYSHRL plaintiff must likewise show that the employer's proffered nondiscriminatory reasons were pretextual.  *Shands v. Lakeland Cent. Sch. Dist.*, 771 F. App'x 121, 122 (2d Cir. 2019) (summary order).[40]

Claims under the NYCHRL, however, are evaluated separately, "construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks and citation omitted).  The NYCHRL "does not require either materially adverse employment actions or severe

---

[40] In *Gorzynski*, the Second Circuit "assume[d], without deciding, that the Supreme Court's *Gross* decision affect[ed] the scope of the [NYSHRL] as well as the ADEA."  596 F.3d at 106 n.6.  Accordingly, courts in this District have found that age discrimination claims under the NYSHRL match the ADEA framework, and therefore that NYSHRL plaintiffs must demonstrate that age discrimination was the but for cause of the adverse employment action.  *See South v. Cont'l Cas. Co.*, No. 15 Civ. 1627 (WHP), 2017 WL 782909, at *4 (S.D.N.Y. Feb. 28, 2017); *Rinaldi v. Nice, Ltd.*, No. 19 Civ. 424 (LGS), 2021 WL 827767, at *4 (S.D.N.Y. Mar. 4, 2021).  Whether the standard is establishing but for cause or showing pretext, Gittens' NYSHRL claims do not survive.

and pervasive conduct," but instead focuses "on unequal treatment . . . regardless of whether the conduct is 'tangible' (like hiring or firing) or not[.]"  *Id.* at 114 (internal quotation marks and citation omitted).  Moreover, "the NYCHRL requires showing that age was only a 'motivating factor,' rather than the 'but for cause,' of an adverse employment action." *Weiss v. JPMorgan Chase & Co.*, No. 06 Civ. 4402 (DLC), 2010 WL 114248, at *4 (S.D.N.Y. Jan. 13, 2010).  However, even under the NYCHRL, "petty slights or trivial inconveniences . . . are not actionable." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 122 (S.D.N.Y. 2020) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (N.Y. App. Div. 2009)).  The employer "is entitled to summary judgment . . . only if the record establishes as a matter of law that discrimination played no role in its actions." *Mihalik*, 715 F.3d at 110 n.8 (internal quotation marks and citation omitted).

Gittens alleges disparate treatment and discrimination based on the fact that she was functionally demoted, was not promoted from the civil service list, was not selected for any of the positions for which she applied, and was assigned tasks below her civil service title.[41]  Doc. 59 ¶¶ 389–92.  The Court noted in its prior opinion that Gittens had specifically alleged instances of ageist comments and more favorable treatment for younger employees, Doc. 137 at 29–30, and in her opposition Gittens points to Pemberton's description of her as an "old school secretary" and Simon calling her "mommy," Doc. 186 ¶¶ 102–105, 134–36.  However, Gittens' deposition testimony is clear that the "idiots," "dead men," and "old and fat" comments attributed to Simon and Hamilton were hearsay, and therefore they are inadmissible and may not be used to support her *prima facie* case of age discrimination.   Doc. 145 ¶¶ 170–80.  Gittens also

---

[41] In her declaration, Gittens claims that the Individual Defendants and Dr. Larry Johnson, who worked in DOC's Applicant Investigations Unit, hired a Roman Paproci in 2017 from the open competitive list, and that the job vacancy was not posted and she was not given an opportunity to interview.  Doc. 187-1 ¶¶ 181–86.  Since Gittens raises this incident for the first time in her opposition to Defendants' motion for summary judgment, the Court does not consider it.  *Isaac v. City of New York*, 701 F. Supp. 2d 477, 491 (S.D.N.Y. 2010).

contends, and the Court considered at the motion to dismiss stage, that Pemberton treated Gittens, Welch, and Hunter Freeman worse than younger employees in that he did not allow them similar overtime; left them off of certain emails[42]; did not approve certain training opportunities for them; and was "bullying" and "mean to [them]."  Docs. 137 at 30, 150-2 at 107–30.

Defendants argue that none of these incidents are sufficient to state a *prima facie* case of discrimination because they did not occur under circumstances giving rise to an inference of discrimination, and because the discriminatory comments that Gittens cites are inadmissible hearsay.  Doc. 144 at 3–9.  However, given Gittens' allegations that younger HR employees received better treatment under Pemberton's supervision, and the "old school secretary" and "mommy" comments that were directed at her, the Court will assume for purposes of resolving this motion that Gittens has made out a *prima facie* case and proceed to the next steps of the *McDonnell Douglas* analysis.  *See Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases holding that courts may assume a *prima facie* case and skip to the final *McDonell Douglas* step where the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action).

Defendants have proffered legitimate, nondiscriminatory reasons for the employment actions they took.  Doc. 144 at 10–11; *Isaac v. City of New York*, 701 F. Supp. 2d 477, 487 (S.D.N.Y. 2010) ("[D]efendants have come forward with evidence of a legitimate, nondiscriminatory reason for not promoting plaintiff to any of the positions he sought:  defendants hired applicants whom they believed had better qualifications and were best-suited for the positions at issue.").  For example, Pemberton testified that Gittens, unlike newer employees, was not approved to attend certain training sessions

---

[42] At her deposition, Gittens testified that she was not aware of any instances when Pemberton had failed to impart information to Welch or Hunter Freeman.  Doc. 150-2 at 130.

because she had already attended them and therefore was ineligible to attend again. Doc. 150-3 at 171.

Gittens' disparate treatment claim is properly disposed of at summary judgment because she has not established that age discrimination was the but for cause, or even that it played any role, in Defendants' decisions. There is no evidence that the fact that Gittens was not selected for promotion from the civil service list nor hired for certain positions was age discrimination. Of the 17 individuals selected from the promotional list for promotion to the title of administrative staff analyst, 16 were over the age of forty and thus within the class protected by the ADEA, and four were born in 1961 or earlier.[43] Doc. 145 ¶ 211. Moreover, Pemberton had legitimate reasons based on job performance for declining to recommend Gittens for promotion. *Id.* ¶¶ 218–29. Accordingly, there is no evidence supporting that her age was the but for cause or even a motivating factor in the fact that she was not promoted to the administrative staff analyst title.

As for the positions that Gittens applied for and was not offered, she claims in her 56.1 response that there are issues of fact as to whether she was as or more qualified than the individuals ultimately selected, and that "a reasonable juror could determine that Defendants' repeated refusal to hire any long tenured employees . . . was rooted in age based animus." *See, e.g.*, Doc. 189 ¶ 61. While there is no dispute that Gittens had many years of experience at the DOC, and more experience at the agency than many of the individuals who were ultimately selected for certain positions, Defendants are correct that, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a

---

[43] Of course, the fact that many of the other successful examinees were over 40 and within the ADEA protected class is not by itself dispositive of Gittens' age discrimination claims, particularly since many of the individuals listed were ten or more years younger than Gittens. The Second Circuit has explained that "an employer's decision to replace an older worker with a significantly younger one can support an inference of intentional age discrimination even when both persons are ADEA class members." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 77–78 (2d Cir. 2005) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996)). The relevant consideration is defendant's knowledge of the age difference. *See id.; see also Bucalo*, 691 F.3d at 130.

discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001); *see also Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 26–27 (2d Cir. 2021) (summary order). In other words, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103 (internal quotation marks and citation omitted). Defendants have established reasonable grounds for all of their hiring and promotion decisions, in that the people Simon and the other Individual Defendants hired had relevant educational or professional backgrounds. Furthermore, three of the applicants selected for positions for which Gittens had applied—Crotti (b. 1957), Penn (b. 1964), and Hamilton (b. 1961)—were all approximately her age. [44] Doc. 145 ¶¶ 59, 76, 84. The Court does not "sit as a super-personnel department that reexamines an entity's business decisions." *Delaney*, 766 F.3d at 169 (internal quotation marks and citation omitted).

　　To the extent Gittens and her HR Department colleagues Welch and Hunter Freeman experienced less favorable treatment or work assignments at the hands of Pemberton and the other Individual Defendants, Gittens has not established that there was any nexus to age-based animus. Notably, Pemberton was only approximately one year younger than Gittens and had also worked in City agencies since the 1980s. Doc. 145 ¶ 211. "Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee." *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), *aff'd,* 423 F. App'x 102 (2d Cir. 2011). Pemberton's comment that Gittens

---

[44] While Gittens' 56.1 response purports to dispute the statements setting out Hamilton's and Penn's dates of birth, her objections are without merit. Doc. 189 ¶¶ 76, 84.

was an "old school secretary without computer skills," and Simon's "mommy" comment, while inappropriate, are "stray remarks" insufficient to establish that Defendants' stated reasons for their employment and staffing decisions were pretext and Defendants would not have taken those actions but for Gittens' age. [45]  *Danzer*, 151 F.3d at 56.  Even under the more solicitous NYCHRL standard, summary judgment is appropriate because the record establishes that discrimination did not play a role in Defendants' employment decisions.  *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015).

### C.  Disparate Impact and Discrimination under the ADEA, NYSHRL, and NYCHRL

Claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another" and do not require "[p]roof of discriminatory motive."  *Hazen Paper Co.*, 507 U.S. at 609.  To establish a *prima facie* case of disparate impact, the plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices."  *Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 479 (S.D.N.Y. 2019) (citing *Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011)); *accord Gordon v. City of New York*, No. 14 Civ. 6115 (JPO), 2018 WL 4681615, at *22 (S.D.N.Y. Sept. 28, 2018) (NYSHRL).  "To make out a dispar-ate impact claim (or, more generally, to rely on statistical evidence), a plaintiff must iden-tify a specific discriminatory employment practice."  *Chin v. Port Auth. of New York &*

---

[45] "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,' a court should consider the following factors:  (1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process."  *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).  While both remarks were made by Gittens' supervisors and could be viewed as discrimi-natory, neither remark was made in relation to the employment decisions that Gittens claims were adverse, and the connection to Defendants' decisionmaking process is attenuated.

*New Jersey,* 685 F.3d 135, 154 (2d Cir. 2012) (citing *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 357 (2011)).  "[S]howing age discrimination through disparate impact is more difficult under the ADEA than under Title VII," because "'ADEA § 4(f)(1) significantly narrows its coverage by permitting any 'otherwise prohibited' action 'where the differentiation is based on reasonable factors other than age.'"  *Walsh,* 375 F. Supp. 3d at 479 (quoting *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005)).

Under the NYCHRL, a plaintiff must allege "(1) 'a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter'; and (2) 'the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the covered entity or does not contribute to the disparate impact.'"  *Teasdale v. New York City Fire Dep't, FDNY,* 574 F. App'x 50, 51–52 (2d Cir. 2014) (quoting N.Y.C. Admin. Code § 8–107(17)(a)(1)–(2)).

At the motion to dismiss stage, the Court allowed Gittens' disparate impact claims to proceed, recognizing that Gittens had specifically pleaded that "ongoing cronyism had a disparate impact on workers with over 20 years of experience at DOC who are of retirement age" and had cited in her complaint over 20 examples of younger, less qualified family and friends of the Individual Defendants who were hired over older, longstanding employees.  Doc. 137 at 33 (citing *Hagan v. City of New York*, 39 F. Supp. 3d 481, 499 (S.D.N.Y. 2014) (identifying cronyism as a facially neutral policy sufficient to support a disparate impact theory)).  Gittens also argues that the DOC's alleged failure to adhere to the *Long Beach* decision and to applicable Civil Service Laws has a disparate impact on older workers.  Doc. 186 ¶¶ 463–508.

At the summary judgment stage, Gittens' claims based on cronyism and *Long Beach* cannot survive.  First, as Defendants point out, Gittens has introduced only anecdotal evidence from her own deposition and that of Mykel Isbel that older, long tenured

DOC workers were disparately impacted by Defendants' promotion and hiring practices. She has not introduced "any statistical evidence of . . . disparate impact," which "takes on special importance for plaintiffs in disparate impact cases." *Attenborough v. Constr. and Gen. Bldg. Laborers' Loc. 79*, 691 F. Supp. 2d 372, 385 (S.D.N.Y. 2009) (noting that other circuits have held that disparate impact claims cannot be proven by anecdotal evidence alone and that courts in this District have frequently noted the absence of statistical evidence in concluding that disparate impact claims failed).  Notably, Gittens' testimony—which, along with Isbel's, is the only evidence submitted in support of her claims of cronyism—provides no information to the Court about the demographic makeup of either the agency as a whole or of the HR Department.  Instead, her testimony describes her aggrievement and perceived mistreatment as well as the experiences of her colleagues, including Jackson, Hunter Freeman, Welch, and Perry.  Such anecdotal evidence is insufficient.  "Disparate impact claims concern the entire population affected by the identified practice, not merely the subset of affected laborers who happen to have brought suit."  *Id.* at 386.  Without painting a clear picture of employee demographics at the DOC and which employees were affected by the allegedly discriminatory practices, Gittens has not met her burden to show a disparate impact.

Second, and fatal to her claim, is that on a more complete record, Gittens' claims of cronyism do not withstand scrutiny.  Defendants Simon, Pemberton, Pinnock, and Hamilton all testified—and Hamilton, Simon, Pinnock, and Barreto further provided declarations—explaining their relationships (mostly, the lack thereof) to the individuals Gittens claims were crony hires.  *See* Docs. 145 ¶¶ 290–327, 146–49.  Gittens' deposition testimony is clear that her claims of cronyism were largely based on the uncorroborated

statements in the DOI complaint[46] and office rumors.[47]

Because Gittens has failed to make a *prima facie* case, the Court does not address Defendants' arguments that they would prevail at either the second or third stage of the burden-shifting analysis.  Doc. 144 at 13–14.  Gittens has made no case for her disparate impact claim, and summary judgment is properly granted to the Defendants.

### D.  Retaliation under the ADEA, § 1983, NYSHRL, NYCHRL, and 1st Amendment

Gittens' retaliation claims, like her discrimination claims, are subject to a burden-shifting analysis.  *See Gorzynski*, 596 F.3d at 110 (explaining that the *McDonnell Douglas* framework applies to ADEA retaliation claims); *Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 686–87, 695–97 (S.D.N.Y. 2020), *aff'd,* 845 F. App'x 11 (2d Cir. 2021) (explaining the application of the *McDonnell Douglas* framework to § 1983 and NYSHRL claims and of the *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) framework to 1st Amendment retaliation claims).

---

[46] As Defendants point out, Doc. 198 at 11, the anonymous complaint is not admissible evidence and does not suffice to rebut Pemberton's, Pinnock's, Hamilton's, and Simon's testimony about their relationships to the individuals who were hired.

[47] Some examples from Gittens' deposition testimony:

> Q:  In paragraph 149 [of the complaint] it states, "Upon information and belief, [Deborah] Stewart is Simon's relative."  What is the basis of your belief about that?
> A:  Once again, that's—that is something that people believed that, okay.  So—
> Q:  Who was the person telling you this?
> A:  (No response)
> Q;  I'm trying to understand where you got this information.
> A:  There's basically people in the office that believe that Ms. Stewart [was] related to Ms. Simon.
> Q:  Do you recall anyone ever specifically telling you that?
> [ . . .]
> A:  I don't remember.
>
> Q:  What is the basis of your belief [that Dahlia] Grant is a close friend of [Hamilton]?
> [ . . .]
> A:  That one I knew for a fact, okay.  That particular position—those two—I have personal friends that know both Claudette [Hamilton] and [Dahlia] Grant and it is known through my personal associations that they are best friends or very good friends.

Doc. 150-2 at 197–99, 200.

Asserting a *prima facie* claim of retaliation requires proof that "(1) the plaintiff was engaged in [protected activity]; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken." *Wanamaker v. Columbia Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997) (ADEA); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (substantially similar standard for § 1983 retaliation claims); *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (same standard for 1st Amendment retaliation); *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016) (same); *Fraiberg v. 4Kids Ent., Inc.*, No. 07 Civ. 01411 (GBD), 2008 WL 821820, at *2 (S.D.N.Y. Mar. 26, 2008) (same standard for NYSHRL retaliation claims).  In an ADEA retaliation case, a plaintiff may establish causation "either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).

To prevail on a retaliation claim under the NYCHRL, a plaintiff must similarly show that "(1) [she] engaged in a protected activity; (2) [her] employer was aware of that activity; (3) [she] suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and (4) that there was a causal connection between the protected activity and the action."  *Pilgrim v. McGraw–Hill Companies, Inc.,* 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009).  The NYCHRL's retaliation provision is broader than that under federal and state law, in that it protects "plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'"  *Ya-Chen Chen*, 805 F.3d at 76 (quoting *Mihalik,* 715 F.3d at 112 and citing N.Y.C. Admin. Code § 8–107(7)).

Unlike in discrimination claims, an adverse employment action "need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (S.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (quoting *Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 720 n.1 (2d Cir. 2010)).  Instead, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 262 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Once the plaintiff has made out a *prima facie* retaliation claim, the defendants may rebut it by articulating legitimate, nonretaliatory reasons for the adverse employment action, *see, e.g.*, *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 211 (2d Cir. 2006), or in the case of 1st Amendment claims, "the defendant may escape liability . . . by proving by a preponderance of the evidence that the same employment action would have been taken absent the protected conduct." *Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998) (citing *Mt. Healthy*, 429 U.S. at 287); *see also Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1952 (2018).  At the next step, the presumption of retaliation dissipates, and the plaintiff must show that retaliation was the but for cause of the adverse action.  *See Massaro v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 17 Civ. 8191 (LGS), 2021 WL 184364, at *5 (S.D.N.Y. Jan. 19, 2021) (explaining that while the Supreme Court has directly addressed whether but for causation is required for ADEA retaliation claims, the Second Circuit and courts in this District have applied the but for standard to retaliation claims under the ADEA); *Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 312–13 (D. Conn. 2014) (applying but for standard to ADEA claim); *Bailey v. Mount Vernon City Sch. Dist.*, No. 17 Civ. 9973 (KMK), 2020 WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020) (but for causation required for § 1983 retaliation claims); *Shein v. New York City Dep't of Educ.,* No. 15 Civ. 4236 (DLC), 2016 WL 676458, at *8

(S.D.N.Y. Feb. 18, 2016) (NYSHRL retaliation claims are analyzed under the same framework as ADEA retaliation claims).  Under the NYCHRL framework, the plaintiff need only show that retaliation played a part in the employer's decision.  *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 269 (S.D.N.Y. 2020).

Defendants argue that Gittens fails to state a *prima facie* case of retaliation under any of her causes of her action because she fails to establish any causal connection between her protected activities and the allegedly adverse actions she experienced.  Docs. 144 at 15–19, 198 at 11–13.  The Court agrees that the record does not support that any of Defendants' actions or decisions of which Gittens complains were taken in retaliation for activity protected by the ADEA, § 1983, 1st Amendment, or state and city law.

Since the Court dismissed Gittens' retaliation claim based on her filing of the instant lawsuit, the two remaining protected activities that she claims led to retaliation are, first, her public complaints about discrimination, nepotism, and cronyism at the May 29, 2015, town hall meeting, and second, her filing of the EEOC complaint in October 2017.[48]  Doc. 137 at 38.  Gittens alleges that after she spoke out at the May 2015 town hall meeting, she was rejected for at least three positions, and that after she filed the October 2017 EEOC complaint, Pemberton assigned her tasks outside of her civil service title and claimed that she had not completed certain 22Rs that she had in fact completed. *Id.* at 38–39.  Gittens' testimony also suggests anecdotally that other employees who spoke out at the town hall—including Romain, Gainey, Jackson, Moshiashvili, and Cicero—experienced what they perceived as adverse actions, such as Moshiashvili losing

---

[48] In her opposition materials, as Defendants note, Gittens appears to raise additional claims of retaliation—first, that Pemberton questioned her about the leave she had taken in retaliation for her political campaign, and second, that Jodi Cross was assigned as her supervisor in approximately late January or early February 2019 in retaliation for filing this lawsuit.  Doc. 198 at 12.  Gittens may not raise new claims of retaliation for the first time in her opposition to Defendants' motion for summary judgment. *See Frilando v. New York City Transit Auth.*, 463 F. Supp. 3d 501, 518–19 (S.D.N.Y. 2020) (collecting cases).  Moreover, Defendants were not served with Gittens' lawsuit until April 2019—in fact, a review of the docket shows that Plaintiff's counsel did not request summons to be issued until the 89th day after filing the complaint and did not serve Defendants with the FAC until the deadline for service under Fed. R. Civ. P. 4(m).  Doc. 27.  Gittens' claim that Cross' January 2019 hiring was retaliatory is therefore baseless.

access to the Payroll Management System and Jackson being transferred to Rikers.  As

Defendants point out, Gittens had not been selected for various positions before she

spoke out at the town hall meeting.  Thus, the record supports Defendants' contention

that she was not selected for certain positions because she was not the best qualified ap-

plicant, rather than in retaliation for any protected activity.  "Where timing is the only ba-

sis for a claim of retaliation, and gradual adverse job actions began well before the plain-

tiff had ever engaged in any protected activity, an inference of retaliation does not arise."

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended*

(June 6, 2001); *see also Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13 Civ.

4467 (MKB), 2015 WL 5692860, at *26 (E.D.N.Y. Sept. 28, 2015) (rejecting retaliation

claim on a continuation theory at summary judgment).

Gittens' claims about Pemberton's treatment of her also do not make out a *prima*

*facie* case.  Gittens alleges that Pemberton assigned her clerical tasks and standards in re-

taliation for her October 2017 EEOC charge.  But he assigned her tasks and standards in

January 2017 and in July 2018, approximately 10 months before and after she filed her

complaint.  Doc. 145 ¶¶ 245, 339.  Thus, there is no temporal connection between the

protected activity and the allegedly adverse action.  *Murray v. Visiting Nurse Servs. of*

*N.Y.,* 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("[D]istrict courts within the Second Cir-

cuit have consistently held that the passage of two to three months between the protected

activity and the adverse employment action does not allow for an inference of causation."

(collecting cases)).  Furthermore, Pemberton, Hamilton, and Pinnock all testified that

they were unaware that Gittens had brought the EEOC charge, which Gittens disputes.

Docs. 145 ¶ 245, 189 ¶ 245.  Even if Defendants did know about her EEOC charge, the

record supports that Pemberton's December 2017 and January 2018 inquiries into Git-

tens' completion of the 22Rs was prompted by requests from the DOC Records Analyst

rather than because of the EEOC charge.  Doc. 145 ¶¶ 246–254.

Assuming *arguendo* that Gittens had established a *prima facie* case of retaliation for any of the adverse actions of which she complains, Gittens' claims do not survive summary judgment because Defendants have established legitimate nonretaliatory reasons for their decisions either not to promote or hire Gittens for certain positions and to assign her certain tasks.  Namely, other applicants were more qualified for those positions, and Gittens received tasks and standards based on her prior performance as part of a department-wide initiative to implement more regular evaluations.  The evidence that Gittens proffers is insufficient to establish that retaliation was the but for cause of those actions or even that it had any causal connection.  Similarly, even assuming that Gittens has established a *prima facie* 1st Amendment retaliation claim that her speech at the May 2015 town hall "was a substantial motivating factor in the adverse employment action" of not being hired for the positions for which she soon after applied, *Smith*, 776 F.3d at 118–19 (internal quotation marks and citation omitted), Defendants are entitled to summary judgment under *Mt. Healthy* because they have shown "by a preponderance of the evidence that [they] would have taken the same adverse employment action"—hiring other candidates who they deemed more qualified—"'even in the absence of the protected conduct.'"  *Id.* at 119 (quoting *Morris v. Lindou*, 196 F.3d 102, 110 (2d Cir. 1999)).

Accordingly, summary judgment is granted for Defendants on all of Gittens' retaliation claims.

### E.  Hostile Work Environment under the ADEA, § 1983, NYSHRL, and NYCHRL

To establish a hostile work environment claim under the ADEA and § 1983, a plaintiff must "show that the complained of conduct:  (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]."  *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation

marks and citation omitted); *see also, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (NYSHRL); *South v. Cont'l Cas. Co.*, No. 15 Civ. 1627 (WHP), 2017 WL 782909, at *7–8 (ADEA and NYSHRL).  By contrast, "the NYCHRL imposes liability for harassing conduct that does not qualify as severe or pervasive, and questions of severity and pervasiveness are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Bermudez*, 783 F. Supp. 2d at 579 (internal quotation marks and citation omitted).  Nevertheless, "the NYCHRL is not a general civility code, and when the conduct alleged is far from a borderline violation of the NYSHRL, then the plaintiff has failed to state a claim under the NYCHRL, as well."  *Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015) (internal quotation marks and citations omitted).

Gittens alleges that the following acts created a hostile work environment:  Barreto failed to intervene when Alfred shook her arm at a 2013 meeting and spread rumors about her; Hamilton and Simon made ageist comments; Pemberton was unfriendly, did not say "good morning" to her, and withheld information she needed to complete tasks; Pemberton criticized her work; she was functionally demoted and denied promotions; and she was not provided yearly evaluations.[49]  While Defendants argue that whether viewed discretely or in the aggregate, these actions are insufficiently severe or pervasive, Doc. 144 at 20–21, Gittens' hostile work environment claim may be disposed of simply

---

[49] Gittens' complaint also alleged that several of her co-workers died due to medical conditions exacerbated by the age-based hostile work environment at DOC.  Doc. 59 ¶ 415.  The evidence is insufficient to support this allegation.  Gittens testified that Welch and Perry died in 2017.  Doc. 150-2 at 154–58.  Gittens and Isbel both testified that Welch died after a fall on the way to work.  Gittens did not provide any specific information about Perry's death beyond that "whatever he was going through with his health the stress of the job made it worse," and that his manager, who Gittens did not work with, "was giving him a hard time." Doc. 150-2 at 156.  Furthermore, even assuming Gittens' contention that Simon yelled and threatened to physically attack Roman at the May 2015 town hall to be part of her hostile work environment claim, she has not made the argument that this behavior was connected to age-based animus, and the "Don't worry, mommy," comment is insufficient to establish an age-based hostile work environment claim.

because, with the exception of the ageist comments that Gittens attributes to Hamilton and Simon, most of which are inadmissible hearsay, none of these have any nexus to Gittens' age, her protected characteristic.  "[I]t is 'axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic,' such as race or gender."  *Lloyd v. Holder*, No. 11 Civ. 3154 (AT), 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  Finally, the "old school secretary"[50] and "mommy" comments, while inappropriate, are "at most, petty slights" insufficient to support a hostile work environment claim even under the NYCHRL standard.  *Rozenfeld v. Dep't of Design & Const. of City of New York*, 875 F. Supp. 2d 189, 209 (E.D.N.Y. 2012), *aff'd*, 522 F. App'x 46 (2d Cir. 2013).

Without evidence that Defendants' conduct was because of her age, Gittens has no hostile work environment claim, and Defendants are entitled to summary judgment.

### F.  Aiding and Abetting under the NYSHRL and NYCHRL

Having failed to establish liability for discriminatory or retaliatory conduct, or for a hostile work environment, Gittens also fails to establish that the Individual Defendants are liable as aiders and abettors under the NYSHRL and NYCHRL.  *See Falchenberg v. New York State Dep't. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (summary order) (aiding and abetting claims are only viable where an underlying violation has taken place).

## IV.   CONCLUSION

In sum, Defendants' motion for summary judgment is GRANTED.  The Court respectfully directs the Clerk of Court to terminate the pending motions, Docs. 143 and

---

[50] Since Gittens did not include the "old school secretary" comment in her SAC, it is unclear whether she was aware that Pemberton described her in this way before bringing this lawsuit, and therefore whether it contributed to her subjective experience of a hostile workplace environment.

197.  The Court further respectfully directs the Clerk of Court to enter judgment for

Defendants and to close the case.

SO ORDERED.

Dated:    March 30, 2022
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.